**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **United States of America** | ) | **Civil Action No.: <u>2:19-cv-3081-RMG</u>** |
| *ex rel.* Jeri Harris, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT** |
| **vs.** | ) | **False Claims Act – Medicare Fraud** |
| | ) | **Jury Trial Demanded** |
| **Hill-Rom Holdings, Inc.,** | ) | |
| **Hill-Rom Company, Inc.,** | ) | |
| **Hill-Rom Services, Inc.,** | ) | |
| **Advanced Respiratory, Inc.,** | ) | |
| **Alton Shader,** | ) | |
| **Dan Davidson,** | ) | |
| **Teri McIntosh,** | ) | |
| **Catherine Johnson,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**Filed Under Seal Per 31 U.S.C. § 3730(b)(2)**
**Do Not Place in Pacer**
**Do Not Place in Press Box**

## <u>INTRODUCTION</u>

1.      Relator Jeri Harris ("Harris" or "Plaintiff" or "Relator") brings this action on behalf of the United States of America against the Defendants for treble damages and civil penalties arising from the Defendants' materially false statements and false claims to the United States, knowingly made to obtain money payments or approvals from the federal government programs and agencies, including but not limited to Medicare, Medicaid and Tricare, which would not have been paid had the truth of the false statements and false claims been known, and the conspiracy related thereto, in knowing violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA" or "False Claims Act").

2.      Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has or will

voluntarily provide to the Attorney General of the United States and to the United States

Attorney for the District of South Carolina, along with this Complaint, a written disclosure

statement of the material evidence and information in the Relator's possession related to the

allegations in the Complaint ("Disclosure Statement").  The Disclosure Statement is supported

by first-hand, direct, independent personal knowledge of Relator and material evidence at the

time of filing establishing the existence of the Defendants' materially false and fraudulent

practices, fraudulent claims, false records, false statements, and conspiracy with respect thereto.

Relator is an original source of the information and material evidence provided in the Disclosure

Statement and this Complaint.

3.      Upon information and belief, the officials of the United States charged with the

responsibility to act in the circumstances, to wit, the Attorney General of the United States, the

United States Attorney for the District of South Carolina, and/or the Inspector General of the

United States Department of Health and Human Services, did not know of the facts material to

the rights or causes of action set forth herein, nor reasonably should have known of such material

facts, until the Relator provider her Disclosure Statement to the United States Attorney General

and the United States Attorney for the District of South Carolina.

4.      Upon information and belief, pursuant to 31 U.S.C. § 3731(b)(2) and *Cochise

Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S.Ct. 1507 (2019), because no official of the United

States charged with the responsibility to act in the circumstances related to this action discovered

the material facts underlying the action until 2019, the statute of limitations is extended to cover

all Defendants' fraudulent acts and claims occurring within ten (10) years of the date of the

service of this Complaint upon one or more of the aforesaid federal officials.

**JURISDICTION AND VENUE**

5.     The Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730(b) and 3732(a), and 28 U.S.C. §§ 1331, 1345, and 1355, and supplemental jurisdiction under 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants are principally located, reside, or transact business in this District and, upon information and belief, one or more of the subject fraudulent acts occurred within this District.

6.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

**NATURE OF THE CASE**

7.     The subject unlawful fraudulent conduct primarily arises out of the submission of knowingly and materially false and fraudulent claims to the United States by the Defendants, and specifically to the Medicare, Medicaid and Tricare programs, as well as a number of other federal agencies, for reimbursements or approvals related to Durable Medical Equipment claims.

8.     These other federal agencies or programs include, but are not limited to, the U.S. Department of Veterans Affairs ("VA") which includes its Spina Bifida Health Care Benefits Program, the Federal Employees Health Benefits Program ("FEHB"), the U.S. Department of Labor's ("DOL") Office of Workers Compensation Program ("OWCP"), and the United Mine Workers of America Health and Retirement Fund ("UMWA-HRF").  The U.S. Office of Personnel Management ("OPM") administers the FEHB, and in part, contracts out plan administration to entities such as the Blue Cross Blue Shield Federal Employee Program and the Government Employee Health Association ("GEHA").

9.      References herein to the "United States" or "federal government" include these other federal agencies or programs, as well as Medicare, Medicaid and Tricare.

10.     The nature of the Defendants' knowing and material false and fraudulent claims to the federal government, and the schemes and artifices of Defendants which were used to defraud the federal government, all in knowing and material violation of the FCA, are set forth in more detail below.  As for all of the knowingly false claims presented, or caused or conspired to be presented for payment or approval, to the federal government by the Defendants as set for below, the federal government would not have paid these fraudulent claims had it known the information which caused the claims to be false.

## SUMMARY OF THE FRAUDS AND FRAUDULENT SCHEMES

11.     **First**, the Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government regarding the sale of Hill-Rom beds known as Clinitrons.  In a nationwide scheme to defraud the federal government in knowing violation of the FCA (the "Clinitron Scheme"), the Defendants knowingly sold **used** Clinitron beds to the federal government, its contractors and its health insurance beneficiaries, and fraudulently represented the beds as **new**.  Furthermore, as part of and in furtherance of this scheme, the Defendants knowingly and fraudulently failed to provide the federal government, its contractors and/or its health insurance beneficiaries the usual and customary price for the sale of Clinitron beds, in violation of the substantially-in-excess rules of 42 U.S.C. § 1320a-7(b)(6), and, as a result, such Clinitron Scheme claims were knowingly and materially false and fraudulent violations of the FCA.

12.     **Second**, the Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government for travel expenses

related to repairs to Hill-Rom Durable Medical Equipment ("DME") when such expenses did not

qualify for reimbursement.  In a nationwide scheme to defraud the federal government in

knowing violation of the FCA (the "Travel Expense Scheme"), the Defendants knowingly and

fraudulently routinely presented claims to the federal government and its contractors which

mischaracterized travel time as DME repair time and miscoded non-reimbursable travel time as

HCPCS Code K0739 which is reimbursable under federal programs, and as a result, such Travel

Expense Scheme claims were knowingly and materially false and fraudulent violations of the

FCA.

13.      **Third**, the Defendants knowingly presented, or caused or conspired to be presented, for

payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME

beds and mattresses for which there was no underlying medical necessity, no supporting medical

diagnosis, nor any medical reasonableness. In a nationwide scheme to defraud the federal

government in violation of the FCA (the "Lack of Medical Necessity Scheme"),  the Defendants

knowingly and fraudulently routinely presented materially false claims to the federal government

and its contractors for Hill-Rom DME products which were sold or rented to federal health care

beneficiaries when there was no supporting medical necessity, no supporting medical diagnosis,

nor medical reasonableness, including, but not limited to, Hill-Rom's DME hospital beds, Group

II low air loss mattresses, powered air flotation therapy beds (low air loss), and air fluidized

therapy beds.  As a result, such Lack of Medical Necessity Scheme claims were knowingly and

materially false and fraudulent violations of the FCA.

14.      **Fourth**, the Defendants knowingly presented, or caused or conspired to be presented, for

payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME for

which the Defendants upcoded and miscoded to E1399 which were not medically necessary nor

medically reasonable.  In a nationwide scheme to defraud the federal government in violation of

the FCA (the "E1399 Upcode Scheme"),  the Defendants knowingly and fraudulently routinely

presented, or caused to be presented, materially false claims to the federal government and its

contractors for Hill-Rom DME products.  Furthermore, as part of and in furtherance of this

E1399 Upcode Scheme, the Defendants knowingly and fraudulently failed to provide the federal

government, its contractors and/or its health insurance beneficiaries the usual and customary

price for the sale of its E1399 Upcode Scheme DME, in violation of the substantially-in-excess

rules of 42 U.S.C. § 1320a-7(b)(6).  As a result of the illegal upcodes and SIE violations, such

E1399 Upcode Scheme claims were knowingly and materially false and fraudulent violations of

the FCA.

15.    **Fifth**, the Defendants knowingly presented, or caused or conspired to be presented, for

payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME

which were ordered as a result of Defendants' waived co-payments, deductibles and other

financial responsibilities for federal health care beneficiaries in knowing, intentional and willful

violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).  In a

nationwide scheme to defraud the federal government in violation of the AKS and the FCA (the

"Co-Pay Waiver Scheme"),  the Defendants knowingly and fraudulently routinely presented, or

caused to be presented, materially false claims to the federal government and its contractors for

Hill-Rom DME products which were the result of illegal remuneration paid to federal health care

beneficiaries. As a result of the illegal remuneration paid in violation of the AKS, such Co-Pay

Waiver Scheme claims were knowingly and materially false and fraudulent violations of the

FCA.

16.    **Sixth**, the Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME products by fraudulently submitting claims in violation of Medicare, Medicaid and Tricare enrollment, licensing and claims processing requirements. In a nationwide scheme to defraud the federal government in violation of the FCA (the "Enrollment/Licensing Scheme"), the Defendants knowingly and fraudulently routinely presented claims to the federal government and its contractors for Hill-Rom DME products by intentionally misrepresenting and/or failing to disclose the true and correct enrollment or licensing status of the billing entity or provider, the rendering entity or provider, and/or the service facility entity or provider.  These material, unlawful misrepresentations and omissions to the federal government included the following: (a) Billing from non-enrolled sites; (b) Billing from non-licensed sites; (c) Billing with intentionally wrong or fake National Provider Identification ("NPI") numbers; (d) Billing with an entity to which no NPI had been assigned; (e) Billing and intentionally failing to disclose any NPI number; (f) Billing from closed sites; (g) Billing from co-located sites; and, (h) Billing by a provider that did not provide the DME product.  As a result, the said Enrollment/Licensing Scheme claims were knowingly and materially false and fraudulent violations of the FCA.

17.    **Seventh**, the Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government regarding the sale of Hill-Rom beds known as TotalCare Beds.  In a nationwide scheme to defraud the federal government in knowing violation of the FCA (the "TotalCare Scheme"), the Defendants knowingly sold **used** TotalCare beds to the federal government, its contractors and its health insurance beneficiaries, and fraudulently represented the beds as **new**.  Furthermore, as part of and in furtherance of this scheme, the Defendants knowingly and fraudulently failed to provide

the federal government, its contractors and/or its health insurance beneficiaries the usual and customary price for the sale of Total beds, in violation of the substantially-in-excess rules of 42 U.S.C. § 1320a-7(b)(6), and, as a result, such TotalCare Scheme claims were knowingly and materially false and fraudulent violations of the FCA.

18. **Eighth,** the Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME for which the Defendants upcoded and miscoded to E0303 or E0304 which were not medically necessary nor medically reasonable.  In a nationwide scheme to defraud the federal government in violation of the FCA (the "Bariatric Upcode Scheme"),  the Defendants knowingly and fraudulently routinely presented, or caused to be presented, materially false claims to the federal government and its contractors for Hill-Rom DME products.  As a result of the illegal upcodes and miscodes, such Bariatric Upcode Scheme claims were knowingly and materially false and fraudulent violations of the FCA.

19. **Ninth**, the Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME which were ordered by, arranged for, or recommended by third-party DME vendors as a result of Defendants' illegal remuneration to send DME vendors to induce referrals of federal health care beneficiaries in violation of the federal AKS statute, 42 U.S.C. § 1320a-7b(b).  In a nationwide scheme to defraud the federal government in violation of the AKS and the FCA (the "Vendor AKS Scheme"), the Defendants knowingly and fraudulently routinely presented, or caused or conspired to be presented, materially false claims to the federal government and its contractors for Hill-Rom DME products which were the result of illegal remuneration paid or offered to third-party vendors to induce the ordering of Hill-Rom DME products to be sold to federal health

care beneficiaries. As a result of the illegal remuneration paid in violation of the AKS, such Vendor AKS Scheme claims by Hill-Rom and its vendors were knowingly, willfully and materially false and fraudulent violations of the AKS and the FCA.

20.    **Tenth**, due to prior false billing schemes, Defendant Hill-Rom entered into a 5-year Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS") with an Effective Date of October 1, 2011.  Each of the false and fraudulent claims cited herein which occurred while the CIA was in force were "overpayments" to Hill-Rom subject to the CIA's provisions and created an obligation of Hill-Rom to pay the money back to the United States.  Hill-Rom knew of its obligations to pay the money back to the federal government as a result of these false claims, but knowingly schemed (the "CIA Scheme") to not do so.  Pursuant to its CIA Scheme, Defendant Hill-Rom knowingly made or used, or caused or conspired to be made or used, false records and false statements material to its obligation to pay or transmit money to the United States Government, knowingly concealed or conspired to conceal its obligations to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, or conspired to avoid and decrease, its obligations to pay or transmit money or property to the United States Government, in knowing and material violation of both the CIA and 31 U.S.C. § 3729(a)(1)(G).

## THE PARTIES

### A.  RELATOR

21.    **Relator Harris** is an individual United States citizen and is domiciled in and a resident of the State of South Carolina.  Relator has a college degree in accounting, and has received the following certifications from the American Academy of Professional Coders, of which she is a

former National Board Member and Executive Board Member:  (a) Certified Professional Coder; and, (b) Certified Professional Coder-Hospital.  Relator has also received a Medical Compliance Specialist-Physician certification from the Medical Compliance Training Company.   Relator was employed by Hill-Rom as an insurance specialist.  Her duties at Hill-Rom generally included the following:  Initiate and facilitate the process of obtaining patient-related insurance forms, such as Authorization of Benefits Notifications ("ABNs"), verify patient benefits, evaluate payer coverage and reimbursement, communicate with patient or caregiver when needed, facilitate the post-therapy return of equipment, and perform other duties and projects as assigned.  She was employed at Hill-Rom from about 2009 until about July of 2018, and her other job descriptions at Hill-Rom included contract analyst and process training coordinator.

22.     During her employment with Hill-Rom, Relator made repeated warnings and complaints to the Hill-Rom management about the fraudulent and abusive nature of Hill-Rom's conduct as described herein.  She repeatedly warned Hill-Rom that its fraudulent and abusive conduct violated the Medicare laws, regulations and rules as well as the False Claims Act, and could expose Hill-Rom to administrative, civil and criminal liability. Hill-Rom was on notice of, but continuously ignored, Relator's warnings and complaints, and harassed and discriminated against her due to her warnings, complaints and efforts to stop the frauds and false claims, and, ultimately, Relator was constructively discharged from her employment at Hill-Rom because of the same. Relator was likewise retaliated against, demoted and harassed due to her refusal to ignore, consent to, participate in, approve or commit unlawful or illegal acts as requested by Hill-Rom, and the Relator was discriminated against by Hill-Rom with respect to the terms and conditions of her employment, and was eventually constructively discharged by Hill-Rom from her position of employment due to her refusal to ignore, consent to, participate in, approve or

commit unlawful or illegal acts as requested by Hill-Rom and its management, in violation of the public policy of the State of South Carolina and the United States.

## B.  DEFENDANTS – ENTITIES

23.    **Defendant Hill-Rom Holdings, Inc.** (sometimes referenced as "HRHI") is, upon information and belief, a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, Illinois 60601.  Hill-Rom Holdings, Inc. is a worldwide manufacturer and provider of medical technologies and related services for the health care industry, including the manufacture, sale, and/or rental of standard hospital beds and patient handling equipment ("PHE"), moveable medical equipment ("MME") and DME products and related services to medical providers through nationwide interstate commerce. It regularly transacts business in the State of South Carolina and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System, 150 West Market Street, Suite 800, Indianapolis, Indiana 46204.

24.    **Defendant Hill-Rom Company, Inc.** (sometimes referenced as "HRCI") is, upon information and belief, a wholly-owned subsidiary of Hill-Rom Holdings, Inc. and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 1069 State Route 46 East, Batesville, Indiana 47006.  It conducts nationwide business operations similar to those of HRHI. It regularly transacts business in the State of South Carolina and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System, 2 Office Park Court, Suite 103, Columbia, South Carolina 29223.

complaint 2019-10-30

25.    **Defendant Hill-Rom Services, Inc.** (sometimes referenced as "HRSI") is, upon information and belief, a wholly-owned subsidiary of Hill-Rom Company, Inc. and/or Hill-Rom Holdings, Inc., and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 1069 State Route 46 East, Batesville, Indiana 47006.  It conducts nationwide business operations similar to those of HRHI.  It regularly transacts business in the State of South Carolina and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System, 150 West Market Street, Suite 800, Indianapolis, Indiana 46204.

26.    HRHI, HRCI and HRSI acted individually and in concert to knowingly present, or knowingly cause or conspire to be presented, the materially false and fraudulent claims which are the subject of this Complaint.  HRHI, HRCI and HRSI acted individually and in concert to knowingly make and use, or knowingly cause or conspire to be made and used, false statements and false records material to the false and fraudulent claims which are the subject of this Complaint. HRHI, HRCI and HRSI are sometime collectively referenced as "Hill-Rom" or "H-R."  Upon information and belief, Hill-Rom's home webpage is www.hill-rom.com.

27.    The 2011 CIA that Hill-Rom entered into with the OIG is attached hereto and incorporated herein as **Exhibit 1**.  All exhibits referenced in this Complaint are attached hereto and incorporated herein by reference.

28.    The term of the CIA was five (5) years.  Much of Hill-Rom's fraudulent conduct set forth in this Complaint occurred while the CIA was still in effect.  Under the CIA, pursuant to Section H entitled "Repayment of Overpayments," Hill-Rom was required to repay any overpayment from any federal health care program within thirty (30) days of identification or knowledge of

any such overpayment, or notify the payor if the amount of overpayment was not quantified within the said thirty (30) days, and provide a schedule of when the repayment would be made.

29.     Pursuant to the CIA, Hill-Rom was required to report a "Reportable Event" to the Office of Inspector General within thirty (30) days. Id. at p. 15-16.

30.     A Reportable Event under the CIA included (a) "a substantial overpayment" and (b) "a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized." Id.

31.     **Defendant Advanced Respiratory, Inc.** (sometimes referenced as "ARI") is a corporation formed and existing under the laws of the State of Minnesota, with its principal place of business at 1020 Country Road F West, St. Paul, Minnesota 55126. ARI is a wholly-owned subsidiary of Hill-Rom, Inc. which was acquired in 2003. Upon information and belief, ARI is a manufacturer and provider of DME, medical technologies and related services for the health care industry, including the manufacture, sale, and/or rental of DME products and services related to respiratory health and operates nationwide through interstate commerce. Its products include DME to help mobilize retained secretions which affect lung functions, including the MetaNeb System, Vest Airway Clearance System, VitalCough System, Monarch Airway Clearance System, and VisiVest Airway Clearance System. Upon information and belief, it regularly transacts business in the State of South Carolina and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System Inc., 1010 Dale Street North, St. Paul, Minnesota 55117. Upon information and belief, its webpage is https://respiratorycare.hill-rom.com.

32.    Defendants Hill-Rom and ARI have knowingly presented, or caused or conspired to present, false and fraudulent claims to the federal government's health care insurance programs for payment or approval as more specifically set forth below.   Hill-Rom and ARI have knowingly made and used, or knowingly cause or conspire to be made and used, false statements and false records material to the false and fraudulent claims which are more specifically set forth below.

## C.  DEFENDANTS – INDIVIDUALS

33.    **Defendant Alton Shader** ("Shader") was, at all times relevant, upon information and belief, a Hill-Rom employee, and he has been a Vice President, Senior Vice President and ultimately President of Hill-Rom North America.  Upon information and belief, in or about 2015, Shader also became President of Hill-Rom's subsidiary Welch Allyn and its Front Line Care division.  Upon information and belief, his Hill-Rom responsibilities over the years have included being in charge of the Acute Care and Post-Acute business units which included CPS (rental), Extended Care (rental/capital), and Direct-To-Consumer (Home Care Capital) lines of business, and he was in charge of all departments supporting these business lines, including but not limited to sales, logistics, billing, collecting, various contracts, enrollment, credentialing and accreditation, service, marketing, personnel, operations, etc….   Upon information and belief, all Hill-Rom employees designated "Post-Acute Care" would have reported ultimately to Shader.

34.    Upon information and belief, in about 2015 he also assumed responsibility for Hill-Rom's and ARI's Respiratory Care business units, and he was in charge of all departments supporting these business lines, including but not limited to sales, logistics, billing, collecting, various contracts, enrollment, credentialing and accreditation, service, marketing, personnel,

operations, etc…. Upon information and belief, all Hill-Rom employees designated "Front-Line Care" would have reported ultimately to Shader

35.    Upon information and belief, he was Hill-Rom's Medicare Authorizing Official in charge of the company's Medicare enrollment disclosure, compliance and certification requirements. Upon information and belief, Shader is a resident of the state of Illinois. Upon information and belief, he routinely caused or conspired to be presented numerous false claims to the federal government knowing that they were false and fraudulent. In particular, upon information and belief, as set forth below, he knowingly caused or conspired to present claims to the federal government which misrepresented the status of the Hill-Rom Clinitron beds as new when, in truth and in fact, such Clinitron beds were used. Upon information and belief, with respect to claims for payment or approval to federal health care programs involving subject Clinitron beds, Shader knew of the falsity of Hill-Rom's representations to the federal government that the Clinitron beds were new, when in fact they were used, or he acted with reckless disregard or deliberate ignorance of the truth of said information.

36.    **Defendant Dan Davidson** ("Davidson") was, at all times relevant, upon information and belief, a Hill-Rom employee who was the sales and operations manager of the Direct-To-Consumer ("D-T-C") division, which was Hill-Rom's division to sell company products directly to patient consumers as opposed to institutional-type sales. Upon information and belief, Davidson is a resident of the state of Indiana. Upon information and belief, he routinely caused or conspired to be presented numerous false claims to the federal government knowing that they were false and fraudulent. In particular, upon information and belief, as set forth below, he knowingly caused or conspired to present claims to the federal government which misrepresented the status of the Hill-Rom Clinitron and TotalCare beds as new when, in truth

and in fact, such Clinitron and TotalCare beds were used. Upon information and belief, with respect to claims for payment or approval to federal health care programs involving subject Clinitron and TotalCare beds, Davidson knew of the falsity of Hill-Rom's representations to the federal government that the Clinitron and TotalCare beds were new, when in fact they were used, or he acted with reckless disregard or deliberate ignorance of the truth of said information.

37.    Upon information and belief, he knowingly caused or conspired to present false claims to the federal government pursuant to Hill-Rom's Enrollment/Licensing Scheme. Upon information and belief, with respect to claims for payment or approval to federal health care programs involving subject Enrollment/Licensing Scheme, Davidson knew of the falsity of Hill-Rom's these claims to the federal government, or he acted with reckless disregard or deliberate ignorance of the falsity of these claims.

38.    **<u>Defendant Teri McIntosh</u>** ("McIntosh") was, at all times relevant, upon information and belief, a Hill-Rom employee who was a claims specialist who was responsible for filing insurance claims on behalf of the company. Upon information and belief, McIntosh is a resident of the state of Indiana. Upon information and belief, on behalf of Hill-Rom, she routinely presented, or caused or conspired to be presented, numerous false claims to the federal government knowing that they were false and fraudulent, including those false claims resulting from the Clinitron Scheme and the TotalCare Scheme.

39.    In particular, upon information and belief, as set forth below, she knowingly presented, or caused or conspired to present, claims to the federal government which misrepresented the status of the Hill-Rom Clinitron and TotalCare beds as new when, in truth and in fact, such Clinitron and TotalCare beds were used. Upon information and belief, with respect to claims for payment or approval to federal health care programs involving subject Clinitron TotalCare Scheme and

TotalCare Scheme, McIntosh knew of the falsity of Hill-Rom's representations to the federal government that the Clinitron and TotalCare beds were new, when in fact they were used, or she acted with reckless disregard or deliberate ignorance of the truth of said information.

40.    **Defendant Catherine Johnson** ("Johnson") was, at all times relevant, upon information and belief, a Hill-Rom employee who was supervisor of customer payor services who was responsible, in part, for filing and monitoring insurance claims on behalf of the company.  Upon information and belief, Johnson is a resident of the state of South Carolina.  Upon information and belief, on behalf of Hill-Rom, she routinely presented, or caused or conspired to be presented, numerous false claims to the federal government knowing that they were false and fraudulent.  In particular, upon information and belief, as set forth below, she knowingly presented, or caused or conspired to present, claims to the federal government which misrepresented unreimbursable travel expenses as reimbursable repair expenses.  Upon information and belief, with respect to Hill-Rom's claims for payment or approval to federal health care programs involving travel expenses miscoded as repair expenses, Johnson knew of the falsity of Hill-Rom's representations to the federal government that the subject travel expenses were correctly coded as K0739, when in fact they were miscoded, or she acted with reckless disregard or deliberate ignorance of the truth of said information.

41.    All of the Defendants have knowingly presented, or caused to be presented, materially false and fraudulent claims for payment or approval to federal health care benefit programs, including Medicare, Medicaid and Tricare, in violation of 31 U.S.C. § 3729(a)(1)(A), as set forth herein.  All of the Defendants have knowingly made, used or caused to be made or used, one or more materially false records or false statements material to a false or fraudulent claim to federal health care benefit programs, including Medicare, Medicaid and Tricare, in violation of 31

U.S.C. § 3729(a)(1)(B), as set forth herein.  All of the Defendants have knowingly made, used or caused to be made or used, one or more materially false records or false statements material to an obligation to pay or transmit money or property to the federal Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the federal Government, including the federal health care benefit programs Medicare, Medicaid and Tricare, in violation of 31 U.S.C. § 3729(a)(1)(G), as set forth herein. All of the Defendants have knowingly conspired, combined, and agreed to commit, and have knowingly aided and abetted each other in the commission of, violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) as more fully set forth herein, all in a conspiracy in knowing violation of  31 U.S.C. § 3729(a)(1)(C).

42.    Relator investigated Hill-Rom's and its employees' fraudulent violations of the FCA set forth above and below, and warned the Defendants to stop one or more of the said fraudulent practices in violation of the FCA.  Relator refused to participate in these fraudulent activities.  As a result of Relator's whistleblowing warnings, complaints, investigation, attempts to stop one or more of these FCA violations and fraudulent business practices in violation of the FCA, refusal to participate in continued FCA violations and fraudulent business practices in violation of the FCA, recommendations, and lawful acts in furtherance of an action under the FCA (sometimes collectively referenced as "Protected Activities") regarding the Defendant's fraudulent acts and omissions in violation of the FCA set forth above and below, Relator was retaliated against and discriminated against by the Defendant Hill-Rom, with respect to the terms and conditions of her employment, and was constructively discharged and terminated, demoted, harassed, and subjected to a hostile work environment, all in violation of the False Claims Act.

43.    Relator's unjust, unlawful, wrongful constructive discharge and constructive termination

of her employment with Hill-Rom was the direct and proximate result of Plaintiff's refusal to

commit, participate in, approve, ignore or consent to illegal or unlawful acts at the request of,

promotion or encouragement of Hill-Rom and its employees, agents and servants, and said

unlawful constructive discharge and constructive termination was in violation of the public

policy of the State of South Carolina and the United States.  These illegal and unlawful acts

refused and rejected by the Relator included violations of South Carolina criminal laws,

violations of federal criminal laws, violations of federal civil laws other than the FCA, violations

of the terms and conditions of one or more Veterans Administration ("VA") contracts and related

Federal Acquisition Regulations and rules, and violations of the terms and conditions of the CIA.

## THE FALSE CLAIMS ACT

44.    The False Claims Act ("FCA"), at 31 U.S.C. § 3729, provides, in pertinent part, as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or
(G);…
(G) knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money or property to the
Government, or knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or property to the Government,
is liable to the United States Government for a civil penalty of not less than $
5,500 and not more than $ 11,000, as adjusted by the Federal Civil Penalties
Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410),
plus 3 times the amount of damages which the Government sustains because of
the act of that person.

(b) Definitions. For purposes of this section--
(1) the terms "knowing" and "knowingly"--

(A) mean that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud;
(2) the term "claim"--
(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
(i) is presented to an officer, employee, or agent of the United States; or
(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--
(I) provides or has provided any portion of the money or property requested or demanded; or
(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and
(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;
(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and
(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property….

(h) Relief From Retaliatory Actions.—

(1) In general.—Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief.—Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

45.    The FCA, at 31 U.S.C. § 3731, provides, in pertinent part, as follows:

(b) A civil action under section 3730 may not be brought—
(1) more than 6 years after the date on which the violation of section 3729 is committed, or
(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

46.    The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the false claims and fraudulent acts of that person, plus a civil penalty.  For violations that occurred on or before November 2, 2015, the FCA imposes a civil penalty for each false claim of not less than $5,500 and not more than $11,000.  For false claims occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA").  Upon information and belief, at this time, by operation of the BBA, for all FCA penalties assessed after February 3, 2017, whose associated false claims occurred after November 2, 2015, the penalty for each false claim is not less than $10,957 and not more than $21,916.  28 C.F.R. § 85.3(a)(9) (2008); 81 Fed. Reg. 42491 (Jun. 30, 2016).

## THE AKS STATUTE AND REGULATIONS

47.    The Anti-Kickback Statute ("AKS" or "AKS Statute"), at 42 U.S.C. § 1320a-7b, provides in part:

(a) **Making or causing to be made false statements or representations**
Whoever—
(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f) of this section),
(2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment,

(3) having knowledge of the occurrence of any event affecting
(A) his initial or continued right to any such benefit or payment, or
(B) the initial or continued right to any such benefit or payment of any other individual in
whose behalf he has applied for or is receiving such benefit or payment, conceals or fails
to disclose such event with an intent fraudulently to secure such benefit or payment either
in a greater amount or quantity than is due or when no such benefit or payment is
authorized,
(4) having made application to receive any such benefit or payment for the use and
benefit of another and having received it, knowingly and willfully converts such benefit
or payment or any part thereof to a use other than for the use and benefit of such other
person,
(5) presents or causes to be presented a claim for a physician's service for which payment
may be made under a Federal health care program and knows that the individual who
furnished the service was not licensed as a physician, or
(6) for a fee knowingly and willfully counsels or assists an individual to dispose of assets
(including by any transfer in trust) in order for the individual to become eligible for
medical assistance under a State plan under subchapter XIX of this chapter, if disposing
of the assets results in the imposition of a period of ineligibility for such assistance under
section 1396p (c) of this title, shall

(i) in the case of such a statement, representation, concealment, failure, or
conversion by any person in connection with the furnishing (by that person) of
items or services for which payment is or may be made under the program, be
guilty of a felony and upon conviction thereof fined not more than $25,000 or
imprisoned for not more than five years or both, or

(ii) in the case of such a statement, representation, concealment, failure,
conversion, or provision of counsel or assistance by any other person, be guilty of
a misdemeanor and upon conviction thereof fined not more than $10,000 or
imprisoned for not more than one year, or both. In addition, in any case where an
individual who is otherwise eligible for assistance under a Federal health care
program is convicted of an offense under the preceding provisions of this
subsection, the administrator of such program may at its option (notwithstanding
any other provision of such program) limit, restrict, or suspend the eligibility of
that individual for such period (not exceeding one year) as it deems appropriate;
but the imposition of a limitation, restriction, or suspension with respect to the
eligibility of any individual under this sentence shall not affect the eligibility of
any other person for assistance under the plan, regardless of the relationship
between that individual and such other person. …

(b) Illegal Remunerations
(1)Whoever knowingly and willfully solicits or receives any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or
covertly, in cash or in kind—

(A)in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2)Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(3) Paragraphs (1) and (2) shall not apply to--

(A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program …

(e) Violation of assignment terms

Whoever accepts assignments described in section 1395u(b)(3)(B)(ii) of this title or agrees to be a participating physician or supplier under section 1395u(h)(1) of this title and knowingly, willfully, and repeatedly violates the term of such assignments or agreement, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $2,000 or imprisoned for not more than six months, or both.

(f) "Federal health care program" defined

For purposes of this section, the term "Federal health care program" means--

(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5); or

(2) any State health care program, as defined in section 1320a-7(h) of this title.

(g) In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.

(h) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

48.    The Exclusions Statute, at 42 U.S.C. § 1320a-7(b)(6) (the "Substantially-in-Excess Rules" or "SIE Rules"), provides for permissive exclusion from participating in federal health care programs for excessive charges and unnecessary medical services.

49.    The Exclusions Statute, at 42 U.S.C. § 1320a-7(b)(7), provides for permissive exclusion from participating in federal health care programs for fraud, kickbacks and other prohibited activities.

50.    Since March 23, 2010, the Social Security Act, at 42 U.S.C. § 1320a-7k(d), has required health care providers who receive or retain federal health care program overpayments to report and return the overpayments within 60 days of identification of said overpayments.  A health care provider who receives or retains federal health care program funds in violation of Stark or AKS must return such funds as overpayments.  A failure to timely return such overpayments is subject to a reverse false claim under the FCA.  The statute provides, in pertinent part, as follows:

(d) Reporting and Returning of Overpayments.—

(1) In general.—If a person has received an overpayment, the person shall—
(A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and
(B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

(2) Deadline for reporting and returning overpayments.—An overpayment must be reported and returned under paragraph (1) by the later of—

(A) the date which is 60 days after the date on which the overpayment was identified; or
(B) the date any corresponding cost report is due, if applicable.

(3) Enforcement.—Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31, United States Code) for purposes of section 3729 of such title.

(4) Definitions.—In this subsection:
(A) Knowing and knowingly.—The terms "knowing" and "knowingly" have the meaning given those terms in section 3729(b) of title 31, United States Code.
(B) Overpayment.—The term "overpayment" means any funds that a person receives or retains under title XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such title.

51.     Medicare, Medicaid and Tricare are each considered a "health care benefit program" as

defined by 18 U.S.C. § 24 and/or a "health care program" as defined by 42 U.S.C. § 1320a-7b(f).

52.     Claims made to Medicare, Medicaid and Tricare in violation of the AKS Statute are

deemed prohibited false and fraudulent claims for payment and are subject to the federal FCA.

42 U.S.C. § 1320a-7b(g).

53.     The False Statements Relating to Health Care criminal statute, at 18 U.S.C. § 1035,

provides as follows:

(a) Whoever, in any matter involving a health care benefit program, knowingly and willfully—

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or
(2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.
(b) As used in this section, the term "health care benefit program" has the meaning given such term in section 24 (b) of this title.

54.     The criminal false claims statute, at 18 U.S.C. § 287, provides as follows:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

55.    The criminal conspiracy to commit false claims statute, 18 U.S.C. § 286, provides as

follows:

> Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

56.    The criminal False Statements statute, 18 U.S.C. § 1001, provides in part as follows:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
> shall be fined under this title, imprisoned not more than 5 years….

57.    The Health Care Fraud statute, 18 U.S.C. § 1347, provides, in pertinent part, as follows:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

58.    The Health Care Fraud criminal conspiracy statute, at 18 U.S.C. § 1349, provides, in

pertinent part, as follows:  "Any person who attempts or conspires to commit any offense under

this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

### FACTUAL BACKGROUND
### Federally Funded Health Insurance Programs

59.    Various provisions of the United States Code authorize payment of federally funded benefits by federal and state health care benefit programs, which include programs known as Medicare, Medicaid and Tricare.   Funds to support these federal health benefit programs are appropriated from the United States Treasury as required pursuant to 42 U.S.C. § 1395w and other provisions of the United States Code.

### Medicare:

60.    The United States, through the Department of Health and Human Services ("HHS"), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*. ("Medicare").

61.    HHS has delegated the administration of the Medicare (and Medicaid) Program to its component agency, the Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Finance Administration ("HCFA"),  and CMS has the authority to promulgate regulations. 42 U.S.C. § 1395h(a)(l); 42 C.F.R. §§ 400.200, 489.1(c).  Upon information and belief, prior to 2013, HHS, through CMS, administered Part A of the Medicare Program through private contractors known as a "fiscal intermediaries" as authorized by 42 U.S.C. § 1395h.  Upon information and belief, prior to 2013, HHS administered Part B of the Medicare Program through a private contractors known as a "carriers" as authorized by 42 U.S.C. § 1395u.  Upon information and belief, by the end of 2013, Part A fiscal intermediaries and Part B carriers were replaced by entities called Medicare Administrative Contractors ("MACs").  Under this administration, the fiscal intermediary, carrier, and/or the MAC, as the case may be, reviews and

approves claims submitted for medical reimbursement by Medicare providers, and makes

payment using monies allocated by the United States government on those claims which appear

to be eligible for reimbursement under the programs. 42 U.S.C. § 1395u (Medicare).

62.     Medicare reimbursement of hospital costs or charges is governed by Part A of Medicare,

42 U.S.C. §§ l395c through 1395i-5, and reimbursement of physicians' charges as well as

medical goods and supplies is subject to Part B, 42 U.S.C. §§ 1395j through l395w-4. Post-

institutional home health services are subject to Part A, 42 U.S.C. § 1395d(a)(3). Some Durable

Medical Equipment ("DME") costs may be reimbursed under part A pursuant to 42 U.S.C. §

1395f(k). As part of Part B benefits, Medicare pays certain costs associated with home health

care pursuant to 42 U.S.C. § 1395k(a)(2)(A).  These costs include DME provided by qualified

suppliers.  42 U.S.C. §§ 1395(a)(1)(I), (Q), (V); 1395m(a)(7), (8), (21)(B); 1395m(j); 1395w-

3(a)(2)(A); 1395x(m), 1395x(n), 1395x(0), 1395x(s)(6), 1395x(u), 1395x(ee), and 1395x(tt).

63.     CMS makes periodic payments to providers (including suppliers of medical goods) and

physicians who submit claims under Medicare reimbursement provisions. 42 U.S.C. § 13951(a);

42 C.F.R. Parts 414, 415, 424 and 489.  Payment may be made to a provider or supplier only

when supported by necessary and accurate information. 42 U.S.C. § 1395l(e).

64.     Under Part A, providers and suppliers are entitled to reimbursement based on several

methods, depending on the relation of the provider or supplier to Medicare as a participating or

nonparticipating provider. 42 C.F.R. §§ 409.3, 424.3, 424.51; 42 C.F.R. § 413, Subpart J. Under

42 U.S.C. § 1395d, benefits are available for inpatient hospital services, post-hospital extended

care services, including home health care, and hospice care. A physician must certify that such

treatment is necessary. 42 U.S.C. § 1395f(a)(2). The method of payment of benefits is authorized

by 42 U.S.C. § 1395f(b) and 42 U.S.C. § 1395g. In some instances, payment is based on a per

diem amount. 42 U.S.C. § 1395yy.  Suppliers are covered as allowed by regulation.  42 C.F.R. §§ 409.14, 410.12, 424.55.  DME is also covered under Part A in some instances.  42 C.F.R. § 409.45(e).

65.     Specific types of medical services, goods, and supplies are covered under Medicare Part B. The scope of benefits is generally controlled by 42 U.S.C. § 1395k and 42 C.F.R. § 410.10. Benefits include physicians' services as well as incidental services and supplies commonly provided in the performance of physicians' services and also certain diagnostic services, 42 U.S.C. §§ 1395k(a), 1395x(q), 1395x(s)(I), 1395w-4(t)(4)(A) (physicians' reimbursable services), and 1395xx(a)(1). See also, 42 C.F.R. Parts 410, 411, 414, 415, and 422.

66.     By statute, Medicare regulations controlling payments under Part B establish the reimbursement of provider supplies, goods, and services. 42 U.S.C. § 1395m; 42 C.F.R. Part 414, Subparts D and I; 42 C.F.R. Part 405, Subpart E. Under Medicare Part B, certain providers and suppliers may become participating providers and suppliers and accept assignments of coverage from qualified patients to obtain reimbursements under Medicare. 42 U.S.C. §§ 1395u(h)(1) and (i); 42 C.F.R. §§ 414.20 and 489.13(a). Participating providers and suppliers are required to follow billing, accounting, and documentation requirements imposed by regulations, carriers and MACs. 42 U.S.C. § 1320c-5(a); 42 U.S.C. § 1320a-7(b)(11); 42 US.C. § 1395u(i); 42 C.F.R. §§ 421.400, 424.5, 489.20(f).

67.     Medicare Part B claims must be coded as required by regulation. 42 U.S.C. § 1395yy(a)(10); 42 C.F.R. §§ 414.2, 414.20, 424.32. Physician certification is required before payment may be made for Part B benefits. 42 U.S.C. § 1395n(a); 42 C.F.R. §§ 424.13, 424.20, 489.21. Providers or suppliers may be reimbursed for the reasonable costs of these services and items as provided by regulation. 42 U.S.C. §§ 1395x(v)(1)(E), 1395tt(a), and 1395yy; 42 C.F.R.

§§ 413.1, 413.13. All requests for payment for these services or medical goods must include a Medicare provider number. 42 US.C. §§ 1395u(t), and 1395cc. Any amounts in benefits incorrectly overpaid must be accounted for by the provider or supplier. 42 U.S.C. §§ 1395cc(a)(1)(C), (a)(l)(H)(ii).

68.    Home Health Services are defined by 42 U.S.C. § 1395x(m) to include DME as required by a plan of care established by a physician. 42 U.S.C. § 1395m(j)(5); 42 C.F.R. §§ 409.43, 410.3(a)(3), and 484.18. Home Health Agencies may make arrangements with suppliers to provide DME to their patients.   42 U.S.C. § 1395u(p)(4); 42 C.F.R. §§ 410.150(b)(5), (6), (19) and 410.152(d),(g).

69.    Payments are made to Home Health Agencies pursuant to 42 U.S.C. § 1395f(k) and for DME as provided in 42 US.C. § 1395m(a)(1). Conditions are placed upon the participation of Home Health Agencies under 42 U.S.C. § 1395bbb. Moreover, payment of claims is subject to 42 U.S.C. § 1395n, which requires, among other things, not only that a physician certify and subsequently recertify medical need when services or items are furnished over an extended period of time, but that such certifications and recertifications be documented and their continued medical necessity monitored in conformity with an established plan of care. 42 U.S.C. § 1395n(a)(2)(A); 42 C.F.R. §§ 409.41(b), 409.43(c)(3), 409.44(a), 410.12(a)(3), 411.1(a), 424.11(b), 424.22, 424.24, and 484.55. Recertifications must be conducted at least once every two months by a physician to establish continuing medical necessity. 42 C.F.R. § 484.55(d)(1). Home Health Agencies are required to maintain clinical records on their patients. 42 U.S.C. § 1395x(o)(3). See also, 42 U.S.C. §§ 1395x(s), 1395x(u), 1395x(ee)(2)(D), and 1395x(tt); 42 C.F.R. § 409.44, 424.11, 484.18, 484.48, and 489.21(a)(1).

70.     No payment may be made for undocumented or unnecessary medical services. 42 U.S.C.
§ 1395y(a); 42 C.F.R. §§ 405.207(a), 424.24(b), 489.21(b)(I), 1001.701, and 1001.901.

71.     Medicare benefits under Part B include DME necessary for the treatment of any covered
condition. 42 U.S.C. §§ 1395m(a)(13), 1395x(n), 1395x(s)(6); 42 C.F.R. §§ 405.500, 410.3(3),
410.10(h). DME is provided by a supplier qualified to participate in Medicare. 42 U.S.C. §
1395x(d). Regulations define suppliers as any entity that sells or rents DME to Part A or Part B
covered beneficiaries. 42 C.F.R. § 424.57(a). Benefits for DME are payable under Part B as
provided in 42 U.S.C. § 1395l(a)(1)(I) and (V) as well as 42 U.S.C. § 1395m(a). See also 42 C.F.R.
§ 414, Subpart D.

72.     In order for any DME to be covered, a physician or other authorized person must specify the
type of equipment and write a prescription for the item. 42 U.S.C. §§ 1395m(a)(1)(E)(ii),
1395m(a)(11)(B); 42 C.F.R. § 410.12(a)(3).  Part B pays for the rental or purchase of DME for the
treatment of decubitus ulcers "if the equipment is ordered in writing by the beneficiary's attending
physician, or by a specialty physician on referral from the beneficiary's attending physician, and
the written order is furnished to the supplier before the delivery of the equipment," 42 C.F.R. §
410.38(d)(1), and the prescribing physician monitors use of the equipment, 42 C.F.R. §
410.38(d)(2). No payment will be made for such DME unless medical necessity is properly
documented. 42 U.S.C. § 1395m(a)(1)(E)(v); 42 C.F.R. § 405.501(d), 410.12(b). Cf. 42 U.S.C. §
1395m(a)(21)(B) (nonparticipating suppliers of hospital beds and air mattresses).

73.     In conformity with these provisions, certificates of medical necessity are required for DME
and must contain the identification of the supplier and the beneficiary, a description of the DME,
the proper product code, and any necessary administrative information aside from information
relating to the beneficiary's medical condition. 42 U.S.C. § 1395m(j)(2)(A)(i). The statute further

defines a certificate of medical necessity as "a form or other document containing information required by the carrier to be submitted to show that an item is reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395m(j)(2)(B).

74.     Pursuant to 42 U.S.C. § 1395m(a)(12) and § 1395u(a), for the administration of Medicare DME benefits, CMS divides the country into regions denominated A, B, C, and D. For example, the state of South Carolina is in Region C. 42 C.F.R. § 421.210(c). Regional carriers or MACs are designated for handling DME claims. 42 C.F.R. §§ 421.210(a), 421.400. All suppliers of DME must obtain and periodically renew a supplier number pursuant to 42 U.S.C. § 1395m(j)(1)(A), and such suppliers may only obtain a number if those suppliers have met the standards imposed by statutes and regulations pursuant to 42 U.S.C. § 1395m(j)(1)(B)(ii)(I) – (IV). See also, 42 C.F.R. §§ 424.57(b), 424.57(c)(I), (d), (e).

75.     Some medical devices and DME are subject to competitive acquisition regulations under 42 U.S.C. § 1395w-3(a)(2)(A). See also, 42 C.F.R. § 405.502(a)(6). Payments based on reasonable charges for certain DME are subject to 42 C.F.R. § 405.511 and coding systems must be used for these claims under 42 C.F.R. § 405.512(a).

76.     Under 42 C.F.R. § 414.210, "Medicare pays for durable medical equipment… including a separate payment for maintenance and servicing," 42 C.F.R. § 414.210(a), including DME "(capped rental items), as specified in § 414.229," § 414.210(b)(iv). Payment for maintenance and servicing of a rental item is thus subject to 42 C.F.R. §§ 414.210(e)(2) and 414.229. Equipment may be replaced in some instances subject to provisions on continuous use but the reasonable useful lifetime of DME cannot exceed 5 years from the date DME is delivered to the beneficiary. 42 C.F.R. § 414.210(t)(1).

77.     In the case of DME subject to capped rental under 42 C.F.R. § 414.229, the monthly fee schedule cannot exceed 10% of the purchase price for the first three months and 7.5% of the purchase price for the remaining months but in the tenth month of continuous use suppliers must offer beneficiaries a purchase option. 42 C.F.R. § 414.229(b)(2), (d)(2). If purchase is not elected by the beneficiary, "payment continues on a rental basis not to exceed a period of continuous use of longer than 15 months." 42 C.F.R. § 414.229(d)(2)(i). After this 15 month period, rental is capped and the supplier must supply DME "without charge, other than a charge for maintenance and service fees, until medical necessity ends or Medicare coverage ceases." Id. Continuous use is defined in 42 C.F.R. § 414.230(b) as a period beginning with the first month of need and lasting until "a beneficiary's medical need for a particular item … ends." Id. Moreover, the criteria for a new rental period when use of DME is interrupted for a period of more than 60 consecutive days can begin only with a new prescription for DME and new documentation of medical necessity. 42 C.F.R. § 414.230(d).

78.     Consequently, payments for DME are made on a monthly basis for the rental of such items during the period of medical need but may not exceed a continuous period of use longer than 15 months subject to certain conditions as to offering DME to the beneficiary for purchase. 42 U.S.C. § 1395m(a)(7)(A); 42 C.F.R. § 424.57(c)(5). Moreover, a supplier may bill for service and maintenance after the 15 month cap every six months but no rental may be paid after imposition of the cap when DME is used for a continuous time. 42 U.S.C. §§ 1395m(a)(7)(A)(iv), (v), (vi); 1395m(a)(11)(A).

79.     The administration of Medicare relies on the physician's judgment in the first instance as to what services, prescriptions, supplies, or equipment, and thus what charges, will be medically necessary. 42 U.S.C. § 1395f(a); 42 U.S.C. § 1395n(a)(2)(B); 42 C.F.R. §§ 410.12(a)(3), 424.10,

424.24. Payments from Medicare are made based on accurate information required to determine the amount due for medical care ordered by physicians. 42 U.S.C. § 13951(e); 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1395u(p)(1). See generally, 42 C.F.R. Part 410, Subpart B; 42 C.F.R. Part 424, Subpart B; 42 C.F.R. §§ 405.803, 424.5(a)(6). No payment may be made when medical goods or services are not shown to be medically necessary.  42 U.S.C. § 1395y(a)(I)(A), (B).

80.     Various claims forms and other regulatory requirements to obtain reimbursement require that the provider or supplier certify that the required medical care or supplies were actually provided at the level reported and were medically necessary and that the charges for the care do not exceed the charges paid by the general public for similar care. 42 U.S.C. § 1395n; 42 U.S.C. § 1320a-7(b)(6); 42 U.S.C. § 1320c-5(a); 42 C.F.R. §§ 411.400, 411.406; 42 C.F.R. Part 424, Subpart B; 42 C.F.R. Part 410, Subpart B. Certification is also required that the information submitted is correct and supported by documentation and treatment records.  Id.; 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.  Certifying medical necessity of goods knowing that those goods were not delivered or provided or were delivered or provided solely for profit constitutes submission of a false or fraudulent claim. Intentionally billing Medicare for excessive charges is a felony under 42 U.S.C. § 1320a-7b(d).

81.     The Medicare statute requires the creation of regulations controlling the factors used to determine the level of payments for various services, goods, and supplies provided to Medicare beneficiaries. 42 U.S.C. §§ 1395m, 1395x(v), 1395u(b)(8); 42 C.F.R. §§ 405.503, 405.511; 42 C.F.R. Part 414.

82.     Under the statutorily mandated regulatory system establishing five-digit billing codes for use in making Medicare claims for reimbursement, various codes and modifiers are used to designate the level of service provided. 42 U.S.C. § 1395u(p)(l); 42 U.S.C. § 1395w-4(c)(5); 42

U.S.C. § 1395w-3a. Using what is known as the Health Care Common Procedure Coding System ("HCPCS"), providers and suppliers bill services and goods according to designated code numbers corresponding to the level of medical service or equipment provided. 42 C.F.R. §§ 405.512, 414.40, 424.32(a)(2).

83.    The HCPCS is divided into two principal subsystems, referred to as Level I and Level II of the HCPCS. Level I of the HCPCS is comprised of CPT ("Current Procedural Terminology"), a numeric coding system maintained by the American Medical Association ("AMA") for use by health care professionals for their services.

84.    Level II of the HCPCS is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT codes, such as ambulance services and durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS") when used outside a physician's office. Because Medicare and other insurers cover a variety of services, supplies, and equipment that are not identified by CPT codes, the level II HCPCS codes were established for submitting claims for these items.  Level II codes are also referred to as alpha-numeric codes because they consist of a single alphabetical letter followed by 4 numeric digits, while CPT codes are identified using 5 numeric digits.

https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/index.html.

85.    The practices known as "upcoding" and "miscoding" in the completion of Medicare claim forms involves misclassifying or mischaracterizing diagnoses, treatments, items or goods to increase the level of reimbursement. Engaging in a persistent practice or pattern of "upcoding" or "miscoding" is fraudulent. Improperly "upcoded" or "miscoded" medical services or goods are not medically necessary nor reasonable charges.

86.    The practice known as "overutilization" occurs when services that are not medically

necessary are billed to Medicare.

87.     Under Medicare Part B, providers of medical services and goods to Medicare recipients submit claims for reimbursement to a Medicare carrier, fiscal intermediary or MAC on a form numbered "CMS 1500*."* 42 U.S.C. § 1395m(a); 42 U.S.C. § 1395w-4(g)(4)(A); 42 C.F.R. Part 424, Subpart C; 42 C.F.R. §§ 424.5(a)(5), 424.32. This form requires the provider or supplier to provide a program identification number, an NPI, patient information, and the five-digit code identifying the services or items for which reimbursement is sought.  A CMS 1500 claim lists those services or items provided to a single patient and may include a number of codes for treatment or items but constitutes a single claim for reimbursement.

88.     A "clean claim" is one that has no defect or impropriety (including the lack of required substantiating documentation) or other circumstance indicating a need for special claim evaluation so that timely reimbursement of the provider or supplier is possible. 42 U.S.C. § 1395u(c)(2)(B)(i). A clean claim is to be paid promptly. 42 U.S.C. § 1395u(c)(2)(A); 42 U.S.C. § 1395h(c); 42 C.F.R. § 402.3.

89.     The completion of claim forms using incorrect or improper or unsupported coding for charges causes the United States to pay claims for services or goods that were not provided or were not medically necessary or reasonable. By certifying such a claim form, the provider or supplier is falsifying a document to obtain payment from the United States. When compliance with Medicare, Medicaid or Tricare statutes and regulations is a condition of payment, falsely certifying such compliance constitutes falsification of a claim.

90.     Under 42 U.S.C. § 1320a-7b(a)(3), providers, suppliers, and physicians taking Medicare assignments as well as beneficiaries themselves have a statutorily created duty to disclose overpayments and billing errors to the Medicare carrier. See also, 42 C.F.R. §§ 401.601(d)(iii),

411.353(d); 42 C.F.R. Part 405, Subpart C.  A provider, supplier, or physician may not collect any amount not authorized by statute or regulation and such amounts must be refunded as appropriate. 42 U.S.C. § 1320a-7k(d); 42 C.F.R. §§ 489.40, 489.41.  Under 42 U.S.C. § 1320a-7b(a)(3), intentional concealment of or intentional failure to disclose such overpayments or billing errors is a felony.

91.    When CMS pays a claim for medical care or goods not provided or medically unnecessary, or when CMS has overpaid claims for any variety of reasons, including duplicate processing of charges, uncovered services, services for which the charge is excessive or unreasonable, or as a result of retaining duplicate payments, a refund is due to and a debt is created in favor of CMS. 42 U.S.C. § 1395u(l)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg; 42 C.F.R. Part 405, Subpart C. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).  In addition, contractual obligation with CMS MACs, carriers or fiscal intermediaries require providers or suppliers to refund overpayments to such MACs, carriers or fiscal intermediaries.  42 U.S.C.  § 1395u; 42 C.F.R. § 489.20(g).

92.    Under Hill-Rom's and ARI's  agreements as suppliers of DME under the Medicare and Medicaid provisions of the Social Security Act, these Defendants are required to maintain records to support the DME provided and for the determination of reasonable costs under 42 U.S.C. § 1395x(v).  See also, 42 U.S.C. § 1395tt.

93.    DME suppliers are subject to a manual from Medicare for coding called the DMERC manual. When the proper code is put on a bill with a modifier indicating that the patient meets medical necessity, the bill may be transmitted electronically. Each DMERC manual is designated by region. Region C includes South Carolina and other Southern states. As is the case in all Medicare regions, Medicare's Region D DMERC Supplier Manual, Chapter 3, page 5, revised

January, 2003, states that for any supplied item of DME to be covered by Medicare, the patient's medical record must contain sufficient documentation of the patient's condition to demonstrate medical necessity for the type of item supplied and for the frequency or duration of use. This information must include the patient's diagnosis, duration of the patient's condition, the clinical course, prognosis, as well as other information. A copy of any CMN should be kept in the patient's record. A Durable Medical Equipment Regional Carrier ("DMERC") or DME MAC may deny any claim for which a supplier has insufficient proof of medical necessity. A simple form is by itself insufficient and additional records must substantiate any information on a CMN or other document showing medical necessity.

94.    Upon information and belief, properly supported claims by DME suppliers for providing bed support surfaces are indicated by a code modifier, "KX," which requires a supplier to have a monthly clinical records documenting continued medical necessity. This modifier was previously denoted as "ZX" and appears on some documentation. Both modifiers are used to show that medical necessity exists at the time that a bill is sent to Medicare. The "KX" modifier indicates that the patient is being monitored, that medical necessity has been documented and that this documentation exists in the patient's home health care agency or the DME supplier's records.  Upon information and belief, Defendants rarely used the KX (or ZX) modifier in claims presented to the federal government as referenced herein.

95.    Upon information and belief, Defendant entities submit claims to Medicare in paper form and/or electronically as permitted by 42 C.F.R. § 424.32(d). Defendants' invoices state the name of the product or service provided and the amount due. Billing transactions reflected in Defendant entities' records would establish how bills were created and sent. Upon information and belief, the federal health care programs pay rental payments and purchase payments for DME directly to the

Defendant entities and the patient receives a copy of a form called an Explanation of Benefits ("EOBs").

96.     Upon information and belief, CMNs are required before DME suppliers may provide medical equipment for planned home therapy for Group 1 and Group 2 bed support surfaces. Standardized intracompany CMN forms are used by DME suppliers for this purpose.  Upon information and belief, Defendant Hill-Rom used and uses a standard form titled "Statement of Ordering Physician, Group II, Support Services" (SOP) to support claims for rental or sale of Group 2 bed support surfaces for federal health care beneficiaries. In order to bill Medicare for a Group 2 bed, a SOP showing medical necessity would have to exist and it would have to reflect that a patient qualified on the basis of appropriate stage pressure sores.

97.     After a bed support surface has been placed with a patient, it can be rented for up to nine months at which time a letter is sent to the patient offering to allow the patient to purchase or continue renting the bed support surface. If the patient exercises the purchase option, the DME supplier then receives 13 months of payment and title is transferred to the patient. If the patient checks the continued rental option or fails to respond in 30 days, rental may continue for up to a total not to exceed 15 months, assuming the patient continues to qualify on the basis of medical necessity. Thereafter, if a patient meets medical necessity, the DME supplier may bill Medicare for maintenance and service every six (6) months.

98.     The Medicare Program is also governed in part by 42 C.F.R. § 424.57(c) which sets for the standards for Medicare (and Medicaid) DME suppliers.  CMS and its MACs have summarized these Section 424.57(c) standards which are required to be met by the DME supplier in order to bill federal health care programs.

99.     For example, see Palmetto GBA's summary of Medicare DMEPOS supplier standards at

https://www.palmettogba.com/Palmetto/Providers.Nsf/files/abbreviatedstandards020816.pdf/$File

/abbreviatedstandards020816.pdf.

100.    Section 424.57(c) standards include, but are not necessarily limited to, the following:

(1). A supplier must be in compliance with all applicable Federal and State licensure and regulatory requirements.

(2). A supplier must provide complete and accurate information on the DMEPOS supplier application.  Any changes to this information must be reported to the National Supplier Clearinghouse within 30 days.

(3). A supplier must have an authorized individual (whose signature is binding) sign the enrollment application for billing privileges.

(4). A supplier must fill orders from its own inventory, or contract with other companies for the purchase of items necessary to fill orders.  A supplier may not contract with any entity that is currently excluded from the Medicare program, any State health care programs, or any other Federal procurement or non-procurement programs.

(5). A supplier must advise beneficiaries that they may rent or purchase inexpensive or routinely purchased durable medical equipment, and of the purchase option for capped rental equipment.

(6). A supplier must notify beneficiaries of warranty coverage and honor all warranties under applicable State law, and repair or replace free of charge Medicare covered items that are under warranty.

(7). A supplier must maintain a physical facility on an appropriate site and must maintain a visible sign with posted hours of operation. The location must be accessible to the public and staffed during posted hours of business. The location must be at least 200 square feet and contain space for storing records.

(8). A supplier must permit CMS or its agents to conduct on-site inspections to ascertain the supplier's compliance with these standards.

(9). A supplier must maintain a primary business telephone listed under the name of the business in a local directory or a toll free number available through directory assistance. The exclusive use of a beeper, answering machine, answering service or cell phone during posted business hours is prohibited.

(10). A supplier must have comprehensive liability insurance in the amount of at least $300,000 that covers both the supplier's place of business and all customers and employees of the supplier.  If the supplier manufactures its own items, this insurance must also cover product liability and completed operations.

(11). A supplier is prohibited from direct solicitation to Medicare beneficiaries. For complete details on this prohibition see 42 CFR § 424.57 (c) (11).

(12). A supplier is responsible for delivery of and must instruct beneficiaries on the use of Medicare covered items, and maintain proof of delivery and beneficiary instruction.

(13). A supplier must answer questions and respond to complaints of beneficiaries, and maintain documentation of such contacts.

(14). A supplier must maintain and replace at no charge or repair cost either directly, or through a service contract with another company, any Medicare-covered items it has rented to beneficiaries.

(15). A supplier must accept returns of substandard (less than full quality for the particular item) or unsuitable items (inappropriate for the beneficiary at the time it was fitted and rented or sold) from beneficiaries.

(16). A supplier must disclose these standards to each beneficiary it supplies a Medicare-covered item.

(17). A supplier must disclose any person having ownership, financial, or control interest in the supplier.

(18). A supplier must not convey or reassign a supplier number; i.e., the supplier may not sell or allow another entity to use its Medicare billing number.

(19). A supplier must have a complaint resolution protocol established to address beneficiary complaints that relate to these standards. A record of these complaints must be maintained at the physical facility.

(20). Complaint records must include: the name, address, telephone number and health insurance claim number of the beneficiary, a summary of the complaint, and any actions taken to resolve it. 21. A supplier must agree to furnish CMS any information required by the Medicare statute and regulations.

(22). All suppliers must be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number. The accreditation must indicate the specific products and services, for which the supplier is accredited in order for the supplier to receive payment for those specific products and services (except for certain exempt pharmaceuticals).

(23). All suppliers must notify their accreditation organization when a new DMEPOS location is opened.

(24). All supplier locations, whether owned or subcontracted, must meet the DMEPOS quality standards and be separately accredited in order to bill Medicare.

(25). All suppliers must disclose upon enrollment all products and services, including the addition of new product lines for which they are seeking accreditation.

(26). A supplier must meet the surety bond requirements specified in 42 CFR § 424.57 (d).

(27). A supplier must obtain oxygen from a state-licensed oxygen supplier.

(28). A supplier must maintain ordering and referring documentation consistent with provisions found in 42 CFR § 424.516(f).

(29). A supplier is prohibited from sharing a practice location with other Medicare providers and suppliers.

(30). A supplier must remain open to the public for a minimum of 30 hours per week except physicians (as defined in section 1848(j) (3) of the Act) or physical and occupational therapists or a DMEPOS supplier working with custom made orthotics and prosthetics.

101.    Medicare is subject to anti-fraud and anti-kickback statutes and regulations.  42 U.S.C. §§ 1320a-7b(a)(6), (d)(1), and (f)(2).  A provider, supplier, or a physician engaging in prohibited activities that result in submission of claims for excessive charges or for unnecessary medical services may be excluded from participation in federally funded health care benefit programs, including Medicare, per 42 U.S.C. §1320a-7(b)(6)(A), which authorizes permissible exclusion from

the federal health care programs for anyone who submits claims "substantially in excess of such individual's or entity's usual charges (or, in applicable cases, substantially in excess of such individual's or entity's costs) for such items or services" . . . or "substantially in excess of the needs of such patients[.]"

102.    Regulation 42 C.F.R. § 1001.701(a)(1) provides, in part, that the "OIG may exclude an individual or entity that has submitted, or caused to be submitted, bills or requests for payments under Medicare or any of the State health care programs containing charges or costs for items or services furnished that are ***substantially in excess of such individual's or entity's usual charges or costs*** for such items or services[.]" (emphasis added).

103.    Fraudulent or improper practices justifying recoupment or other sanctions include noncompliance with contractual terms, excessive billing or overcharges, billing for undocumented services, knowingly providing incomplete or inaccurate information, persistent maintenance of poor records, upcoding, miscoding, billing for non-performed services, and falsifying certifications.

104.    Medicare defines fraud as "making false statements or representations of material facts in order to obtain some benefit or payment for which no entitlement would otherwise exist."

Medicare General Information, Eligibility and Entitlement Manual, Chapter 1, § 20.3.1.

Medicare provides examples of fraud as follows:

    • Billing for services that were not furnished and/or supplies not provided. This includes billing Medicare for appointments that the patient failed to keep;

    • Altering claims forms and/or receipts in order to receive a higher payment amount;

    • Duplicating billings that includes billing both the Medicare program and the beneficiary, Medicaid, or some other insurer in an effort to receive payment greater than allowed;

    • Offering, paying, soliciting, or receiving bribes, kickbacks, or rebates, directly or indirectly, in cash or in kind, in order to induce referrals of patients or the purchase of goods or services that may be paid for by the Medicare program;

• Falsely representing the nature of the services furnished. This encompasses describing a noncovered service in a misleading way that makes it appear as if a covered service was actually furnished;

• Billing a person who has Medicare coverage for services provided to another person not eligible for Medicare coverage; and

• Using another person's Medicare card to obtain medical care.

Id.

105.    Medicare defines "abuse" as "practices that, either directly or indirectly, result in unnecessary costs to the Medicare program." Id. at § 20.3.2.  Medicare follows three standards when judging whether acts constitute abuse of the program: (1) reasonable and necessary; (2) conformance to professionally recognized standards; and (3) provision at a fair price.  Id. Medicare provides examples of abuse as follows:

• Charging in excess for services or supplies;

• Providing medically unnecessary services or services that do not meet professionally recognized standards;

• Billing Medicare based on a higher fee schedule than for non-Medicare patients;

• Submitting bills to Medicare that are the responsibility of other insurers under the Medicare secondary payer (MSP) regulation; and

• Violating the participating physician/supplier agreement.

Id.

**Medicaid:**

106.    At all relevant times, the United States provided funds to state Medicaid programs, under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*. (hereinafter "Medicaid").  The United States generally provides matching funds for the Medicaid program and ensures that the

states comply with the minimum standards in the administration of the program in order to qualify for federal funding.

107.    Using claim forms similar to those of the Medicare program, health care providers submit claims for payment to various Medicaid programs for health care services provided to their respective Medicaid beneficiaries.

108.    DME suppliers may bill Medicaid for services, supplies and items provided to Medicaid patients.  Upon information and belief, they submit CMS claim forms for this purpose.  By submitting CMS claim forms, the DME suppliers expressly and/or impliedly certify that they are eligible for participation in the respective Medicaid program, that they have complied with all applicable laws, regulations and program requirements, including the AKS Statute and FCA, and that the claim is truthful, correct, complete and for medically necessary services or items that have been performed or provided.

109.    In each state, the Medicaid Program is managed by the state which must have a state plan in compliance with federal law and a statewide surveillance program that safeguards against unnecessary or inappropriate use of Medicaid services and against excess payments.  42 C.F.R. § 456.3.  In South Carolina, the Medicaid Program is managed by the South Carolina Department of Health and Human Services ("SCDHHS").

110.     The Medicaid Program in each state, as exemplified by the South Carolina Medicaid Program, in general will only pay for DME which is "medically necessary."    SCDHHS Healthy Connections Provider Manual, Durable Medical Equipment, at 1-12; 2-1.

111.    "Providers must bill their usual and customary charges up to the Medicaid allowable as indicated in the fee schedule."  Id. at 2-18;

112.    "Providers are required to bill their usual and customary rate when filing Medicaid

claims. Charges to Medicaid cannot exceed charges to private patients, whether they are self-pay

or covered by another carrier."  SCDHHS Healthy Connections Provider Administrative and

Billing Manual, at 48.

113.    Upon information and belief, most other states have similar requirements prohibiting

charges in excess of usual and customary charges.

114.    South Carolina's Medicaid Program requires the use of the CMS 1500 Form for the filing

of claims.  SCDHHS Healthy Connections Provider Manual, Durable Medical Equipment, at 3-8.

115.    Upon information and belief, all Medicaid programs incorporate Medicare's anti-fraud

and program integrity provisions within their respective programs.  For instance, the South

Carolina Medicaid Program specifically states that it "operates under the anti-fraud provisions of

42 U.S. Code § 1320a-7b. This federal law relates to both fraud and abuse of the program and

identifies illegal acts, penalties for violations, and the individuals and/or entities liable under this

section."  Id. at 2-18.

116.    The Medicaid Program Integrity regulations define "fraud" as "an intentional deception

or misrepresentation made by a person with the knowledge that the deception could result in

some unauthorized benefit to himself or some other person. It includes any act that constitutes

fraud under applicable Federal or State law."  42 C.F.R. § 455.2.

117.    The Medicaid Program is also governed in part by 42 C.F.R. § 424.57(c) which sets for

the standards for Medicaid and Medicare DME suppliers.

**Tricare:**

118.    Tricare (formerly known as Champus) is a federally funded managed health care

program, managed by the U.S. Defense Health Agency ("DHA"), that provides medical benefits

to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retired service members.  10 U.S.C. §§ 1071-1110b; 32 C.F.R. Part 199.

119.    Tricare and Champus are herein referenced interchangeably.

120.    DME companies may bill Tricare for services and items or supplies provided to Tricare patients.  DME providers such as Hill-Rom submit to Tricare for payment or approval CMS claim form 1500s, or claim forms similar thereto, for this purpose.  By submitting these claim forms, the providers certify expressly and/or impliedly that they are eligible for participation in the Tricare program, that they have complied with all applicable laws, regulations and program requirements, including the AKS Statute and FCA, and that the claim is truthful, correct, complete and for medically necessary services or items that have been performed or provided.

121.    Tricare only reimburses providers for DME services and supplies that are "medically necessary," ordered by a physician, and "supported by adequate documentation."  32 C.F.R. § 199.2; 32 C.F.R. § 199.4(d)(3); Tricare Reimbursement Manual 6010.58-M, February 1, 2008, Chapter 1, Section 11, Claims for Durable Medical Equipment, Prosthetics, Orthotics, And Supplies (DMEPOS); https://www.tricare.mil/CoveredServices/IsItCovered/Exclusions; https://www.tricare.mil/CoveredServices/IsItCovered/DurableMedicalEquipment.

122.    Tricare also requires that a DME supplier provide only provides reimbursement for "allowable charges."  The allowable charge for DME supplies is the lowest of (a) the actual billed charge, (b) the prevailing charge (or amount derived from a conversion factor) made for a given procedure, adjusted to reflect local economic conditions, or (c) the maximum allowable

charge. Tricare Reimbursement Manual 6010.58-M, February 1, 2008, Chapter 5, Section 1, Allowable Charges, at ¶ 3.2; 32 C.F.R. § 199.14(j), (k).

123.    Tricare DME reimbursement may be based on the same amounts established under the CMS DMEPOS fee schedule under 42 C.F.R. Part 414, subpart D. 32 C.F.R. § 199.14(k).

124.    Tricare regulations specifically identify examples of situations presumed to be an abuse of, or fraud upon, its program. Tricare regulations, at 32 C.F.R. § 199.2 define "Abuse" and "Fraud" as follows:

> Abuse. For the purposes of this part, abuse is defined as any practice that is inconsistent with accepted sound fiscal, business, or professional practice which results in a Champus claim, unnecessary cost, or Champus payment for services or supplies that are: (1) Not within the concepts of medically necessary and appropriate care, as defined in this part, or (2) that fail to meet professionally recognized standards for health care providers. The term "abuse" includes deception or misrepresentation by a provider, or any person or entity acting on behalf of a provider in relation to a Champus claim….

> Fraud. For purposes of this part, fraud is defined as (1) a deception or misrepresentation by a provider, beneficiary, sponsor, or any person acting on behalf of a provider, sponsor, or beneficiary with the knowledge (or who had reason to know or should have known) that the deception or misrepresentation could result in some unauthorized Champus benefit to self or some other person, or some unauthorized Champus payment, or (2) a claim that is false or fictitious, or includes or is supported by any written statement which asserts a material fact which is false or fictitious, or includes or is supported by any written statement that (a) omits a material fact and (b) is false or fictitious as a result of such omission and (c) is a statement in which the person making, presenting, or submitting such statement has a duty to include such material fact. It is presumed that, if a deception or misrepresentation is established and a Champus claim is filed, the person responsible for the claim had the requisite knowledge.

125.    Tricare regulations, at 32 C.F.R. § 199.9(b), set forth some examples of "abuse" of the program as follows:

> (2) Improper billing practices. Examples include, charging Champus beneficiaries rates for services and supplies that are in excess of those charges routinely charged by the provider to the general public, commercial health insurance carriers, or other federal health benefit entitlement programs for the same or similar services….

(3) A pattern of claims for services which are not medically necessary or, if medically necessary, not to the extent rendered….

(5) Failure to maintain adequate medical or financial records….

(7) Billing substantially in excess of customary or reasonable charges….

126.    Tricare regulations, at 32 C.F.R. § 199.9(c), set forth some examples of "fraud" upon the

program as follows:

(1) Submitting Champus claims (including billings by providers when the claim is submitted by the beneficiary) for services, supplies, or equipment not furnished to, or used by, CHAMPUS beneficiaries….

(2) Billing or submitting a Champus claim for costs for noncovered or nonchargeable services, supplies, or equipment disguised as covered items….  (iii) charging to Champus, directly or indirectly, costs not incurred or not reasonably allowable to the services billed or claimed under Champus….

(3) Breach of a provider participation agreement which results in the beneficiary (including parent, guardian, or other representative) being billed for amounts which exceed the Champus-determined allowable charge or cost.

(4) Billings or Champus claims for supplies or equipment which are clearly unsuitable for the patient's needs or are so lacking in quality or sufficiency for the purpose as to be virtually worthless.

(5) Billings or Champus claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders.

(6) Misrepresentations of dates, frequency, duration, or description of services rendered, or of the identity of the recipient of the services or the individual who rendered the services.

(7) Submitting falsified or altered Champus claims or medical or mental health patient records which misrepresent the type, frequency, or duration of services or supplies or misrepresent the name(s) of the individual(s) who provided the services or supplies.

(8) Duplicate billings or Champus claims. This includes billing or submitting Champus claims more than once for the same services, billing or submitting claims both to

Champus and the beneficiary for the same services, or billing or submitting claims both to Champus and other third-parties (such as other health insurance or government agencies) for the same services, without making full disclosure of material facts or immediate, voluntary repayment or notification to Champus upon receipt of payments which combined exceed the Champus-determined allowable charge of the services involved.

(9) Misrepresentation by a provider of his or her credentials or concealing information or business practices which bear on the provider's qualifications for authorized Champus provider status….

(11) Submitting Champus claims at a rate higher than a rate established between Champus and the provider, if such a rate has been established. For example, billing or claiming a rate in excess of the provider's most favored rate limitation specified in a residential treatment center agreement….

(13) Agreements or arrangements between the supplier and recipient (recipient could be either a provider or beneficiary, including the parent, guardian, or other representative of the beneficiary) that result in billings or claims which include unnecessary costs or charges to Champus.

**Federal Health Care Programs' Enrollment Applications and Supplier Agreements and Certifications**

127.    The Medicare, Medicaid and Tricare programs require health care providers to file an enrollment application in order to qualify to receive the programs' benefits. Upon information and belief, the Defendant entities submitted enrollment applications to these federal program providers for some locations and, to the extent an entity and location was enrolled at times relevant to this action, certified that they would comply with Medicare, Medicaid and Tricare laws, regulations, and program instructions, and further certified that they understood that payment of a claim by Medicare, Medicaid and Tricare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions, including the Federal AKS Statute and FCA.

128.    Upon information and belief, the Defendant entities, for certain locations, had an

authorized representative sign a Medicare Enrollment Application, Form CMS-855S (for

suppliers), found at  https://www.cms.gov/Medicare/CMS-Forms/CMS-

Forms/Downloads/cms855s.pdf, and a similar form for Medicaid and Tricare, which, in pertinent

part, contained the following certification or a certification substantially similar thereto:

> I have read the contents of this application, and the information contained herein is true, correct and complete. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the NSC MAC of this fact immediately….
>
> I agree to notify the NSC MAC of any current or future changes to the information contained in this application in accordance with the timeframes established in 42 C.F.R. section 424.57….
>
> I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare identification number(s), and/or the imposition of fines, civil damages, and/or imprisonment….
>
> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Stature, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act))**….
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.
>
> (emphasis added)

129.    Upon information and belief, the Medicare Enrollment Application contains the

following instructions:  "DMEPOS suppliers must furnish their Legal Business Name (LBN) as

reported to the Internal Revenue Service (IRS), National Provider Identifier (NPI), Tax

Identification Number (TIN), and supplier billing number (if issued) below.  NOTE: Each business location **MUST** have its own NPI, unless enrolling as a sole proprietor/proprietorship with multiple locations."  Id.

130.    Upon information and belief, the Medicare Enrollment Application contains the following instructions:  "A supplier is prohibited from sharing a practice location with other Medicare providers and suppliers" and a supplier must, within thirty (30) days, "report changes to your current business, (e.g., you are adding, removing, or changing existing information under this Medicare supplier billing number)."  Id.

131.    Upon information and belief, Medicaid and Tricare Enrollment Applications contain similar instructions requiring a separate NPI and enrollment for each business location, requiring any changes in supplier information to be reported within 30 days of the change, and prohibiting co-located sites with other program suppliers.

132.    Upon information and belief, an NPI number, which is required to be obtained prior to enrollment, is the standard unique health identifier for health care providers and suppliers and is assigned by the National Plan and Provider Enumeration System ("NPPES"), which is a system managed by CMS.  https://nppes.cms.hhs.gov/#/.

133.    Upon information and belief, the Defendant entities entered into one or more Participating Supplier Agreements, CMS Form 460s, with the United States health care benefits programs, including, but not limited to, Medicare, Medicaid, and Tricare.  Upon information and belief, pursuant to the Medicare Participating Supplier Agreements, at all times relevant to this action, the Defendant entities agreed to accept assignments of monies paid for Medicare beneficiaries, and such payments were made directly to these defendant entities.  42 U.S.C. § 1395cc.

134.    42 C.F.R. § 489.3 states that "provider agreement means an agreement between CMS and one of the providers specified in § 489.2(b) to provide services to Medicare beneficiaries and to comply with the requirements of section 1866 of the Act [42 U.S.C. § 1395cc]."

135.    Generally, an assignment is an agreement by health care provider to be paid directly by Medicare, to accept the payment amount Medicare approves for the service, and not to bill the patient for any more than the Medicare deductible and coinsurance.

136.    Upon information and belief, sometimes Hill-Rom was a non-participating supplier to federal health care programs, but would still be subject to the federal health care programs' laws, regulations, rules and instruction when it presented claims for reimbursement to federal health care programs.

137.    The form CMS-460 provides in part that "the above named person or organization, called 'the participant,' hereby enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare laws and regulations and which are furnished while this agreement is in effect."

138.    Materially false claims for health care services provided, including those in violation of the Federal AKS Statute or FCA, do not qualify for payment or assignment under the laws and regulations governing Medicare, Medicaid and Tricare.

## Claims For Payment To The Federal Government

139.    Claims for payment by health care providers to the federal health care programs are made on CMS-approved paper and/or comparable ASC X12N 837 electronic claim forms.  Upon information and belief, health care providers like Hill-Rom and ARI make claims for payment to the federal government on form CMS-1500 or its comparable ASC X12N 837 electronic claim

forms. <u>See Medicare Claims Processing Manual</u>, Chapter 26 –Completing and Processing Form CMS-1500 Data Set; <u>Medicare Claims Processing Manual</u>, Chapter 20 – Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) § 110 – General Billing Requirements for DME, Prosthetics, and Supplies; 11010.1.B – Form CMS-1500 Health Insurance Claim Form.

140.    The Form CMS-1500 contains the following certification which must be signed by the provider or supplier:  "I certify that the statements on the reverse apply to this bill and are made a part hereof."  The reverse side of Form CMS-1500 contains the following:

> BECAUSE THIS FORM IS USED BY VARIOUS GOERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS…
>
> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties…
>
> SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS …)  I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS…
>
> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws...
>
> MEDICAID PAYMENTS (PROVIDER CERTIFICATION) I hereby agree to keep such records as are necessary to disclose fully the extent of the services provided…  I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge…
>
> SIGNATURE OF PHYSICIAN (OR SUPPLIER) I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction…

**This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of any material fact, may be prosecuted under applicable Federal or State laws.**

(emphasis added)

141.    Upon information and belief, the Defendants knowingly submitted, or caused to be submitted, CMS Form-1500 claim forms for payment or approval, or the electronic equivalent, to the federal government with the foregoing certifications, which were false and fraudulent, and have had an authorized representative sign such certifications, continuously since 2009, and, upon information and belief, the said Defendants continue to knowingly submit, or cause to be submitted, such false claims and false certifications to Medicare, Medicaid, and Tricare.

## DEFENDANTS' FRAUDULENT SCHEMES, ACTS AND FALSE CLAIMS

### The Clinitron Scheme to Sell Used Clinitron Beds as New Beds, with SIE and HCPCS Violations

142.    Upon information and belief, since about 2011, Defendants Hill-Rom, Davidson, McIntosh and Shader knowingly presented, or caused or conspired to be presented, materially false claims to the federal government for payment or approval as a result of the unlawful and fraudulent Clinitron Scheme.

143.    Defendant Hill-Rom, by and through its officers, employees, agents and servants, devised and carried out the nationwide Clinitron Scheme to defraud the federal government by selling used equipment as new equipment. In particular, Hill-Rom sold its Clinitron model beds to or for federal health care beneficiaries, paid for by federal health care programs, by misrepresenting the beds as **new** when Hill-Rom knew that they were, in fact, **used**.

144.    The subject Clinitron is an air fluidized specialty bed, with silicone-coated beads which create a flotation-like environment (and acts as a support surface somewhat like a mattress), which purports to promote healing for patients with compromised skin by minimizing the forces that cause tissue breakdown such as pressure, friction, heat and moisture.

145.    Since approximately 2011, Hill-Rom has sold the Clinitron from its rental fleet to federal health care beneficiaries, their federal health care programs and/or contractors, and submitted CMS Claim Form 1500s to the federal health care programs and/or their contractors for payment or approval.

146.    These knowingly false Clinitron Scheme claims to the federal government made by Hill-Rom for the sale of these beds ranged from about $45,000 to $66,000.

147.    Hill-Rom routinely submitted or presented materially false and fraudulent claims to the federal health care programs because Hill-Rom knowingly claimed and represented that the Clinitron beds were brand new, when, in fact, the beds were used.

148.    Below is a photograph of a typical Hill-Rom Clinitron bed:



149.    The following materially false Clinitron Scheme claims were fraudulently and knowingly presented by Hill-Rom, or were knowingly caused to be presented by Hill-Rom and its officers, employees, servants and agents, to federal health care programs and/or their contractors for payment for supposedly new Clinitron beds which were, in fact, used beds:

complaint 2019-10-30

| Patient | Primary Diagnosis | HCPCS | Modifier | Product | Billed NU Amount | Payor | Date of Service | Claim Filed (Initial) |
|---------|-------------------|-------|----------|---------|------------------|-------|-----------------|-----------------------|
| EB | 707.24 | E0194 | NU | Clinitron | $ 45,000.00 | Medicaid (TN) | 3/30/2014 | 7/1/2014 |
| GC | 707.24 | E0194 | NU | Clinitron | $ 66,443.00 | Medicaid (WA) | 12/17/2014 | 12/22/2014 |
| JJ | 707.24 | E0194 | NU | Clinitron | $ 66,443.00 | Medicare | 1/24/2015 | 1/27/2015 |
| MD | 707.24 | E0194 | NU | Clinitron | $ 66,443.00 | Medicaid (WA) | 12/11/2014 | 12/15/2014 |
| RP | 707.24 | E0194 | NU | Clinitron | $ 45,000.00 | Medicare | 11/18/2014 | 11/24/2014 |
| WA | 952.05 | E1399 | NU | Clinitron | $ 66,443.00 | Medicaid (CA) | 5/19/2015 | 6/23/2015 |
| EB | 707.03 | E0194 | NU | Clinitron | $ 45,000.00 | Medicare | 3/17/2015 | 3/23/2015 |
| LC | 707.03 | E0194 | NU | Clinitron | $ 66,443.00 | Medicare | 9/29/2014 | 10/6/2014 |
| JE | 705.05 | E0194 | NU | Clinitron | $ 66,443.00 | FEP (MD) | 11/10/2014 | 11/18/2014 |
| DM | 707.23 | E1399 | NU | Clinitron | $ 66,443.00 | Medicaid (FL) | 5/20/2015 | 5/27/2015 |
| KO | 707.03 | E0194 | NU | Clinitron | $ 66,443.00 | Medicare | 4/24/2015 | 4/30/2015 |
| JS | 707.00 | E0194 | NU | Clinitron | $ 66,443.00 | Medicare | 4/24/2015 | 4/29/2015 |
| VT | 344.9 | E0194 | NU | Clinitron | $ 66,443.00 | Medicare | 1/30/2015 | ? |
| MW | 344.1 | E0194 | NU | Clinitron | $ 45,000.00 | Medicare | 7/31/2014 | 8/8/2014 |

150.    These foregoing Clinitron Scheme claims are just representative samples of the untold

numerous false and fraudulent Clinitron claims presented to federal health care programs

pursuant to this nationwide scheme to defraud, and, upon information and belief, Hill-Rom

routinely submitted substantially more such claims to federal health care programs.  Upon

information and belief, each of these foregoing Clinitron Schemes claims was paid.

151.    The Medicare Claims Processing Manual, Chapter 20 – Durable Medical Equipment,

Prosthetics, Orthotics, and Supplies (DMEPOS), provides in part, at Section 130.9 – Showing

Whether Rented or Purchased, that the modifier "**NU**" must be utilized in claims for *new* durable

medical equipment and the modifier "**UE**" must be utilized for claims for *used* durable medical

equipment.  It further provides in part as follows:

> Claims must specify whether equipment is rented or purchased. For purchased
> equipment, the itemized bill or **claim** **must also indicate** whether equipment is ***new or***
> ***used.*** If the provider or supplier fails to indicate on an assigned claim whether equipment
> was new or used, the MAC processing the claims assumes purchased equipment is used
> and process the claim accordingly, i.e., they pay on the basis of the used purchase fee.
> (emphasis added)

152. For all of these Clinitron Scheme claims, Hill-Rom materially misrepresented in the CMS Form 1500 claims (or the electronic equivalent) the status of the equipment with the modifier **NU** (new equipment) and did not use the accurate modifier **UE** (used equipment). Thus, the federal health care programs and contractors which paid these claims were defrauded because they paid for Clinitrons which were supposedly new when the beneficiaries were actually being sold used Clinitrons.

153. The Clinitron beds have been sold only out of Hill-Rom's rental fleet since about 2011. In its Work Instruction entitled "DTC Capital Order Discount Matrix," Document Number BS01551, effective May 15, 2012, Hill-Rom set forth its sales discounting policies for its products, including the Clinitron beds. **Exhibit 2** (Work Instruction).

154. In Appendix A to the said Work Instruction, Hill-Rom set forth its Direct-To-Consumer (DTC) Discount Matrix, which specifically noted special internal management approvals for discounts for the Clinitron beds because there was a "separate process due to sale out of the _rental fleet_." Id. (emphasis added).

155. The Appendix cited further that "*Clinitron sold out of rental fleet:  DTC Sales Manager can approve at $40k and above, VP Sales at $30k and above, anything below $30k requires President of Post Acute approval."  Id.

156. Clearly, its upper management knew that Hill-Rom was only selling used Clinitrons from the Hill-Rom rental fleet.

157. An example of a redacted fraudulent claim submitted by Hill-Rom for Patient WA is attached as **Exhibit 3**.  The claim was submitted on June 23, 2015 to the California Medicaid Program (LA Care Health Plan) by Hill-Rom employee Teri McIntosh and included a $66,443.00 claim for a Clinitron Bed.  In Box 24D of the CMS Claim Form 1500, the modifier

for the Clinitron Rite Hite bed is clearly identified as "NU" which falsely represented the subject bed as new. The correct modifier was "UE" for this used Clinitron bed. Upon information and belief, this knowingly false claim was paid by the California Medicaid Program.

158.    Relator knows this Clinitron bed sold to WA in 2015 was used because an inspection of the Service Work Request shows a serial number for this bed as CS105530 which records indicated was previously titled in another patient's name. Upon information and belief, the prior patient had fully paid Hill-Rom for this Clinitron, but Relator unable to determine how Hill-Rom got title or possession from the prior patient. So, in effect, upon information and belief, Hill-Rom was paid twice for this particular Clinitron.

159.    Upon information and belief, Hill-Rom employee Defendant Teri McIntosh, on behalf of Hill-Rom, presented, or caused or conspired to be presented, numerous similar such false claims to the federal government, including those identified above, knowing that they were false and fraudulent in misrepresenting the status of the Clinitrons as new, or she acted with reckless disregard or deliberate ignorance as to whether the subject Clinitrons were new or used.

160.    McIntosh knew the difference between a used Clinitron modifier ("UE") and a new Clinitron modifier ("NU") because on at least one insurance Clinitron claim she put the correct "UE" modifier in the claim Form 1500. This claim was for Minnesota Patient PB, dated September 2, 2014, to Health Partners Insurance, for a Clinitron bed.

161.    Hill-Rom's motive for these deceptive misrepresentations was to financially gouge the federal government with respect to the subject Clinitron sales because the company used new sales prices instead of used prices which would have been substantially less due to federal DME fee schedules.

162.    McIntosh also knowingly and fraudulently miscoded the HCPCS codes in some of the Clinitron Scheme claims.

163.    The proper HCPCS code for the Clinitron is E0194, which, according the HCPCS Level II guidelines, is for an "air fluidized bed."  In some of the Clinitron Scheme claims, the HCPCS code E1399 was inserted in the claims, which misrepresented the proper code.  HCPCS code E1399 is for "durable medical equipment, miscellaneous," and Medicare does not allow the E1399 code to be used when there is a specific HCPCS code applicable to the DME.

164.    For instance, DME Medicare Administrative Contractor CGS has instructed that "[s]uppliers billing miscellaneous-coded products are reminded that items that have a specific HCPCS code must not be billed with miscellaneous HCPCS codes." https://cgsmedicare.com/jc/pubs/news/2016/0816/cope362.html.

165.    In the case of a Clinitron bed claim, the only applicable HCPCS code was E0194 for an air fluidized bed.  At least two examples of such intentional, fraudulent miscoding are set forth above in the claims for Patient WA dated June 23, 2015 and for Patient DM dated May 27, 2015, which were both knowingly and fraudulently miscoded.  Upon information and belief, many other Clinitron Scheme claims contained the knowingly false and miscoded HCPCS code.

166.    In an email dated May 19, 2015, at **Exhibit 4**, Dan Davidson, Hill-Rom's DTC sales and operations manager, noted that the Clinitron sales revenues to date, a little more than five months into 2015, for its salespersons were as follows:

| | |
|---|---|
| Tricia (Litzinger) | $428,880 |
| Mike (Boyce) | $501,004 |
| Gena (Reidy) | $341,998 |
| Paul (Bunting) | $165,454 |
| Jim (Biltz) | $ 42,210 |
| Katlyn (Hahn) | $ 32,400 |
| George (Gutzwiller) | $104,754 |
| [Total | $1,616,700] |

167.    Upon information and belief, many, if not all, Clinitron Scheme claims were also knowingly false because they expressly and/or impliedly certified that they were compliant with Medicare laws and regulations, when, in truth and fact, the prices for Clinitron were not compliant with SIE statutes and regulations.  42 U.S.C. § 1320a-7(b)(6); 42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 1001.701(a)(1).

168.    Most, if not all, of the Clinitron Scheme claims were substantially in excess of Hill-Rom's usual charges and substantially in excess of its costs.  It is apparent that all of the above noted claims in excess of $66,000 far exceeded those claims which were presented at $45,000.

169.    Upon information and belief, Hill-Rom's Dealer/Facility Price, as set forth in a Dealer Price List dated October 18, 2013, was $9,966.45 for a Clinitron At Home model and $11,214.60 for a Clinitron Rite Hite model.

170.    Upon information and belief, Hill-Rom had sales for Clinitron beds to non-federal buyers, in 2012, which included prices of $12,442.91, $18,684.12, $35,000.00 and $40,000.00 per Clinitron, 2013 sales which included prices of $20,225.35, $25,241.00, $25,760.70 and $31,281.00 per Clinitron, 2014 sales which included prices of $25,800.00, $39,747.62, $40,000.00 and $42,750.00 per Clinitron, and 2015 sales which included prices of $20,107.59, $25,800.00, $31,680.00 and 32,400.00 per Clinitron.

171.    Upon information and belief, Davidson knew that the subject Clinitron beds were being sold out of Hill-Rom's rental fleet to federal health program beneficiaries and federal contractors, and, on behalf of Hill-Rom, knowingly presented, or caused or conspired to be presented, numerous similar such false claims to the federal government, including those identified above, knowing that they were false and fraudulent in misrepresenting the status of the Clinitrons as new, SIE compliant, and properly HCPCS coded, or he acted with reckless

disregard or deliberate ignorance as to whether this information or theses representation were truthful or false.

172.    Upon information and belief, Alton Shader participated in a PowerPoint Presentation, on or about March 24, 2014, in which Hill-Rom's sales force was instructed that the company was exiting Clinitron beds from the market and encouraging the sales force to continue to generate revenue volume from the sale of the used Clinitron rental fleet.  Upon information and belief, he was aware of Hill-Rom's Clinitron Scheme fraudulent practices in presenting claims to the federal government and miscoding the Clinitrons as new when they were used, miscoding Clinitrons as HCPCS E1399 when the proper code was E0194, and charging excessive amounts in violation of SIE statutes and regulations.

173.    Upon information and belief, Shader knew that the subject Clinitron beds were being sold out of Hill-Rom's rental fleet to federal health program beneficiaries and federal contractors, and, on behalf of Hill-Rom, knowingly presented, or caused or conspired to be presented, numerous similar such false claims to the federal government, including those identified above, knowing that they were false and fraudulent in misrepresenting the status of the Clinitrons as new, as SIE compliant, and properly HCPCS coded, or he acted with reckless disregard or deliberate ignorance as to whether this information or these representation were truthful or false.

174.    Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting in its Clinitron Scheme claims that the quality of its Clinitron beds were being sold as new, and further knew that the Clinitron beds were used and there were no Clinitrons being sold by Hill-Rom since 2011 that were new.  Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting to the federal government that the quality of its Clinitron beds were being sold as compliant with SIE

laws and regulations when most, if not all Clinitron Scheme claims, were not so compliant. Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting to the federal government that E1399 as the correct HCPCS code of its Clinitron beds in many of its Clinitron Scheme claims. Hill-Rom, by and through its officers, employees, management, servants and agents, knew that it was materially misrepresenting to the federal government that these Clinitron Scheme claims were true, accurate and complete.

175.    Upon information and belief, Hill-Rom received payment from the federal health care programs for these fraudulently submitted Clinitron Scheme claims. The federal government would not have paid these claims had it known that these claims were false and fraudulent. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the beds were new. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the beds were compliant with SIE requirements. The federal government would not have paid those claims with miscoded HCPCS codes had it known of the falsity of Hill-Rom's express and/or implied representations that the correct HCPCS code for these beds was E1399. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the claims were true, accurate and complete.

176.    Hill-Rom and its officers, employees, management, servants and agents, including Davidson, McIntosh and Shader, knew that these Clinitron Scheme claims presented to the federal government for reimbursement for so-called new Clinitrons, SIE compliant Clinitron prices, and miscoded HCPCS codes for Clinitrons were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially

false and fraudulent, or were deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and caused and conspired to be presented, said false and fraudulent claims in violation of the FCA.

**The Travel Expense Scheme to Bill Travel Expenses as Repair Expenses**

177.    Defendant Hill-Rom devised and carried out a nationwide scheme to defraud the federal government by routinely fraudulently billing for travel expenses related to repairs to its DME pursuant to its Travel Expense Scheme.

178.    In a nationwide scheme to defraud the federal government in knowing violation of the FCA, Hill-Rom knowingly and fraudulently routinely presented claims to the federal government and/or its contractors which mischaracterized travel time as DME repair time and miscoded non-reimbursable travel time as HCPCS Code K0739 which is reimbursable under federal programs, and such claims were materially false and fraudulent violations of the FCA.

179.    In particular, Hill-Rom defrauded federal health care programs and/or their contractors by intentionally misrepresenting time expended for travel under the HCPCS code K0739 in claims for payment submitted by Hill-Rom to the federal government per CMS Form 1500s.

180.    The HCPCS code K0739 covers repairs to DME.  The HCPCS code K0739 descriptive narrative, set forth in the HCPCS Level II guidelines, states as follows: "Repairs or nonroutine **service** for durable medical equipment other than oxygen equipment requiring the skill of a technician, **labor component**, per 15 minutes."  (emphasis added).

181.    On its face, HCPCS code K0739 does not reference or cover travel.  The HCPCS code A9901 is generally used for travel services, and its narrative, set forth in the HCPCS Level II

guidelines, states as follows: "DME delivery, set up, and/or dispensing service component of another HCPCS code."

182. Further, CMS specifically prohibited reimbursement for travel expenses related to DME repairs. The four Medicare DME MACs which cover the nation have, since at least since April 1, 2009, prohibited payments to DME suppliers for travel time claims related to repairs.

183. Noridian Healthcare Solutions, LLC, the DME Jurisdiction A MAC, provides in its instructions, entitled "Repairs, Maintenance and Replacement," set forth at https://med.noridianmedicare.com/web/jadme/topics/repairs/repairs, as follows: "Suppliers are reminded that there is **no Medicare payment for travel time** or equipment pick-up and/or delivery." (emphasis added).

184. CGS Administrators, LLC, the DME Jurisdiction B MAC, provides in its Supplier Manual, Chapter 5, DMEPOS Fee Schedule Categories, in its Repair Labor Billing and Payment Policy at page 21, as follows: "The following table contains repair units of service allowances for commonly repaired items billed under HCPCS code K0739 (Repair or Nonroutine Service for Durable Medical Equipment Other than Oxygen Equipment Requiring the Skill of a Technician, Labor Component, Per 15 Minutes). This applies to non-rented and out-of-warranty items. Units of service include basic troubleshooting and problem diagnosis. One unit of service = 15 minutes. **Please note that there is no Medicare payment for travel time** or equipment pick-up and/or delivery." (emphasis added).

185. CGS Administrators, LLC, the DME Jurisdiction C MAC, provides in its Supplier Manual, Chapter 5, DMEPOS Fee Schedule Categories, in its Repair Labor Billing and Payment Policy at page 21, as follows: "The following table contains repair units of service allowances for commonly repaired items billed under HCPCS code K0739 (Repair or Nonroutine Service for

Durable Medical Equipment Other than Oxygen Equipment Requiring the Skill of a Technician, Labor Component, Per 15 Minutes). This applies to non-rented and out-of-warranty items. Units of service include basic troubleshooting and problem diagnosis. One unit of service = 15 minutes. **Please note that there is no Medicare payment for travel time** or equipment pick-up and/or delivery."  (emphasis added).

186.    **Exhibit 5**, the CGS Repair, Labor, Billing and Payment Policy, also at

https://www.cgsmedicare.com/jc/pubs/news/2009/0209/cope9427_3.html, provides that

"Suppliers are reminded that there is no Medicare payment for travel time or equipment pick-up and/or delivery."

187.    Noridian Healthcare Solutions, LLC, the DME Jurisdiction D MAC, provides in its instructions,  entitled  "Repairs,  Maintenance  and  Replacement,"  set  forth  at https://med.noridianmedicare.com/web/jadme/topics/repairs/repairs,  as  follows:  "Suppliers  are reminded  that  there  is  **no  Medicare  payment  for  travel  time**  or  equipment  pick-up  and/or delivery."  (emphasis added).

188.    At  all  times  relevant,  upon  information  and  belief,  there  were  simply  no  Medicare, Medicaid or Tricare statutes, regulations, manuals or instructions which authorized reimbursement for travel related to the repair of DME.

189.    For example, the Washington State Medicaid Manual, at page 68, provides that "trouble shooting, delivery, evaluations, travel time, etc. are included in the reimbursement of the items." https://www.hca.wa.gov/assets/billers-and-providers/dme-wheelchair-bi-20180101.pdf.

190.    **Exhibit 6**, the Washington State Department of Social and Health Services, Monthly DME Webinar  and  Q&A,  https://www.hca.wa.gov/assets/billers-and-providers/dme-webinar-rentals-

repairs-replacement-parts.pdf, at page 19, provides that "travel and diagnostic/assessment time are not compensated - those are built into the rate for the parts.").

191.    Washington State Code 82-543-9000(8) provides in part that the reimbursement rate for purchased or rented DMC includes … "mileage, travel time, gas, etc."

192.    Hill-Rom knew to not present bills or submit invoices to federal health care program payers seeking travel expense reimbursements because these programs did not pay for travel expenses. In Hill-Rom's Work Instruction entitled "Billing for Repairs Where Hill-Rom has Transferred Title to the HC Patient," effective date of April 15, 2012, Hill-Rom Document Number BS01177, the company stated at Section 7.7.2 as follows: "BFR Specialist will review FFS Daily Report and create an S6 order in JDE for third party payer invoices for repairs.  **Travel will not be entered on the S6 order for payers that don't allow for travel charges.**" (emphasis added).  See **Exhibit 7** (2012 Hill-Rom work instructions).

193.    Hill-Rom employees knew that travel time was not billable from discussions with Relator. On July 21, 2014, in a conference call between Relator and Hill-Rom employees Shannon Dearborn (DTC manager of operations and sales), Michael Boyce (DTC sales representative) and Kristen Gregory (director of managed care, contracting and enrollment), the topic was specifically discussed and Relator informed the group that travel time was not allowed to be billed, and Gregory agreed. See **Exhibit 8** (Relator's 7/21/2014 notes).

194.    However, the next day, on July 22, 2014, in a meeting between Catherine Johnson (supervisor of customer payor services), Rhoda Hiott (documentation specialist), and Marilyn Wyatt (documentation specialist), Relator warned them that travel time was not billable to federal payors.  While someone stated that Medicare was not billed for travel time, Hiott and Wyatt said they were told by Hill-Rom management to bill both travel time and tech labor services under

HCPCS code K0739 and that the taxpayers would pay for it. See **Exhibit 9** (Relator's 7/22/2014 notes).

195.    Relator followed up the conference call and meeting by emailing Sara Blessing (regulatory and legal department) and speaking with Brian Roth (DTC director of marketing) and telling them both of the discussions regarding billing for travel time, and warned them that the HCPCS code KO739 was not an appropriate billing code for travel time and that travel time could not be reimbursed by federal payors.

196.    Yet Hill-Rom routinely categorized travel time under the code K0739 in its repair spreadsheet of costs, with an hourly rate of $140.00. See **Exhibit 10** (2014 Hill-Rom repair spreadsheet).

197.    Upon information and belief, the following is a partial list of materially false and fraudulent claims knowingly presented to the federal government by Hill-Rom.  In these fraudulent claims, Hill-Rom knowingly presented to the federal government claims for reimbursement for travel expenses which were intentionally and fraudulently miscoded as HCPCS code K0739 in order to receive reimbursement for services which were not reimbursable by the federal government health care programs.  By misrepresenting the HCPCS code in Box 24 of the Claim Form 1500s, Hill-Rom was falsely representing travel time as repair time, in order to fraudulently receive reimbursements from federal government, as follows:

| Patient | Date of Service | Date of Claim | Payor | Type of Beneficiary | Patient State of Residence | Travel Time 15-Min Units | Primary Diagnosis | HCPCS Code | Travel $ claimed |
|---|---|---|---|---|---|---|---|---|---|
| DP | 12/8/2014 | 2/13/2015 | Care Improvement Plus | Medicare | SC | 4 | 340 | K0739 | $ 140.00 |
| MD | 3/3/2015 | 3/19/2015 | Molina Healthcare of WA | Medicaid | WA | 16 | 707.05 | K0739 | $ 560.00 |
| BJ | 8/19/2016 | ? | AETNA Better Health MI | Medicaid | MI | 4 | I69.898 | K0739 | $ 140.00 |
| BJ | 9/16/2016 | ? | AETNA Better Health MI | Medicaid | MI | 4 | G91.9 | K0739 | $ 140.00 |
| SH | 11/29/2016 | ? | AETNA Better Health | Medicaid | OH | 7 | G82.50 | K0739 | $ 245.00 |
| DR | 5/19/2016 | 8/17/2016 | Molina Healthcare of OH | Medicaid | OH | 22 | 189.304 | K0739 | $ 770.00 |
| DR | 5/19/2016 | 11/16/2016 | Molina Healthcare of OH | Medicaid | OH | 22 | 189.304 | K0739 | $ 770.00 |
| SH | 3/10/2017 | 4/7/2017 | AETNA Better Health | Medicaid | OH | 8 | G82.50 | K0739 | $ 280.00 |
| SH | 3/10/2017 | 7/25/2017 | AETNA Better Health | Medicaid | OH | 8 | G82.50 | K0739 | $ 280.00 |

198.   **Exhibit 11** is a sample redacted Claim Form 1500 for Patient MD above presented on March 19, 2015.

199.   Upon information and belief, the following is another partial list of materially false and fraudulent claims presented to the federal government by Hill-Rom, based upon Explanation of Benefits ("EOBs") received by Hill-Rom on December 14, 2015, from CGS – DME MAC Jurisdiction C, referenced to Hill-Rom NPI # 1215014329, which Relator believes were likewise submitted to the federal government for payment for time spent on repairs when, in actuality, the time was actually spent on non-reimbursable travel:

| Patient | Date of Service | Account Number | Payor | Code | Amount Claimed |
|---|---|---|---|---|---|
| RH | 7/27/2015 | 9862743 | Medicare | K0739 | $ 630.00 |
| NH | 7/16/2015 | 9966043 | Medicare | K0739 | $ 140.00 |
| PM | 8/11/2015 | 9914851 | Medicare | K0739 | $ 280.00 |
| RD | 8/21/2015 | 9966048 | Medicare | K0739 | $ 560.00 |
| TM | 7/28/2015 | 9862747 | Medicare | K0739 | $ 140.00 |
| LO | 9/4/2015 | 9969273 | Medicare | K0739 | $ 560.00 |
| KJ | 7/8/2015 | 9851148 | Medicare | K0739 | $ 280.00 |
| DJ | 8/14/2015 | 9914858 | Medicare | K0739 | $ 350.00 |
| MM | 7/6/2015 | 9959176 | Medicare | K0739 | $ 140.00 |

200.   Upon information and belief, the following is another partial list of list of materially false and fraudulent Travel Expense Scheme claims knowingly presented to the federal government by Hill-Rom, based upon Hill-Rom invoices, which Relator believes were likewise submitted to the federal government for payment for time spent on repairs when, in actuality, the time was actually spent on non-reimbursable travel:

complaint 2019-10-30

| Patient | Invoice Date | Invoice # | Payor | Type of Beneficiary | Patient State of Residence | Travel Time | Travel $ Invoiced | Billing Hill-Rom Facility |
|---|---|---|---|---|---|---|---|---|
| CN | 2/20/2010 | 5505930 | MDB-MEDICAID OF KY | Medicaid | KY | 3 | $ 420.00 | Batesville, IN |
| AN | 7/3/2010 | 5877149 | MDB-MEDICAID OF NC | Medicaid | NC | 2.5 | $ 350.00 | Batesville, IN |
| TM | 8/7/2010 | 5962761 | MCARE DMERC RC REG B-IL | Medicare | IL | 4 | $ 560.00 | Batesville, IN |
| PB | 9/11/2010 | 6049683 | MCARE DMERC RC REG C-TX | Medicare | TX | 1 | $ 140.00 | Batesville, IN |
| KG | 9/13/2010 | 6051848 | MCARE DMERC RC REG C-MS | Medicare | MS | 1 | $ 140.00 | Batesville, IN |
| SM | 9/29/2010 | 6080415 | MCARE DMERC RC REG C-GA | Medicare | GA | 1.5 | $ 210.00 | Batesville, IN |
| DB | 9/29/2010 | 6080414 | MCARE DMERC RC REG C-TN | Medicare | TN | 0.3 | $ 63.00 | Batesville, IN |
| CB | 10/23/2010 | 6145252 | USFHP | Tricare | WA | 1 | $ 140.00 | Batesville, IN |
| RH | 12/12/2011 | 7234970 | MCARE DMERC RC REG A-NH | Medicare | NH | 0.5 | $ 70.00 | Batesville, IN |
| CN | 3/12/2012 | 7455077 | MDB-MEDICAID OF KY | Medicaid | KY | 5 | $ - | Batesville, IN |
| TH | 6/1/2013 | 8433326 | MCARE DMERC RC REG D-CA | Medicare | CA | 1.5 | $ 210.00 | Batesville, IN |
| CN | 6/22/2013 | 8452617 | MDB-MEDICAID OF KY | Medicaid | KY | 4 | $ 560.00 | Batesville, IN |
| CN | 7/15/2014 | 9167718 | MDB-MEDICAID OF KY | Medicaid | KY | 3 | $ 420.00 | Batesville, IN |

201.    The claims set forth herein are just representative samples of numerous false and fraudulent Travel Expense Scheme claims presented to federal health care programs and/or their contractors pursuant to this nationwide scheme to defraud, and, upon information and belief, Hill-Rom routinely submitted substantially more such claims than is set forth herein.

202.    Upon information and belief, aforesaid Hill-Rom employees Dearborn, Boyce, Gregory, Johnson, Hiott, and Wyatt knew that Hill-Rom was falsely representing to the federal government that travel expenses were correctly coded as repair expenses per K0739, and, on behalf of Hill-Rom, knowingly presented, or caused or conspired to be presented, numerous similar such false claims to the federal government, including those identified above, knowing that they were false and fraudulent in misrepresenting the HCPCS code of travel expenses as repair expenses, or acted with reckless disregard or deliberate ignorance as to whether this information or these representations were truthful or false.

203.    Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting in its Travel Expense Scheme claims that travel expenses were correctly coded as K0739. Hill-Rom, by and through its officers, employees, management, servants and agents, knew that it was materially misrepresenting that these Travel Expense Scheme claims were true, accurate and complete.

204.    Upon information and belief, Hill-Rom received payment from the federal health care programs for these fraudulently submitted Travel Expense Scheme claims.  The federal government would not have paid these claims had it known that these claims were false and fraudulent.  The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that travel expenses were correctly coded as repair expenses per K0739.  The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the claims were true, accurate and complete.

205.    Hill-Rom, by and through its officers, employees, servants and agents, knew that these Travel Expense Scheme claims presented to the federal government for reimbursement with miscoded HCPCS codes for travel expenses were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or was deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and knowingly caused and conspired to be presented, said false and fraudulent claims in violation of the FCA.

**The Lack of Medical Necessity Scheme**

206.    Defendant Hill-Rom conducted its nationwide Lack of Medical Necessity ("LMN") Scheme of knowingly and routinely presenting materially false and fraudulent claims to the federal government for DME products and items which were not medically necessary nor medically reasonable because the patients' condition and diagnoses did not support the DME Hill-Rom provided.

207.    The scope of these false and fraudulent LMN Scheme claims was, and upon information and belief, continues to be, widespread, and crosses many different product lines. For instance, Hill-Rom would routinely sell hospital beds with Group II low air loss mattresses to federal health care beneficiaries for which the patients did not have qualifying wounds such as Stage 2, 3 or 4 decubitus ulcers which were required to exist in order for applicable beds and mattresses, including integrated flotation beds and Group II low air loss mattresses, to be considered medically necessary and reasonable.

208.    Likewise, Hill-Rom routinely would sell bariatric beds and Group II low air loss mattresses to federal health care beneficiaries for which the patients did not meet the weight criteria for a bariatric bed nor did the patient have qualifying wounds which were required to exist in order for the beds and mattresses to be considered medically necessary and reasonable.  Hill-Rom's DME products which were sold to federal health care beneficiaries when there was no medical necessity or medical reasonableness included, but are not limited to, the following hospital beds and Group II low air loss mattresses, powered air flotation therapy beds (low air loss), and air fluidized therapy beds:

>    Hospital Bed (flat deck; can support a group 1 prevention mattress or group 2 powered low air loss therapy mattress; all listed are fully electric): Advanta2 Bed; CareAssist ES Bed; ExcelCare Bed; Resident LTC Bed; 100 Low Bed; 1000 Bed; 405 Bed; BasicCare Bed.

>    Bariatric Bed (flat deck; can support a group 1 prevention mattress or group 2 powered low air loss therapy mattress; all listed are fully electric): TriFlex II; 1039 Bariatric Bed; 1048 Bariatric Bed; TotalCare Bariatric Bed.

>    Powered Air Flotation Bed (has Integrated powered group 2 low air loss and/or flotation and/or alternating pressure therapy mattress; all are fully electric): TotalCare; TotalCare Sport; TotalCare Connect; TotalCare Bariatric; VersaCare AIR; VersaCareP500.

>    Air Fluidized Therapy Bed (Group III): Clinitron At Home; Clinitron 2; Clinitron Rite Hite.

>    Group II Powered Therapy Mattresses (can be put on any flat deck hospital bed; low air loss and/or flotation and/or alternating pressure therapy mattress; Power source is blower

or pump, that plugs into an A/C outlet), powered group 2): Accumax Quantum Convertible; Accumax Quantum VPC with Airport CU pump; P300; P310; P320; P400; P500; Synergy Air Elite; Synergy Air Elite Bariatric; Synergy Air Elite Turn.

209.    Below is a partial list of examples of materially false and fraudulent claims knowingly presented to the federal government for DME products for which the underlying diagnosis of the patients' condition did not justify or support the medical necessity nor medical reasonableness of the Hill-Rom DME sold to the referenced patients.

210.    In all of the following claims, there were no qualifying wounds which made the bed or mattress medically necessary or reasonable, and, in the case of bariatric beds, there were also no indications that the patient met the weight requirement to justify the bariatric bed as medically necessary or reasonable.

| Pt. | Date of Service | Date of Claim | State | Payor | Product | Claim Amount | Notes |
|---|---|---|---|---|---|---|---|
| MA | 5/22/2014 | 6/12/2014 | NM | Medicaid | SAE W/Blower | $ 15,486 | |
| MA | 5/22/2014 | 10/29/2014 | NM | Medicaid | SAE W/Blower | $ 15,486 | |
| MA | 5/22/2014 | 1/16/2015 | NM | Medicaid | SAE W/Blower | $ 15,486 | |
| BA | 9/9/2015 | 9/16/2015 | NJ | Tricare | CareAssist; P310 | $ 9,783 | |
| YB | 5/23/2017 | 5/26/2017 | AZ | Medicare | P500 Therapy Mattress | $ 18,000 | |
| YB | 5/23/2017 | 7/11/2017 | AZ | Medicare | P500 Therapy Mattress | $ 18,000 | |
| LB | 12/17/2014 | 1/5/2015 | IN | Medicare | P310 Mattress | $ 10,983 | |
| LB | 12/17/2014 | 2/11/2015 | IN | Medicare | P310 Mattress | $ 10,983 | |
| AC | 2/12/2015 | 2/17/2015 | TX | FEHB | VersaCare P500 | $ 23,906 | |
| TC | 3/3/2015 | 3/10/2015 | OH | Medicare | P310 Mattress Wound Surface | $ 15,000 | |
| SC | 8/28/2014 | 10/24/2014 | PA | SBHCBP | Low Air Loss Mattress | $ 7,909 | Note 1 |
| GD | 5/31/2016 | 6/9/2016 | CA | Medicare | ES100 CareAssist Bed; P500 | $ 30,475 | |
| JE | 11/10/2014 | 11/18/2014 | MD | FEHB | Clinitron | $ 66,443 | |
| RF | 1/7/2015 | ? | TX | Medicare | VersaCare P500 | $ 17,845 | Note 2 |
| RF | 1/7/2015 | ? | TX | Medicare | VersaCare P500 | $ 17,845 | Note 2 |
| NH | 9/30/2015 | 10/12/2015 | KS | Tricare | VersaCare/P500 | $ 23,906 | |
| NH | 9/30/2015 | 11/16/2015 | KS | Tricare | VersaCare/P500 | $ 23,906 | |
| MK | 8/18/2017 | 8/24/2017 | NY | Medicare | Triflex with scale | $ 43,562 | |
| AL | 12/18/2014 | 12/26/2014 | CA | Medicaid | Synergy Air Elite | $ 14,389 | |
| AL | 12/18/2014 | 2/12/2015 | CA | Medicaid | Synergy Air Elite; HR Bariatric Bed | $ 24,862 | |
| SL | 3/10/2015 | 6/17/2015 | WA | Medicare | VersaCare P500 | $ 26,177 | |
| AL | 8/5/2015 | 8/28/2015 | WA | Medicare | ES100 CareAssist Bed; P500 | $ 28,250 | |
| AM | 8/14/2015 | 9/3/2015 | NY | Medicare | Synergy Air Elite | $ 10,000 | |
| TP | 1/4/2016 | 1/11/2016 | TX | Tricare | VC900 Versacare; Viking Lift | $ 23,486 | |
| JP | 6/30/2015 | 8/17/2015 | NY | Medicare | Synergy Air Elite | $ 13,313 | |
| JR | 5/1/2015 | 5/19/2015 | MI | Medicaid | VC700 VersaCare Air | $ 15,344 | |
| CS | 8/11/2015 | 10/9/2015 | PA | Medicaid | CareAssist; P500 | $ 28,250 | |
| CS | 8/11/2015 | 12/15/2015 | PA | Medicaid | CareAssist; P500 | $ 28,250 | |
| CS | 8/11/2015 | 2/4/2016 | PA | Medicaid | CareAssist; P500 | $ 17,045 | |
| JS | 4/24/2015 | 6/10/2015 | HI | Medicare | Clinitron | $ 67,869 | |
| PS | 3/23/2016 | 5/26/2016 | PA | Medicaid | Triflex II Bariatric Bed; SAE | $ 37,513 | |
| | | | | | | $ 719,750 | Total |
| Note 1: Spina Bifida Health Care Benefits Program is a U.S. Dept. of Veteran's Affairs program. | | | | | | | |
| Note 2: Two separate claims, one filed under ICN 1316729457, and one under ICN 1329573938. | | | | | | | |

211.    Relator believes that Hill-Rom's practice of submitting knowingly and materially false and fraudulent claims to the federal government for DME products which were not medically necessary and not medically reasonable was a company-wide endeavor and that further

complaint 2019-10-30

investigation by the federal government will reveal thousands of similar false and fraudulent claims.

212.    The federal government would not have paid these LMN Scheme claims had the truth been known that the products were not medically necessary nor medically reasonable for the patients.

213.    Hill-Rom certified on the Claim Form 1500s for each of these LMN Scheme claims, both expressly and impliedly, that the DME products were medically necessary and reasonable for the patients, when, in truth and fact, they were not.  Hill-Rom certified on the Claim Form 1500s for each of these claims, both expressly and impliedly, that the claims were true, complete and accurate, even though they were not.  Hill-Rom certified on the Claim Form 1500s for each of these claims, both expressly and impliedly, that the claims complied with applicable statutes, regulations, rules and program requirements, when, in truth and fact, they did not.

214.    Hill-Rom knew that these LMN Scheme claims to the federal government for reimbursement were for medically unnecessary and unreasonable DME products and knew these claims were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or was deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and caused to be presented, said false and fraudulent claims in violation of the FCA.

**The E1399 Upcode Scheme with HCPCS Coding and SIE Rules Violations**

215.    Upon information and belief, since about 2009, Defendant Hill-Rom knowingly presented, or caused or conspired to be presented, and, upon information and belief, continue to knowingly present, or cause to be presented, materially false claims to the federal government for payment or approval as a result of the unlawful and fraudulent E1399 Upcode Scheme.

216.    Defendant Hill-Rom, by and through its officers, employees, agents and servants, devised and carried out the nationwide E1399 Upcode Scheme to defraud the federal government by knowingly miscoding and upcoding HCPCS codes of numerous DME products in claims to the federal health care programs.  In particular, Hill-Rom sold or rented various types of its DME to or for federal health care beneficiaries, paid for by federal health care programs, by misrepresenting the HCPCS code as E1399 when Hill-Rom knew that the E1399 was not the correct HCPCS code.

217.    Because these products were knowingly and intentionally upcoded and miscoded, they were likewise medically unnecessary and unreasonable.  Because these products were knowingly and intentionally upcoded and miscoded, they were likewise sold or rented to the federal government, its contractors and beneficiaries, in violation of SIE Rules.

218.    Defendant Hill-Rom was not entitled to reimbursement for claims arising out of this scheme, and Defendant Hill-Rom knowingly caused the submission of false and fraudulent claims, in violation of the FCA.

219.    Upon information and belief, in general, DME beds and accessories are divided into seven groups for HCPCS purposes.  Group 1 is Fixed Height Beds with codes E0250, E0251, E0290, E0291, and E0328.  Group 2 is Variable Height Beds with codes E0255, E0256, E0292, and E0293.  Group 3 is Semi-Electric Beds E0260, E0261, E0294, E0295 and E0329.  Group 4 is Total Electric Beds with codes E0265, E0266, E0296 and E0297.  Group 5 is Heavy Duty Beds with codes E0301, E0302, E0303, and E0304.  Group 6 is Accessories with codes E0271, E0272, E0273, E0274, E0280, E0305, E0310, E0315, E0316, E0910, E0911, E0912, and E0940. Group 7 is Miscellaneous and with code E1399.

220.    Upon information and belief, in general, DME surfaces or mattresses are divided into three groups for HCPCS purposes.

221.    Group 1 is Pressure Reducing Support Surfaces with codes A4640, A9270, E0181, E0182, E0184, E0185, E0186, E0187, E0188, E0189, E0196, E0197, E0198, E0199, and E1399.

222.    Group 2 is Pressure Reducing Support Surfaces with codes E0193, E0277, E0371, E0372, E0373, and E1399.

223.    Group 3 is Pressure Reducing Support Surfaces with code E0194. https://med.noridianmedicare.com/documents/2230703/7218263/PRSS+Group+1+LCD+and+PA; https://med.noridianmedicare.com/documents/2230703/7218263/PRSS+Group+2+LCD+and+PA; https://med.noridianmedicare.com/documents/2230703/7218263/PRSS+Group+3+LCD+and+PA; https://med.noridianmedicare.com/documents/2230703/7218263/Hospital+Beds+And+Accessories+LCD+and+PA/6845708e-b782-4677-97ab-7996cb82d141.

224.    Some of the DME which Defendant Hill-Rom, by and through its employees, officer, servants and agents, miscoded to E1399 in claims knowingly presented or caused or conspired to be presented to the federal government for payment or approval included, but are not necessary limited to, the following:  P500 Therapy Surface Mattress; CareAssist Bed with P300, P310 or P320 Powered Surface Mattresses; Triflex with Scale Bariatric Bed; Triflex II with Scale; Burke Triflex Bed; TotalCare Bed; Progressa Bed System; ES 100 CareAssist; Clinitron Bed; and, the VC900 VersaCare Bed System.

225.    The primary purposes of knowingly falsifying the E1399 Upcode Scheme claims was to maximize Hill-Rom's profits and avoid fee schedules pricing of the various federal health care programs and/or other federal government agencies, such as the OWCP, GEHA, FEHB, UMWA-HRF and FEP.

226.    Hill-Rom often improperly bundled two or more separate HCPCS coded products together in order to try to justify the E1399 code.  However, such improper bundling did not justify the E1399 codes as more specific HCPCS codes were always available and applicable, and the bundling was knowingly fraudulent in order to purportedly justify an E1399 coding.  For instance, Hill-Rom would bundle a CareAssist Bed (HCPCS code E0266) with a P500 Therapy Surface Mattress (HCPCS code E0277) and then input one line item claim for the combined products and improperly code them on one claim line as E1399.

227.    The P500 Therapy Surface Mattress should have been, at all times, separately coded as E0277 in Hill-Rom's claims presented to the federal government, unless the P500 was integrated with a fully electric bed, in which case the code should have been E0193.

228.    The 2014 HCPCS Level II condensed narrative for E0193 is "Powered air flotation bed (low air loss therapy)."  The HCPCS Level II condensed narrative for E0266 is "Hospital Bed, total electric (head, foot, and height adjustments), with any type side rails, without mattress."  The HCPCS Level II condensed narrative for E0277 is "Powered pressure-reducing air mattress."  The HCPCS Level II narrative for E1399 is ""Durable medical equipment, miscellaneous."  See **Exhibit 12** (HCPCS Level II Manual and condensed narratives).

229.    As noted above, Medicare rules prohibit a DME product that has a specific HCPCS code from being billed with the miscellaneous E1399 HCPCS code.

230.    A local coverage determination ("LCD") is a decision made by a DME MAC on whether a particular service or item is reasonable and necessary and covered by Medicare.  Medicare Program Integrity Manual, Chapter 13 – Local Coverage Determinations. https://www.cms.gov/medicare/coverage/determinationprocess/LCDs.html.

231.    CMS and its DME MAC contractors publish articles which are created to provide coding

and billing guidance for services covered by Medicare.  https://www.cms.gov/medicare-coverage-

database/reports/article-status-report.aspx.

232.    The CMS-published Local Coverage Article: Pressure Reducing Support Surfaces – Group

2 – Policy Article (A52490) provides more descriptive HCPCS narratives as follows:

> Code E0277 describes a powered pressure reducing mattress (alternating pressure, low air
> loss, or powered flotation without low air loss) which is characterized by all of the
> following:
>
>    1.  An air pump or blower which provides either sequential inflation and deflation of
>        the air cells or a low interface pressure throughout the mattress, and
>
>    2.  Inflated cell height of the air cells through which air is being circulated is 5 inches
>        or greater, and
>
>    3.  Height of the air chambers, proximity of the air chambers to one another,
>        frequency of air cycling (for alternating pressure mattresses), and air pressure
>        provide adequate beneficiary lift, reduce pressure and prevent bottoming out, and
>
>    4.  A surface designed to reduce friction and shear, and
>
>    5.  Can be placed directly on a hospital bed frame.
>
> Code E0193 describes a semi-electric or total electric hospital bed with a fully integrated
> powered pressure reducing mattress which has all of the characteristics defined above.

233.    Hill-Rom's DME product brochure for the P500 Therapy Surface Mattress is attached as

**<u>Exhibit 13</u>**.

234.    On or about March 3, 2011, Relator raised the issue of proper coding of Hill-Rom products

with E1399 with Barry Grosse, who was Hill-Rom's Chief Compliance Officer.  In an email to

Grosse Relator stated:

> Hi Barry, We've discussed this before several times and I've done training on why
> following proper coding guidelines should be followed, best practices.  However, this
> came up again yesterday during a group meeting while Vicky was here.  I think we really
> need to discuss while you're here.

Page **78** of **141**

I've tried to reiterate that we can't change a code item to an uncoded E1399 because the reimbursement for the coded item isn't high enough. The thought process is to get paid list price, not the lower contracted fee schedule (contracted payer) rate or usual and customary rate (non-contracted payer) of the coded item.

I've discussed this with Shannon, and she wants us to [be] complaint (sic) and follow the rules. This is a huge area of risk! That's not appropriate. I've had numerous discussions, but it needs to come from you please, because the conduct isn't changing.

In response, Gross stated as follows:

Jeri / Shannon: **Jeri is absolutely correct. We should never change the code to something else when there is already a code on the fee schedule. Doing so to increase reimbursement is ABSOLUTELY WRONG!!!!! Doing so intentionally is a violation of the law,** our policies and procedures and is a terminable offense. If we have people who are unwilling to comply, I need their names and we will make short work of the situation. Please call me tomorrow to discuss. (emphasis added).

235.   The intentional conduct of miscoding Hill-Rom products continued, and, in or around January, 2012, a meeting was again held to discuss the subject of E1399 coding. Included in the meeting were Relator, Dearborn, Grosse, Thomas Karbowski and others, and Grosse and Relator emphasized the need to comply with HCPCS coding requirements and that to use the E1399 code when there was an existing applicable HCPCS code was not appropriate, would result in false claims, and expose Hill-to potential FCA liability.

236.   Upon information and belief, Grosse was notified of his termination from Hill-Rom shortly after this meeting.

237.   On or about November 28, 2012, Hill-Rom manager Shannon Dearborn came to Relator and asked why are you still using HCPCS code E0277 for the P500 Surface Mattress when she had been specifically been told to use E1399 and was continuing to refuse to do so. Relator told Dearborn that E0277 was the correct HCPCS for the P500 Surface Mattress, and her concern that to use another code would amount to fraudulent billing in violation of the FCA. Dearborn insisted

that Relator use the E1399 code, and Relator asked her to put that in writing, but did not get an immediate written response.

238.    Relator eventually received a FY2013 Products Listing from Dearborn, attached as **Exhibit 14**, and continued to be instructed to use the E1399 code for the P500, as well as other Hill-Rom DME, most of which had specific and applicable HCPCS codes and should not have been coded E1399.

239.    Upon information and belief, the E1399 Upcode Scheme included, but is not necessarily limited to, the following knowingly fraudulent practices of upcoding and miscoding:

> (a) Instead of correctly using the E0277 code for the P500 Therapy Surface Mattress in a sale of the P500 only, Hill-Rom knowingly and routinely miscoded and upcoded the P500 as E1399 in its claims to the federal government.  Instead of correctly using the E0277 code separately for the P500 Therapy Surface Mattress and the E0266 code separately for the CareAssist bed, Hill-Rom knowingly and routinely unlawfully bundled them as one item, and miscoded and upcoded the bundled CareAssist bed and the P500 as E1399 in its claims to the federal government.

> (b) Instead of correctly using the E0266 code separately for the CareAssist Bed (with siderails, without non-powered surface mattress), or the E0297 code (without siderails, without non-powered surface mattress), and the E0277 code separately for the P300, P310 or P320 Powered Surfaces, Hill-Rom knowingly and routinely unlawfully bundled them as one item, and miscoded and upcoded the bundled CareAssist bed and the P300, P310 or P320 as E1399 in its claims to the federal government.

> (c) Instead of correctly using the E0265 code separately for the CareAssist Bed (with siderails, with a non-powered surface mattress), or the E0296 code (without siderails, with a non-powered surface mattress), Hill-Rom knowingly and routinely unlawfully unbundled the CareAssist and non-powered mattress as two separate items, and miscoded and upcoded CareAssist bed and the non-powered mattress as E1399 in its claims to the federal government.

> (d) Instead of correctly using the E0193 code for the Progressa Bed sold bundled with an integrated powered air surface (such as a Pulmonary Surface or P500 surface), Hill-Rom knowingly and routinely miscoded and upcoded the bundled DME as a Progressa Bed as E1399 in its claims to the federal government.

(e) Instead of correctly using the E0265 code for the Progressa Bed sold bundled with a foam surface mattress, Hill-Rom knowingly and routinely miscoded and upcoded the bundled DME as a Progressa Bed as E1399 in its claims to the federal government.

(f) Instead of correctly using the E0266 code for the Progressa Bed sold separately but with a foam surface correctly and separately sold using the E0184 code for the foam surface, Hill-Rom knowingly and routinely miscoded and upcoded both DME products as E1399 in its claims to the federal government.

(g) Instead of correctly using the E0193 code for the TotalCare Bed sold bundled with an integrated powered air surface (such as a Pulmonary Surface or P500 surface), Hill-Rom knowingly and routinely miscoded and upcoded the bundled DME as a TotalCare Bed as E1399 in its claims to the federal government.

(h) Instead of correctly using the E0265 code for the TotalCare Bed sold bundled with a foam surface mattress, Hill-Rom knowingly and routinely miscoded and upcoded the bundled DME as a TotalCare Bed as E1399 in its claims to the federal government.

(i) Instead of correctly using the E0266 code for the TotalCare Bed sold separately but without a foam surface, and correctly using the E0184 code sold separately for the foam surface, Hill-Rom knowingly and routinely miscoded and upcoded both DME products as E1399 in its claims to the federal government.

(j) Instead of correctly using one of the following bariatric bed codes, E0301 (weight capacity for 350-600 pounds, no mattress), E0302 (weight capacity for over 600 pounds, no mattress), E0303 (weight capacity for 350-600 pounds, with mattress), E0304 (weight capacity for over 600 pounds, with mattress), regarding the Triflex, Triflex II, and Burke Triflex beds, Hill-Rom knowingly and routinely miscoded and upcoded these Triflex model beds as E1399 in its claims to the federal government.

(k) Instead of correctly using the E0266 code separately for the VersaCare Bed (with siderails, without non-powered surface mattress), or the E0297 code (without siderails, without non-powered surface mattress), Hill-Rom knowingly and routinely unlawfully miscoded and upcoded the VersaCare model beds as E1399 in its claims to the federal government.

(l) Instead of correctly using the E0265 code separately for the VersaCare Bed (with siderails, with a non-powered surface mattress), or the E0296 code (without siderails, without non-powered surface mattress), Hill-Rom knowingly and routinely unlawfully miscoded and upcoded VersaCare model beds and the non-powered mattress as E1399 in its claims to the federal government.

(m) Instead of correctly using the E0193 code separately for the VersaCare Bed (with an integrated powered air surface mattress), Hill-Rom knowingly and routinely unlawfully miscoded and upcoded VersaCare model beds and the integrated powered air mattress as E1399 in its claims to the federal government.

(n) Instead of correctly using the E0194 code separately for the Clinitron (Air Fluidized Specialty) Bed, Hill-Rom knowingly and routinely unlawfully miscoded and upcoded Clinitron Beds as E1399 in its claims to the federal government.

240.    The VersaCare bed came in different models in two basic formats, powered and non-powered.  The non-powered models were VC200, VC300, VC400, VC420, and VC500. The powered models were VC700, VC720, VC900 and VC920.  None of the VersaCare bed models should have been coded E1399.

241.    The CareAssist bed came in different models:  ES100, ES120, ES200, ES300, ES400AX, ES420AX, ES500, ES600, and ES610.  None of the CareAssist bed models should have been coded E1399.

242.    The following are representative samples of such false claims pursuant to Hill-Rom's E1399 Upcode Scheme:

| Patient | Primary Diagnosis | HCPCS Code Used | Correct HCPCS Code(s) | Product | Billed Amount | Payor | Date of Service | Claim Filed (Initial) |
|---|---|---|---|---|---|---|---|---|
| YB | L89.214 | E1399 | E0277 | P500 Therapy Surface Mattress | $ 18,000.00 | Medicaid (AZ) | 5/23/2017 | 5/26/2017 |
| AL | 343.0 | E1399 | E0277 | P500 Therapy Surface Mattress | $ 15,000.00 | Medicaid (WA) | 8/5/2015 | 8/28/2015 |
| WL | G82.20 | E1399 | E0277 | P500 Therapy Surface Mattress | $ 18,000.00 | Medicaid (VA) | 9/28/2017 | 10/4/2017 |
| MC | 854.00 | E1399 | E0277 | P500MR Pressure Distribution Mattress | $ 15,000.00 | Tricare | 4/15/2013 | 4/23/2015 |
| GD | G83.9 | E1399 | E0277 | P500MR Pressure Distribution Mattress | $ 15,000.00 | Medicare | 5/31/2016 | 6/9/2016 |
| CS | 854.00 | E1399* | E0266, E0277 | CareAssist ES Bed with P500 Mattress | $ 28,250.00 | Medicare | 8/11/2015 | 10/2/2015 |
| CS | 854.00 | E1399* | E0266, E0277 | CareAssist ES Bed with P500 Mattress | $ 17,045.30 | Medicaid (PA) | 8/11/2015 | 10/9/2015 |
| MN | G80.0 | E1399* | E0266, E0277 | CareAssist ES600 Bed with P310 Mattress | $ 9,783.00 | Medicare | 12/26/2013 | ? |
| BA | 343.2 | E1399* | E0266, E0277 | CareAssist Bed with P310 Mattress | $ 9,783.00 | Tricare | 9/9/2015 | 9/16/2015 |
| AN | G82.50 | E1399 | E0193 | Progressa Pro 885 with Pulmonary Surface | $ 65,175.00 | DOL | 6/8/2017 | 6/14/2017 |
| MC | G20 | E1399 | E0193 | Progressa Pro 885 with Pulmonary Surface | $ 65,175.00 | DOL | 6/8/2017 | 6/14/2017 |
| DC | S06.2X6S | E1399 | E0193 | Progressa Pro 885 with Pulmonary Surface | $ 65,175.00 | Medicaid (NY) | 5/19/2017 | 5/30/2017 |
| DH | 344.00 | E1399 | E0193 | TotalCare Sport Bed | $ 48,750.00 | Medicaid (CA) | 6/17/2015 | 7/27/2015 |
| JM | 344.03 | E1399 | E0193 | TotalCare Sport Bed | $ 34,393.00 | Medicare | 1/14/2012 | ? |
| SN | 854.00 | E1399 | E0193 | TotalCare Bed | $ 46,589.00 | Tricare | 10/21/2010 | 10/29/2010 |
| TC | 496 | E1399 | E0266 | ES 100 CareAssist Bed | $ 13,250.00 | Medicare | 3/3/2015 | 3/10/2015 |
| TC | L89.154 | E1399 | E0266 | ES 120 CareAssist Bed with Scale | $ 14,750.00 | Medicaid (OK) | 5/26/2017 | 6/1/2017 |
| AL | 343.0 | E1399 | E0266 | ES 100 CareAssist Bed | $ 13,250.00 | Medicaid (WA) | 8/5/2015 | 8/28/2015 |
| GD | G83.9 | E1399 | E0266 | ES 100 CareAssist Bed | $ 13,250.00 | Medicare | 5/31/2016 | 6/9/2016 |
| WL | G82.20 | E1399 | E0266 | ES 100 CareAssist Bed | $ 13,250.00 | Medicaid (VA) | 9/28/2017 | 10/4/2017 |
| MC | 854.00 | E1399 | E0266 | ES 100 CareAssist Bed | $ 13,613.00 | Tricare | 4/15/2015 | 4/23/2015 |
| TP | G83.5 | E1399 | E0193 | VC900 VersaCare Bed | $ 18,710.00 | Tricare | 1/4/2016 | 1/11/2016 |
| RF | 344.01 | E1399 | E0193 | VC900 VersaCare Bed P500 | $ 17,845.00 | Medicare | 1/7/2015 | ? |
| BW | M85.58 | E1399 | E0193 | VC900 VersaCare Bed P500 | $ 28,350.00 | Medicare | 9/7/2017 | 9/12/2017 |
| AC | 341.0 | E1399 | E0193 | VC900 VersaCare Bed P500 Bed System | $ 23,906.00 | FEHB | 2/12/2015 | 2/17/2015 |
| SB | 952.9 | E1399 | E0193 | VC900 VersaCare Bed P500 Bed System | $ 23,906.00 | Medicare | 3/10/2015 | 3/17/2015 |
| NH | 707.00 | E1399 | E0193 | VC900 VersaCare Bed P500 Bed System | $ 23,906.00 | FEHB | 9/30/2015 | 10/12/2015 |
| JR | 330.0 | E1399 | E0193 | VC700 VersaCare Air Bed System | $ 15,344.00 | Medicaid (MI) | 5/1/2015 | 5/19/2015 |
| JP | 443.9 | E1399 | E0301 or E0302 | Triflex II with Scale | $ 30,249.00 | Medicare | 6/30/2015 | 8/17/2015 |
| PS | E66.01 | E1399 | E0301 or E0302 | Triflex II Bariatric | $ 24,200.00 | Medicaid | 3/23/2016 | 5/26/2016 |
| MK | N18.6 | E1399 | E0301 or E0302 | Triflex II with Scale Bariatric Bed | $ 43,562.00 | Medicare | 8/18/2017 | 8/24/2017 |
| AA | E66.9 | E1399 | E0301 or E0302, plus E0277 | Triflex (Burke) Bed | $ 24,200.00 | Medicaid (VA) | 3/23/2017 | 3/28/2017 |
| WA | 952.05 | E1399 | E0194 | Clinitron Bed/Mattress | $ 66,443.00 | Medicaid (CA) | 5/19/2015 | 6/23/2015 |
| DM | 707.23 | E1399 | E0194 | Clinitron Bed/Mattress | $ 66,443.00 | Medicaid (FL) | 5/20/2015 | 5/27/2015 |

*Bundled products - These DME must not be bundled and must be separately billed on claim.

243.    A comparison of fee schedule allowable charges to Hill-Rom's claims set forth above underscores the extent of Hill-Rom's greed, profit motivation, and excessive and unreasonable charges which resulted from the E1399 Upcode Scheme.

244.    Upon information and belief, the following are examples of such overcharging as a result of the E1399 Upcode Scheme, referencing the preceding spreadsheet:

245.    Patient AL's Medicaid 2015 WA allowable for E0277 was $6,494.93, not $15,000 H-R billed on 8/28/2015.

complaint 2019-10-30

246.    Patient MC's Tricare 2015 KS allowable for E0277 was $8,748.74, not $15,000 H-R billed on 4/23/2015.

247.    Patient CS's Medicare 2015 PA allowable for E0277 was $8,027.50, not $28,250 H-R billed on 10/2/2015.  Here, Hill-Rom bundled two separately identifiable DME items into one miscellaneous HCPCS E1399 code to upcode and upcharge Medicare.

248.    Patient GD's Medicare 2016 CA allowable for E0266 was $1,869.53, not $13,250 H-R billed on 6/9/2016.

249.    Patient WL's Medicaid 2017 VA allowable for E0266 was $1,554.67, not $13,250 H-R billed on 10/4/2017.

250.    Patient MC's Tricare 2015 KS allowable for E0266 was $2,043.08, not $13,613 H-R billed on 4/23/2015.

251.    Patient DC's Medicaid 2017 NY allowable for E0193 was $4,543.50, not $65,175 H-R billed on 5/30/2017.

252.    Patient JM's Medicare 2012 NY allowable for E0193 was $10,873.33, not $34,393 H-R billed for the DME product provided on 1/14/2012.

253.    Patient TP's Tricare 2016 TX allowable for E0193 was $9,944.61, not $18,710 H-R billed on 1/11/2016.

254.    Patient RF's Medicare 2015 TX allowable for E0193 was $10,393.24, not $17,845 H-R billed for the DME product provided on 1/7/2015.

255.    Patient NH's Tricare 2015 KS allowable for E0193 was $11,235.90, not $23,906 H-R billed on 10/12/2015.

256.    Patient MK's Medicare 2017 NY allowable for E0301/E0277 (combined) was $12,008.49, not $43,562 H-R billed on 8/24/2017.

257.    Patient JP's Medicare 2015 NY allowable for E0301 was $3,259.75, not $30,249 H-R billed on 8/17/2015.

258.    Relator is informed and believes that Hill-Rom's practice of submitting knowingly and materially false and fraudulent claims to the federal government for pursuant to its E1399 Upcode Scheme was a company-wide endeavor and that further investigation by the federal government will reveal thousands of similar false and fraudulent claims.

259.    The federal government would not have paid these E1399 Upcode Scheme claims had the truth been known that the subject DME products were upcoded, miscoded, not medically necessary, and not medically reasonable for the patients.

260.    Hill-Rom certified on the Claim Form 1500s for each of these claims, both expressly and impliedly, that the claims were true, complete and accurate, even though they were not.

261.    Hill-Rom certified on the Claim Form 1500s for each of these claims, both expressly and impliedly, that the DME products were properly and accurately coded, when, in truth and fact, they were not.

262.    Hill-Rom certified on the Claim Form 1500s for each of these claims, both expressly and impliedly, that the DME products were medically necessary and reasonable for the patients, when, in truth and fact, they were not.

263.    Hill-Rom certified on the Claim Form 1500s for each of these claims, both expressly and impliedly, that the claims complied with applicable statutes, regulations, rules and program requirements, including SIE rules, when, in truth and fact, they did not.

264.    Hill-Rom knew that these E1399 Upcode Scheme claims to the federal government for reimbursement were for upcoded, miscoded, SIE non-compliant, medically unnecessary and medically unreasonable DME products and knew these claims were materially false and

fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or was deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and caused to be presented, said false and fraudulent claims in violation of the FCA.

**The Co-Pay Waiver Scheme to Induce DME Orders in Violation of the AKS Statute**

265.    Defendant Hill-Rom and its employees knowingly, willfully and intentionally offered, arranged for, and provided remuneration to federal health care beneficiaries with the intent to induce continued DME referrals and orders, in violation of the AKS, 42 U.S.C. § 1320a-7b.  Defendant Hill-Rom was not entitled to reimbursement for claims arising out of this scheme, and Defendant Hill-Rom knowingly and willfully caused the submission of false and fraudulent Co-Pay Waiver Scheme claims, in violation of the FCA.

266.    The AKS not only prohibits outright bribes to a federal health care beneficiary, but also prohibits offering or paying for any remuneration to a federal health care beneficiary that has, as one purpose, inducement of the federal health care beneficiary to order a DME product and/or related services which are reimbursed by the federal health care programs.

267.    Claims to federal health care insurance programs that include items or services resulting from a violation of the AKS are false or fraudulent under the FCA.  42 U.S.C. §1320a-7b(g).

268.    Defendant Hill-Rom knowingly presented, or caused to be presented, for payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME which were ordered as a result of Defendants' waived co-payments for federal health care beneficiaries in violation of the federal AKS Statute.

269.  "Co-pays" or "Co-payments," as used in this Complaint, includes co-payments, deductibles or other financial responsibilities of a patient for which Hill-Rom was entitled to collect from the patient but which such patient financial responsibilities were waived by Hill-Rom.

270.  Pursuant to its nationwide Co-Pay Waiver Scheme to defraud the federal government in violation of the AKS and the FCA, the Defendant Hill-Rom knowingly and fraudulently routinely presented, or caused to be presented, materially false claims to the federal government and its contractors for Hill-Rom DME products which were the result of illegal remuneration paid to federal health care beneficiaries in the form of waived co-payments.

271.  The routine waiver of a beneficiary's deductibles, copays and/or other patient financial responsibilities has long been unlawful as an AKS kickback in the federal health insurance programs. On December 19, 1994, the OIG issued a Special Fraud Alert on the subject, stating that "routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare."

272.  Defendant Hill-Rom knowingly and willfully presented or caused to be presented false or fraudulent claims for payment or approval to the United States for DME products that were false as a result of illegal kickbacks in the form of waived copays, deductibles or patient financial responsibilities and which were billed to Medicare, Medicaid and Tricare.

273.  Upon information and belief, no AKS safe harbor or exception applies to Hill-Rom's routine waivers of co-pays, deductibles or patient financial responsibilities.

274.  The following is, upon information and belief, a partial list of knowing, willful and intentional waivers of copays, deductibles or patient financial responsibilities by Hill-Rom, one

purpose of which was to induce the purchase of the DME and induce future referrals and orders of

DME products and service by federal health care beneficiaries:

| Patient AB# | Hill-Rom Invoice # | Date of Service | Primary Payor | Secondary Payor | State | Amount Waived | % of Claim Waived |
|---|---|---|---|---|---|---|---|
| xxx3530 | 733348 | 10/19/2016 | Medicaid | N/A | KY | $ 1,135.48 | 100 |
| xxx4375 | 688325 | 8/31/2016 | Medicare | Medicaid | TX | $ 1,877.10 | 100 |
| xxx427 | 692198 | 6/10/2016 | Medicare | Medicaid | AL | $ 158.83 | 15.35 |
| xxx8668 | 585627 | 7/12/2017 | Medicare | Medicaid | PA | $ 504.89 | 9.31 |
| xxx1757 | 691759 | 9/26/2016 | Medicare | Medicaid | AL | $ 1,331.81 | 28.51 |
| xxx4638 | 410318 | 4/7/2016 | Medicare | Medicaid | CT | $ 121.74 | 14.15 |
| xxx7382 | 733948 | 11/8/2016 | Medicare | Medicaid | VA | $ 450.65 | 18.73 |
| xxx1509 | 691740 | 6/14/2016 | Medicare | Medicaid | OK | $ 81.03 | 13.54 |
| xxx5164 | 640221 | 7/22/2016 | Medicare | Medicaid | LA | $ 279.73 | 15.13 |
| xxx3887 | 813896 | 11/22/2016 | Medicare | Medicaid | MN | $ 579.58 | 53.67 |
| xxx9951 | 815624 | 11/10/2016 | Tricare | N/A | ? | $ 560.00 | 100 |
| xxx3930 | 264667 | 1/26/2016 | Medicare | BCBS AL FEP | AL | $ 2,389.28 | 50.23 |
| xxx351 | 591840 | 7/13/2016 | Medicare | Medicaid | WY | $ 3,104.81 | 42 |
| xxx1404 | 542246 | 6/28/2016 | Medicare | Medicaid | WI | $ 41.51 | 17.76 |
| xxx1310 | 9986576 | 9/14/2015 | Medicare | BCBS VA FEP | VA | $ 1,221.83 | 59.04 |
| xxx110 | 542240 | 6/22/2016 | Medicare | Medicaid | RI | $ 679.88 | 15.85 |
| xxx206 | 692209 | 9/6/2016 | Medicare | Medicaid | NY | $ 127.29 | 20.88 |
| xxx3509 | 399227 | 4/1/2016 | Medicare | Medicaid | TN | $ 739.56 | 20.2 |

275.    Hill-Rom, by and through its officers, employees, servants and agents, knew that it was

materially misrepresenting in its Co-Pay Waiver Scheme claims, both expressly and impliedly,

that the claims were compliant with the AKS, when, in fact, they were not.

276.    Hill-Rom, by and through its officers, employees, management, servants and agents, knew

that it was materially misrepresenting both expressly and impliedly, that these Co-Pay Waiver

Scheme claims were true, accurate and complete, when, in fact, they were not.

277.    Upon information and belief, Hill-Rom received payment from the federal health care

programs for these fraudulently submitted Co-Pay Waiver Scheme claims.  The federal

government would not have paid these claims had it known that these claims were false and fraudulent. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the claims complied with the AKS Statute. The federal government would not have paid these Co-Pay Waiver Scheme claims had it known the falsity of Hill-Rom's express and/or implied representations that the claims were true, accurate and complete.

278.    Hill-Rom, by and through its officers, employees, servants and agents, knew that these Co-Pay Waiver Scheme claims presented to the federal government for reimbursement or approval which resulted from remuneration inducements to beneficiaries were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or was deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly and willfully presented, and knowingly and willfully caused and conspired to be presented, said false and fraudulent claims in violation of the AKS and the FCA.

**The Enrollment/Licensing Scheme**

279.    The Defendants knowingly presented, or caused or conspired to be presented, for payment or approval, materially false or fraudulent claims to the federal government for Hill-Rom DME products by fraudulently submitting claims in violation of Medicare, Medicaid and Tricare enrollment, licensing and claims processing requirements.

280.    In a nationwide Enrollment/Licensing Scheme to defraud the federal government in violation of the FCA, the Defendants knowingly and fraudulently routinely presented claims to the federal government and its contractors for Hill-Rom and/or ARI DME products by intentionally misrepresenting and/or failing to disclose the true and correct identity, enrollment and/or licensing

status of the billing entity or provider, the rendering entity or provider, and/or the service facility entity or provider, all in violation of the federal government's enrollment, licensing and claims processing requirements and instructions. These material, knowingly unlawful fraudulent acts upon, and misrepresentations and omissions to, the federal government included the following: (a) Billing from non-enrolled sites; (b) Billing from non-licensed sites; (c) Billing with intentionally wrong or fake National Provider Identification ("NPI") numbers; (d) Billing with an entity to which no NPI had been assigned; (e) Billing and intentionally failing to disclose any NPI number; (f) Billing from closed sites; (g) Billing from co-located sites; and, (h) Billing by a provider that did not provide the DME product.

281.    Upon information and belief, providing the federal government correct information about the billing entity or provider, the rendering entity or provider, and/or the service facility entity or provider, is a condition of payment of claims by the federal government.

282.    The aforementioned federal government Enrollment Application CMS Form 855-S specifies that payment of claims are conditioned upon the claim and the underlying transaction complying with all federal government laws, regulations and program instructions.

283.    The aforementioned CMS Claim Form 1500 expressly states that anyone "who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form" may be prosecuted under applicable federal and state laws.

284.    Medicare Supplier standards require that "a supplier must be in compliance with all applicable Federal and State licensure and regulatory requirements." 42 C.F.R. § 424.57(c)(1); DME MAC Jurisdiction C Supplier Manual, Chapter 2 – Supplier Enrollment, ¶3 Supplier Standards, p. 6 (2017).

285.    The Enrollment Application CMS Form 855-S and related instructions require that any changes to the information provided in the Form 855-S "must be reported within 30 days of the change."

286.    Federal regulations require an enrolled business have a qualified and separate operational physical practice location.  42 C.F.R. § 424.502  Entities must enroll with the National Supplier Clearinghouse ("NSC") and must have both an NPI and a PTAN in order to be eligible to receive Medicare payments for covered DME services, Chapter 2 – Supplier Enrollment,  ¶1 National Provider Identifier (NPI), p.1-2; ¶2 National Supplier Clearinghouse (NSC),  p. 2 (2017).

287.    Under federal regulations and instructions, federal DME providers are prohibited from sharing locations with other federal DME providers and suppliers.  42 C.F.R. § 424.57(c)(29).  Despite the prohibition against co-locations, Hill-Rom and ARI presented claims to the federal government from co-located sites.

288.    For example, both Hill-Rom and ARI were co-located at a North Charleston, South Carolina site from at least about 2009 through 2015.  Likewise, both Hill-Rom and ARI were co-located at a Saint Paul, Minnesota site from at least about 2009 through the present.  Hill-Rom and ARI both operated DME services from these two sites during the time periods indicated.  As a result, all ARI and Hill-Rom claims to the federal government from ARI and Hill-Rom which arose from the North Charleston and Saint Paul sites were knowingly and materially false and fraudulent during the times indicated.

289.    Attached as **Exhibit 15** is a list of examples of Hill-Rom's materially false and fraudulent claims knowingly presented to the federal government and/or its contractors for DME products or services due to one or more of the following material misrepresentations, omissions and/or fraudulent acts: (a) Billing from non-enrolled sites; (b) Billing from non-licensed sites; (c) Billing

with intentionally wrong or fake NPI numbers; (d) Billing with an entity to which no NPI had been assigned; (e) Billing and intentionally failing to disclose any NPI number; (f) Billing from closed sites; (g) Billing from co-located sites; and, (h) Billing by a provider that did not provide the DME product.

290.     Upon information and belief, most states in which Hill-Rom and ARI were doing business required DME providers or suppliers to be licensed or permitted.

### **ALABAMA**

291.     Upon information and belief, Alabama's statutes and/or regulations require a DME provider to be licensed annually and each separate location is required to be licensed.  Ala. Code § 34-14C-4(a).

292.     Upon information and belief, Hill-Rom has had two locations in Alabama which operated as DME service providers between on or about September 1, 2014 until September 29, 2017 without an Alabama DME license, and all claims to the federal government arising from two locations during this time period were knowingly false and fraudulent.  The addresses for these two Hill-Rom locations are (a) 1101 Geneva Street, Ste 304, 305, 306, Opelika, AL 36801; (b) 26400 Pollard Rd., Unit B, Daphne, AL 36526.

293.     Relator advised Hill-Rom in the spring of 2017 that it needed to obtain licenses to operate in Alabama at the Daphne and Opelika locations, specifically warning employees such as Dan Davidson, Tom Karbowski, Nicole Jenkins and Joe Price that it was fraudulent to bill federal programs without proper licenses and enrollment.

294.     Hill-Rom knew that Daphne and Opelika locations were unlicensed and were being used to deliver, service, and repair home DME in Alabama consumers' homes, as well as in other states, but intentionally chose to ignore Relator's warnings to obtain proper licensing.  Thus, upon

information and belief, all Hill-Rom claims presented to the federal government for its above referenced Daphne and Opelika locations which were delivering and servicing DME in Alabama were false and fraudulent between on or about September 1, 2014 until September 29, 2017.

295.    Upon information and belief, since about August, 2014, Hill-Rom and ARI have been co-located at the Daphne facility which was being used to deliver, service, and repair home DME in Alabama consumers' homes for both Hill-Rom and ARI.  Both Hill-Rom and ARI knew the Daphne facility was co-located in violation of federal standards.  Thus, upon information and belief, all Hill-Rom and ARI claims presented to the federal government for the above referenced Daphne location which were delivering and servicing DME in Alabama were false and fraudulent since about August, 2014.

296.    Upon information and belief, between about 2007 through 2014, Hill-Rom enrolled only one facility with Medicare to provide DME services in Alabama, and this facility was located at 418 E. President Ave., #8, Tupelo, MS 38804, with NPI# 1629158738 and PTAN# 0240470061. However, during this time period, Hill-Rom had four facilities in Alabama which were not enrolled but which were being used to deliver, service, and repair home DME in Alabama Medicare beneficiaries' homes for Hill-Rom.  These facilities which were not enrolled with Medicare but were providing DME services in Alabama were located at Birmingham, Daphne, Huntsville and Opelika.  Thus, upon information and belief, all Hill-Rom Medicare claims presented to the federal government for the above referenced Birmingham, Daphne, Huntsville and Opelika locations, which were delivering and servicing DME in Alabama, were false and fraudulent from about 2007 through 2014.

297.    Upon information and belief, Hill-Rom enrolled its Birmingham facility with Medicare in 2014.  From about 2014 through at least 2018, Hill-Rom had two facilities in Alabama which were

not enrolled but which were being used to deliver, service, and repair home DME in Alabama Medicare beneficiaries' homes for Hill-Rom. These facilities which were not enrolled with Medicare but were providing DME services in Alabama were located at Daphne and Opelika. Thus, upon information and belief, all Hill-Rom Medicare claims presented to the federal government for the above referenced Daphne and Opelika locations, which were delivering and servicing DME in Alabama, were false and fraudulent from about 2014 through at least 2018.

298.    Upon information and belief, the United Mine Workers of America Health and Retirement Funds ("UMWA-HRF") has been a federal program since 2006.

299.    As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to Alabama UMWA-HRF Patient RW's claim dated May 12, 2015, upon information and belief Hill-Rom's claim was false because the claim contained an intentionally wrong or fake rendering provider NPI number as the cited NPI number 1205993797 was assigned to a Charleston, S.C. location (Box 24J), failed to disclose the service location provider or its NPI number (Box 32), and the Charleston billing provider did not provide the service, the Charleston location was not licensed in Alabama, and the Charleston site was co-located with an ARI facility (Box 33).

**ARIZONA**

300.    Upon information and belief, Arizona's statutes and/or regulations have required a DME provider to be licensed or permitted annually since at least 1998. Ariz. Admin. Code § R4-23-692, -693; Ariz. Rev. Stat. §§ 1927.02, 1929-1931, 1939.

301.    Upon information and belief, Hill-Rom had two locations in Arizona in which it operated as a DME service provider since about 2009 through 2018 without an Arizona DME license, and all claims to the federal government arising from these two locations during that time period were

knowingly false and fraudulent. The addresses for these two Hill-Rom locations are (a) 4565 S. Palo Verde Rd., Suite 223, Tucson, AZ 85714-1960; and, (b) 2120 S. 7th Avenue, Suite 150/160, Phoenix, AZ 85007-4161.

302.    Upon information and belief, Hill-Rom was also delivering DME products to Arizona residents, from on or about 2009 through 2018, through its facility in Las Vegas, Nevada, even though neither Hill-Rom nor its Nevada facility had a license to operate with the state of Arizona. The address for this facility is 1889 East Maule Ave., Suites C & D, Las Vegas, NV 89119.

303.    Relator advised Hill-Rom in 2017 that it needed to obtain a license to operate in Arizona. Hill-Rom knew its unlicensed Las Vegas, Nevada location was being used to deliver, service, and repair home DME in Arizona consumers' homes, but intentionally chose to ignore Relator's warnings to obtain proper licensing until 2018. Thus, upon information and belief, all Hill-Rom claims presented to the federal government for its above referenced Nevada location which was delivering and servicing DME in Arizona have been false and fraudulent since about between 2009 and 2018.

304.    Hill-Rom was also using medical gas at its two above referenced locations within the state of Arizona. Upon information and belief, Hill-Rom was required to obtain an Arizona permit or license for medical gas, since at least 2013. Ariz. Admin. Code § R4-23-692, -693; Ariz. Rev. Stat. §§ 1927.02, 1929-1931, 1939. Hill-Rom intentionally chose to not obtain an applicable medical gas license or permit for either location until 2018. Thus, upon information and belief, all Hill-Rom claims presented to the federal government for its above referenced Arizona locations which were utilizing medical gas and delivering and servicing DME in Arizona have been false and fraudulent since about between 2013 and 2018.

305.    Upon information and belief, in about 2013 Hill-Rom enrolled in the Arizona Medicaid program as a DME service provider a Hill-Rom site located at 1525 S. Gladiola St., Salt Lake City, UT 84104-6560.  However, in truth and fact, the Utah location was never used as a Hill-Rom DME service provider in the state of Arizona, and its DME services were provided through the non-enrolled sites at Phoenix, Tucson and Las Vegas, Nevada.  Thus, upon information and belief, all Hill-Rom claims presented to the federal government for its above referenced Utah location for DME services provided in Utah have been false and fraudulent since about 2013.

306.    As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to Arizona Medicare Patient YB's claim dated July 11, 2017, upon information and belief, Hill-Rom's claim was knowingly false because the claim contained an intentionally wrong or fake rendering provider and rendering provider NPI number as the cited NPI number 1114004223 was assigned to its Utah location which did not render the service (Box 24J), the service location provider was not licensed and its NPI number was not disclosed (Box 32), and the billing provider did not provide the service, the Indiana billing provider fraudulently used the Utah location NPI number, the Indiana billing provider was not licensed in or for Arizona, and it was not enrolled in Medicare (Box 33).

## CALIFORNIA

307.    Upon information and belief, California's DME statutes and/or regulations require that a person or entity that provides DME in the state must be licensed and each place of business must be separately licensed.  Cal. Health and Safety Code, Division 104, Part 5, Article 6, Licenses, §§ 111615 – 111656.13.

308.    Upon information and belief, Hill-Rom has had seven locations in California which operated as DME service providers since on or about January, 2015 through October, 2017 without

a California DME license, and all claims to the federal government arising from these seven locations during that time period were knowingly false and fraudulent. The addresses for these seven Hill-Rom locations are: (a) 3707 Meadow View Drive, Suite 400, Redding, CA 96002; (b) 2935 S. Elm Ave., Suite 103, Fresno, CA 93706; (c) 9596 Chesapeake Drive, San Diego, CA 92123-1344; (d) 375 Oyster Point Boulevard, Unit 6, South San Francisco, CA 94080-1977; (e) 9743 Independence Ave., Chatsworth, CA 91311-4318; (f) 1110 Palmyrita Ave., Suite 100, Riverside, CA 92507-1723; and, (g) 830 Riverside Parkway, Suite 90, West Sacramento, CA 95605-1505.

309.   Upon information and belief, Medicare, Tricare and Medicaid each require that a DME provider enroll each of its separate locations which provide DME services.

310.   Upon information and belief, Hill-Rom was enrolled with Medicare to provide DME services in California through its location at 5516 Bandini Blvd., Bell, CA 90201 from about 2009 until about March, 2015. The Bell location closed about 2014. Upon information and belief, Hill-Rom was enrolled with Medicare to provide DME services in California through its location at 12010 Woodruff Avenue, Suite D, E and F, Downey, CA 90241 from about March, 2015 until the present.

311.   Upon information and belief, from about 2009 through the present, all of Hill-Rom's DME business locations in California were providing DME services to Medicare beneficiaries, even though none but the Bell location (2009-2015) and the Downey location (2015-present) were enrolled with Medicare. Thus, upon information and belief, all Hill-Rom Medicare claims presented to the federal government for its California DME locations which were delivering and servicing DME in California, other than those claims from the Bell and Downey locations, have been knowingly false and fraudulent since about 2009.

312.   Upon information and belief, Hill-Rom was enrolled with Medicaid to provide DME services in California through its location at 1412 North Batavia, Orange, CA 92867 from about 2009 until about 2011.  Upon information and belief, Hill-Rom was enrolled with Medicaid to provide DME services in California through its location at 5516 Bandini Blvd., Bell, CA 90201 from about 2011 until the present.

313.   Upon information and belief, from about 2009 through 2017, all of Hill-Rom's DME business locations in California were providing DME services to Medicaid beneficiaries, even though none but the Orange location (2009-2011) and the Bell location (2011-present) were enrolled with Medicaid.  In addition, the Bell location's Medicaid enrollment between 2011 and 2017 was fraudulent because it was based upon the fraudulent use of an NPI number previously assigned to the Orange location until 2017.

314.   Upon information and belief, all Hill-Rom Medicaid claims presented to the federal government for its DME locations which were delivering and servicing DME in California, other than those claims from the Orange location when the DME was actually provided by the Orange location while this location was enrolled with Medicaid (2009-2011) and those claims from the Bell location while this location was apparently properly enrolled with Medicaid (2017 to present), have been knowingly false and fraudulent and in violation of the FCA since about 2009.

315.   Upon information and belief, all Hill-Rom Medicaid claims presented to the federal government for its Bell DME location which was delivering and servicing Medicaid DME customers in California, due to its fraudulent NPI number enrolled with Medicaid, were knowingly false and fraudulent and in violation of the FCA from about 2011 through 2017.

316.   As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to California Medicaid Patient DH's claim dated July 27, 2015, upon information

and belief, Hill-Rom's claim was knowingly false because the claim contained an intentionally wrong or fake rendering provider NPI number as the cited NPI number 1326135583 was for the closed Orange location (Box 24J), falsely identified the service location provider as the Bell location which was a closed location (Box 32), falsely identified a billing provider which did not provide the service, falsely identified the North Charleston, S.C. billing provider which was not enrolled in the California Medicaid program and fraudulently used the NPI number of Orange location (which was closed), and the Charleston site billing provider was co-located with an ARI facility (Box 33).

**FLORIDA**

317.    Upon information and belief, Florida's DME statutes and/or regulations require that a person or entity that provides DME, sometimes referenced as "home medical equipment" or "HME," in the state must hold a license issued by the Florida Agency for Health Care Administration and a "separate license is required of all home medical equipment providers operating on separate premises, even if the providers are operated under the same management." Fla. Stat. § 400.93(1) - (4).

318.    Upon information and belief, Hill-Rom has had at least four locations in Florida which have operated as DME service providers without a Florida DME license or permit, and all claims to the federal government arising from these four locations were knowingly false and fraudulent during the time frames indicated hereinafter.  The addresses for these four Hill-Rom locations are (a) 11220 Metro Parkway, Suite 11, Fort Myers, FL 33912, which was unlicensed from 8/15/2010 through 7/29/2011; (b) 4052 Philips Highway, Suite 15, Jacksonville, FL 32207, which was unlicensed from 12/2/2016 to 05/31/2017; (c) 7199 S. Conway Unit 200, Orlando, FL 32812,

which was unlicensed from 2/28/2016 through 5/31/2017; and, (d) 8507 Benjamin Road, Suite C., Tampa, FL 33634, which was unlicensed from 8/15/2016 through 05/31/2017.

319.    Upon information and belief, Florida's statutes and/or regulations require that a person or entity that provides or possesses medical gas in the state must hold a license or permit issued by the Florida Department of Business and Professional Regulation, or obtain an exemption.  Fla. Stat. § 499.83; Fla. Admin. Code Rule 61N-1.015.

320.    Upon information and belief, Hill-Rom has had at least eight locations in Florida which have operated as DME service providers, which were required to have a Florida medical gas license or permit but were not so licensed or permitted, and had no exemption, and all claims to the federal government arising from these eight locations were knowingly false and fraudulent during the time frames indicated hereinafter.  The addresses for these eight Hill-Rom locations are (a) 341 N. Bryan Road, Dania Beach, FL 33004, which had no medical gas license, permit or exemption from 7/01/2013 through 9/12/2017; (b) 3570 NW 97 Blvd., Unit 15 & 16, Gainesville, FL 32606, which had no medical gas license, permit or exemption from 6/1/2017 through 8/21/2017; (c) 8032 Philips Hwy, Unit 1, Jacksonville, FL 32256, which had no medical gas license, permit or exemption from 6/1/2016 through 9/18/2016; (d) 4051 Philips Hwy, Suite 15, Jacksonville, FL 32207, which had no medical gas license, permit or exemption from 6/1/2016 to 9/18/2016 and from 10/1/2018 to present; (e) 7199 S. Conway Unit 200, Conway, FL 32812, which had no medical gas license, permit or exemption from 3/1/2016 through 8/21/2017; (f) 9020 Brittany Way, Tampa, FL 33619, which had no medical gas license, permit or exemption from 4/1/2010 through 8/15/2016; and, (g) 8507 Benjamin Road, Suite C, Tampa, FL 33634, which had no medical gas license, permit or exemption from 8/16/2016 through 8/28/2017; and, 12541 Metro

Parkway, Unit 18 & 19, Fort Myers, FL 33912, which had no medical gas license, permit or exemption from 8/16/2012 to the present.

321.    Upon information and belief, Hill-Rom was required to have a reciprocal licenses when a location outside the state of Florida was providing DME products and services within the state of Florida.  That is, Hill-Rom was required to be licensed in both the foreign state and the state of Florida in order for the out-of-state location to be authorized to provide services within the state of Florida.  Upon information and belief, Hill-Rom's location at 26400 Pollard Rd, Unit B, Daphne, AL 36526, provided DME products and services within the state of Florida from about 2014 through 2017, even though the Daphne location was not licensed in Alabama during that time period.  Thus, upon information and belief, all of Hill-Rom's claims to the federal government arising from the Daphne location for services provided to Florida federal beneficiaries were knowingly false and fraudulent during the time frames indicated.

322.    Upon information and belief, ARI was enrolled with the Florida Medicaid program for its site located at 7616 Southland Blvd., Suite 105A, Orlando, FL 32809 from at least about 2006 through April, 2019.  Upon information and belief, ARI fraudulently enrolled the NPI number of its Orlando site with Medicaid in about 2006.  Upon information and belief, at that time, ARI enrolled its Orlando site with Medicaid and falsely represented the Orlando site's NPI number as 1053357905.  However, in truth and fact, NPI number 1053357905 had been previously assigned, and continued to be assigned, by CMS's NPPES system to ARI's site located at 1020 West County Road F, Saint Paul, MN 55126.  Upon information and belief, it was not until May, 2019, that ARI appropriately obtained an NPI number (1831754977) for its Orlando site from CMS, but ARI has still not amended its Medicaid enrollment to show the correct NPI number for its Orlando site.  Upon information and belief, since about at least 2009 until the present, ARI's location at Orlando

provided DME products and services in the state of Florida, even though it never obtained a CMS NPI number until May, 2019 and has been fraudulently using the Saint Paul NPI number since about 2006. As a result, all of ARI's claims to Medicaid arising from the Orlando location for services provided to Florida Medicaid beneficiaries were knowingly false and fraudulent since about 2006.

323. Upon information and belief, no Hill-Rom location based in Florida was enrolled in Medicare, Tricare or Medicaid since about 2009 when Hill-Rom's Tallahassee location closed. Upon information and belief, most, if not all, of Hill-Rom's Florida locations were providing DME services and products to federal beneficiaries located in Florida since about 2009. As a result, all of Hill-Rom's claims to Medicare, Tricare and Medicaid arising from any Hill-Rom Florida-based location for DME services and products provided to Florida Medicare, Tricare and Medicaid beneficiaries were knowingly false and fraudulent since about 2009. Hill-Rom invoices show the service centers which provided the DME, including those from Florida-based locations, and demonstrate the falsity of underlying claims to the federal government.

324. As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to Florida Medicaid Patient DM's claim dated July 10, 2015, upon information and belief, Hill-Rom's claim was false because the claim contained an intentionally wrong or fake rendering provider NPI number as the cited NPI number 1205993797 was assigned to a Charleston location (Box 24J), the service location provider was unlicensed for medical gas and non-enrolled in Medicaid at the time of delivery and it provided no NPI number (Box 32), the billing provider did not provide the service, and Charleston cite was co-located with an ARI facility (Box 33).

**GEORGIA**

325.    Upon information and belief, Georgia's DME statutes and/or regulations require that a person or entity that provides DME in the state "must hold a license issued by the Board" and "each place of business shall be licensed by the Board."  Ga. Comp. R. & Regs., Rule 48-7B-.02(1), (5), DME Supplier Licensing Requirements.

326.    Upon information and belief, Hill-Rom has had four locations in Georgia which have been operating as DME service providers since on or about April 10, 2018 without a Georgia DME license, and all claims to the federal government arising from these four locations since then were knowingly false and fraudulent.  The addresses for these four Hill-Rom locations are (a) 1914A North Leg Rd., Augusta, GA 30909-44022; (b) 2905 Amwiler Road, Ste A., Atlanta, GA 30380-6000; (c) 105 Gateway Drive, Suite B, Macon, GA 31210-1141; and, (d) 2700 Gregory Street, Suite 240, Savannah, GA 31404-1443.

327.    Upon information and belief, Hill-Rom was also delivering DME products to Georgia residents, from on or about April 10, 2018, through its facility in Jacksonville, Florida, even though the Florida facility had no license with the state of Georgia.  The address for this facility is 8032 Philips Hwy Unit 1, Jacksonville, FL 32256-4453.

328.    Relator advised Hill-Rom in the summer of 2017 that it needed to obtain licenses to operate in Georgia.  Hill-Rom knew unlicensed Jacksonville, Florida location was being used to deliver, service, and repair home DME in Georgia consumers' homes, as well as in multiple other states, but intentionally chose to ignore Relator's warnings to obtain proper licensing.  Thus, upon information and belief, all Hill-Rom claims presented to the federal government for its above referenced Jacksonville, Florida location which was delivering and servicing DME in Georgia have been false and fraudulent since about April 10, 2018.

329.    Upon information and belief, in 2011 Hill-Rom enrolled in the Georgia Medicaid program a site located at 5365 Dividend Road, Decatur, GA 30035-3834.  However, as part of the said enrollment, Hill-Rom stated the NPI number for the Decatur location was 1215014329.  In truth and fact, NPI number 1215014329 had always been assigned to Hill-Rom's Raleigh, North Carolina location at 7711 Welborn Street, Suites 107 & 108.  Also, Georgia requires a DME provider to be located within the state or within 50 miles of the state.  Hill-Rom's Raleigh location did not meet this Georgia requirement. Thus, upon information and belief, all Hill-Rom claims presented to the federal government for its above referenced Raleigh and Decatur locations for DME services provided in Georgia have been knowingly and materially false and fraudulent and in violation of the FCA since about 2011.

330.    As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to Georgia Medicare Patient RP's claim dated November 24, 2014, upon information and belief, Hill-Rom's claim was false because the claim contained an intentionally wrong or fake rendering provider NPI number as the cited NPI number 1205993797 was assigned to a Charleston location (Box 24J), the claim failed to disclose the service location provider NPI number (Box 32), and the billing provider did not provide the service, the Atlanta billing provider fraudulently used a Charleston location NPI number, and Charleston site was co-located with an ARI facility (Box 33).

## INDIANA

331.    Upon information and belief, since about 2013, Hill-Rom billed Medicare, Tricare and Medicare, and Hill-Rom listed its location at 1069 State Route 46 E, Batesville, Indiana 47006, in the billing provider section of claims to the federal government for DME services even though this location has never been enrolled in these federal health care programs.

332.    Upon information and belief, Hill-Rom was not authorized under Medicare, Tricare or Medicaid laws, regulations and rules to be a Medicare, Tricare or Medicaid billing provider using its Batesville location because this location has never been enrolled in these federal health care programs.

333.    Upon information and belief, Hill-Rom's Batesville location has never provided any DME services reimbursable by Medicare, Tricare or Medicaid in or outside the state of Indiana since about 2013.

334.    Upon information and belief, Hill-Rom was not authorized under Medicare, Tricare or Medicaid laws, regulations and rules to be a Medicare, Tricare or Medicaid billing provider using its Batesville location when the DME products and services were actually provided from another Hill-Rom location.

335.    Upon information and belief, only the DME location which provides DME services or products are authorized to be the billing provider on claims to Medicare, Tricare and Medicaid.

336.    Thus, upon information and belief, all Hill-Rom claims presented to Medicare, Tricare and Medicaid arising from or listing the above referenced Batesville location as the billing provider for DME products and services provided in and outside the state of Indiana, in which the Batesville location did not actually provide the DME products or services, have been knowingly and materially false and fraudulent and in violation of the FCA since about 2013.

337.    As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to Oklahoma Medicaid Patient TC's claim dated June 1, 2017, upon information and belief, Hill-Rom's claim was false because the claim did not identify the rendering provider or its NPI number (Box 24J), the actual service location was not enrolled in Medicaid and its provider NPI number was not identified (Box 32), and the Batesville billing provider location did

not provide the service and neither the location nor its NPI number was enrolled in the Medicaid program (Box 33).

## MINNESOTA

338.    Upon information and belief, ARI and Hill-Rom have been co-located at the Saint Paul, Minnesota site since about 2006.  This specific co-located site is 1020 County Road F W, Saint Paul Minnesota 55126.  A comparison of the CMS NPI registry demonstrates that same Saint Paul address is co-located by ARI and Hill-Rom, to wit, compare ARI's NPI registry at https://npiregistry.cms.hhs.gov/registry/provider-view/1053357905 versus Hill-Rom's NPI registry at https://npiregistry.cms.hhs.gov/registry/provider-view/1730247289.  Likewise, upon information and belief, Alton Shader is still fraudulently listed as the authorized official for Hill-Rom, even though he left Hill-Rom in December, 2018.  Thus, upon information and belief, all Hill-Rom and ARI claims presented to the federal government arising from or listing the above referenced Saint Paul location for DME services provided in Minnesota and elsewhere have been knowingly and materially false and fraudulent and in violation of the FCA since about 2006.

## SOUTH CAROLINA

339.    Upon information and belief, ARI and Hill-Rom were co-located at a North Charleston, South Carolina site from about February, 2012 through June, 2016.  This specific co-located site was 4349 Corporate Road, North Charleston, South Carolina 29405.  Thus, upon information and belief, all Hill-Rom and ARI claims presented to the federal government arising from or listing the above referenced North Charleston location for DME services provided in South Carolina and elsewhere have been knowingly and materially false and fraudulent and in violation of the FCA during this 2012-2016 time period.

340.    Upon information and belief, Hill-Rom's South Carolina Medicaid enrollment has been fraudulent since about 2011 through the present.  Upon information and belief, Hill-Rom enrolled its above referenced North Charleston location in the Medicaid program in about 2011.  However, upon information and belief, in its Medicaid enrollment for South Carolina in 2011, Hill-Rom intentionally and fraudulently used an NPI number which was not assigned to the North Charleston location by CMS, and had been previously been assigned to Hill-Rom's location in Florence, South Carolina.  Thus, upon information and belief, all Hill-Rom claims presented to the Medicaid program for its above referenced North Charleston location for DME services provided in South Carolina and elsewhere have been knowingly and materially false and fraudulent and in violation of the FCA since about 2011.

341.    As noted above, upon information and belief, many of Hill-Rom's Florida locations were not licensed, permitted or exempted for DME services or medical gas, and, none of Hill-Rom's Florida locations have been enrolled in Medicare, Tricare or Medicaid since 2009.  However, upon information and belief, Hill-Rom's North Charleston location was billing these federal programs for DME services in Florida which were provided by and through Hill-Rom's non-enrolled and non-licensed Florida locations.  This fraudulent practice continued through at least 2016.   Thus, upon information and belief, all Hill-Rom claims presented to the federal government arising from or listing the above referenced North Charleston location for DME services provided in Florida have been knowingly and materially false and fraudulent and in violation of the FCA from about 2009 through at least 2016.

342.    Upon information and belief, since about 2009 through 2016, Hill-Rom billed Medicare and listed its Corporate Road North Charleston location in the billing provider section of claims to

the federal government for DME services even though those services were provided by Hill-Rom locations other than the North Charleston location.

343.    Upon information and belief, the Hill-Rom NPI number for its North Charleston location during this time period was 1205993797.  Upon information and belief, Hill-Rom's North Charleston location never provided any DME services reimbursable by Medicare outside the state of South Carolina during this time period.  Upon information and belief, Hill-Rom was not authorized under Medicare laws, regulations and rules to be a Medicare billing provider using its North Charleston location when the DME products and services were actually provided from another Hill-Rom location.

344.    Upon information and belief, only the DME location which provides DME services are authorized to be the billing provider on claims to Medicare.  Thus, upon information and belief, all Hill-Rom claims presented to Medicare arising from or listing the above referenced North Charleston location as the billing provider for DME products and services provided outside the state of South Carolina, in which the North Charleston location did not actually provide the DME products or services, have been knowingly and materially false and fraudulent and in violation of the FCA from about 2009 through at least 2016.

345.    As another example of Hill-Rom's Enrollment-Licensing Scheme, in reference to **Exhibit 15**, with respect to California Medicaid Patient WA's claim dated June 23, 2015, upon information and belief, Hill-Rom's claim was knowingly false because the claim contained an intentionally wrong or fake rendering provider NPI number as the cited NPI number  1205993797 was for the North Charleston, S.C. location which did not render the product or services (Box 24J), falsely identified the service location provider as the Bell location, which was a closed location, not DME licensed, and falsely identified the service location provider's NPI number as 1205993797 (Box

32), the North Charleston, S.C. billing provider did not provide the service, the North Charleston, S.C. billing provider was not enrolled in the California Medicaid program and the North Charleston, S.C. site was co-located with an ARI facility (Box 33).

346.    Relator is informed and believes that Hill-Rom's and ARI's practice of submitting knowingly and materially false and fraudulent claims to the federal government for DME products and services pursuant to the Enrollment/Licensing Scheme was a companywide and nationwide endeavor by both Hill-Rom and ARI, and that further investigation by the federal government will reveal thousands of similar false and fraudulent claims.

347.    Upon information and belief, the federal government would not have paid these Enrollment/Licensing Scheme claims had the truth been known that the claims were false and fraudulent.

348.    Upon information and belief, Hill-Rom and ARI certified on the Claim Form 1500s for each of their respective Enrollment/Licensing Scheme claims, both expressly and impliedly, that it was (a) Billing from enrolled sites; (b) Billing from licensed sites; (c) Billing with an accurate NPI number; (d) Billing with an entity to which an NPI had been assigned; (e) Disclosing its NPI number; (f) Not billing from a closed site; (g) Not billing from a co-located site; and/or, (h) Billing by a provider that provided the DME product, when, in truth and fact, such certifications were false.

349.    Upon information and belief, ARI certified on Claim Form 1500s for Enrollment/Licensing Scheme claims in which it shared a location with Hill-Rom, both expressly and impliedly, that it was not billing from a co-located site, when, in truth and fact, such certification was false.

350. Hill-Rom and ARI certified on the Claim Form 1500s for each of their respective Enrollment/Licensing Scheme claims, both expressly and impliedly, that the claims were true, complete and accurate, even though they were not.

351. Hill-Rom and ARI certified on the Claim Form 1500s for each of their respective Enrollment/Licensing Scheme claims, both expressly and impliedly, that the claims complied with applicable statutes, regulations, rules and program requirements, when, in truth and fact, they did not.

352. Hill-Rom and ARI knew that their respective Enrollment/Licensing Scheme claims to the federal government for reimbursement or approval were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or were deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and caused or conspired to be presented, said false and fraudulent claims in violation of the FCA.

**TotalCare Scheme to Sell Used TotalCare Beds as New Beds, with SIE and HCPCS Violations**

353. Upon information and belief, since about 2011, Defendant Hill-Rom knowingly presented, or caused or conspired to be presented, materially false claims to the federal government for payment or approval as a result of the unlawful and fraudulent TotalCare Scheme.

354. Defendant Hill-Rom, by and through its officers, employees, agents and servants, devised and carried out the nationwide TotalCare Scheme to defraud the federal government by selling used equipment as new equipment. In particular, Hill-Rom sold its TotalCare model beds to or for federal health care beneficiaries, paid for by federal health care programs, by misrepresenting the beds as **new** when Hill-Rom knew that they were, in fact, **used**.

355.    The subject TotalCare is a powered air flotation bed (with an integrated powered air surface which is somewhat like a mattress) which purports to promote healing for patients with compromised skin by using low air loss therapy.  Since approximately 2011, Hill-Rom has sold the TotalCare from its rental fleet to federal health care beneficiaries, their federal health care programs and/or contractors, and submitted CMS Claim Form 1500s to the federal health care programs and/or their contractors for payment or approval.

356.    These knowingly false claims to the federal government made by Hill-Rom for the sale of these beds ranged from about $24,000 to $66,000 each.

357.    Hill-Rom routinely submitted or presented materially false and fraudulent claims to the federal health care programs because Hill-Rom knowingly claimed and represented that the TotalCAre beds were brand new, when, in fact, the beds were used.

358.    Below is a photograph of a typical Hill-Rom TotalCare bed from one of Hill-Rom's product brochures:



TotalCare® Connect Bed

The right bed to help you drive reduced length of stay and reduced pulmonary complications.

359.    As noted above, the Medicare Claims Processing Manual, Chapter 20 – Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS), provides in part, at Section 130.9 – Showing Whether Rented or Purchased, that the modifier "**NU**" must be utilized in claims for *new* durable medical equipment and the modifier "**UE**" must be utilized for claims for *used* durable medical equipment.

360.    For all of these TotalCare Scheme claims, Hill-Rom materially misrepresented in the CMS Form 1500 claims (or the electronic equivalent) the status of the equipment with the modifier **NU** (new equipment) and did not use the accurate modifier **UE** (used equipment). Thus, the federal health care programs and contractors which paid these claims were defrauded because they paid for TotalCares which were supposedly new when the beneficiaries were actually being sold used TotalCares.

361.     An example of a redacted fraudulent claim submitted by Hill-Rom for Patient JM is attached as **Exhibit 16**.  The claim was submitted to the Medicare program for date of service of January 14, 2012 by Hill-Rom and included a $34,393 claim for a TotalCare Bed.  In Box 24D of the CMS Claim Form 1500, the modifier for the TotalCare bed is clearly identified as "NU" which falsely represented the subject bed as new.  The correct modifier was "UE" for this used TotalCare bed.  Upon information and belief, this knowingly false claim was paid by the Medicare program.

362.     Another example of a fraudulent TotalCare claim by Hill-Rom is for Patient JD on a claim to Virginia's Medicaid program for an estimated date of service of November 20, 2012. The CMS Claim Form 1500 is not available to Relator, but the Hill-Rom the invoice order date was November 19, 2012.  Upon information and belief, the amount billed to the Virginia Medicaid program was $38,051, and used the NU modifier.  Upon information and belief, the Virginia Medicaid paid the claim.

363.     These foregoing TotalCare Scheme claims are just representative samples of the untold numerous false and fraudulent TotalCare claims presented to federal health care programs pursuant to this nationwide scheme to defraud, and, upon information and belief, Hill-Rom routinely submitted substantially more such claims to federal health care programs.  Upon information and belief, all such TotalCare Schemes claims was paid.

364.     Hill-Rom's motive for these deceptive misrepresentations was to financially gouge the federal government with respect to the subject TotalCare sales because the company used new sales prices instead of used prices which would have been substantially less due to federal DME fee schedules.

365.    The proper HCPCS code for the TotalCare was either E0193, which, according the HCPCS Level II guidelines, is for a "powered air flotation bed (low air loss therapy)," or E0265, which is for "hospital bed, total electric (head, foot, and height adjustments), with any type side rails, with mattress." **Exhibit 12**.

366.    In most if not all of the TotalCare Scheme claims, the HCPCS code E1399 was inserted in the claims, which misrepresented the proper code.  HCPCS code E1399 is for "durable medical equipment, miscellaneous," and Medicare does not allow the E1399 code to be used when there is a specific HCPCS code applicable to the DME.

367.    In the case of a TotalCare bed claim, the only applicable HCPCS codes were E0193 or E0265.

368.    At least two examples of such intentional, fraudulent miscoding are set forth above in the TotalCare Scheme claims for Patients JM and JD, which, upon information and belief, were both knowingly and fraudulently miscoded as E1399 instead of E0193.

369.    Upon information and belief, many other TotalCare Scheme claims contained the knowingly false and miscoded HCPCS code and NU modifier.

370.    Upon information and belief, many, if not all, TotalCare Scheme claims were also knowingly false because they expressly and/or impliedly certified that they were compliant with Medicare laws and regulations, when, in truth and fact, the prices for TotalCare beds were not complaint with SIE statutes and regulations.  42 U.S.C. § 1320a-7(b)(6); 42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 1001.701(a)(1).

371.    Most, if not all, of the TotalCare Scheme claims were substantially in excess of Hill-Rom's usual and customary charges and substantially in excess of its costs.

372.    Upon information and belief, Dan Davidson and Greg van Sickle knew that the subject TotalCare beds were being sold out of Hill-Rom's rental fleet to federal health program beneficiaries and federal contractors, and, on behalf of Hill-Rom, knowingly presented, or caused or conspired to be presented, numerous similar such false claims to the federal government, including those identified above, knowing that they were false and fraudulent in misrepresenting the status of the TotalCares as new, SIE compliant, and properly HCPCS coded, or they acted with reckless disregard or deliberate ignorance as to whether this information or theses representation were truthful or false.

373.    Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting in its TotalCare Scheme claims that the quality of its reconditioned TotalCare beds were being sold as new, and further knew that the TotalCare beds were used.

374.    Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting that the quality of its so-called reconditioned TotalCare beds were being sold as compliant with SIE laws and regulations when most, if not all TotalCare Scheme claims, were not so compliant.

375.    Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting E1399 as the correct HCPCS code of its reconditioned TotalCare beds in many of its TotalCare Scheme claims.

376.    Hill-Rom, by and through its officers, employees, management, servants and agents, knew that it was materially misrepresenting that these TotalCare Scheme claims were true, accurate and complete.

377.    Upon information and belief, Hill-Rom received payment from the federal health care programs for these fraudulently submitted TotalCare Scheme claims.  The federal government

would not have paid these claims had it known that these claims were false and fraudulent. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the beds were new. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the beds were compliant with SIE requirements. The federal government would not have paid those claims with miscoded HCPCS codes had it known of the falsity of Hill-Rom's express and/or implied representations that the correct HCPCS code for these beds was E1399. The federal government would not have paid these claims had it known the falsity of Hill-Rom's express and/or implied representations that the claims were true, accurate and complete.

378.     Hill-Rom and its officers, employees, management, servants and agents, knew that these TotalCare Scheme claims presented to the federal government for reimbursement for so-called new TotalCare beds, SIE compliant TotalCare bed prices, and miscoded HCPCS codes for TotalCare beds, were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or were deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and caused and conspired to be presented, said false and fraudulent claims in violation of the FCA.

**The Bariatric Upcode Scheme**

379.     Upon information and belief, since about 2009, Defendant Hill-Rom knowingly presented, or caused or conspired to be presented, and, upon information and belief, continue to knowingly present, or cause to be presented, materially false claims to the federal government for payment or approval as a result of the unlawful and fraudulent Bariatric Upcode Scheme.

380.    Defendant Hill-Rom, by and through its officers, employees, agents and servants, devised and carried out the nationwide Bariatric Upcode Scheme to defraud the federal government by knowingly miscoding and upcoding HCPCS codes of its bariatric DME beds in claims to the federal health care programs.  In particular, Hill-Rom presented, or caused or conspired to be presented, to the federal government, false claims with routinely upcoded HCPCS codes for bariatric beds for codes E0303 and E0304 when these codes were not applicable and were not supported by medical necessity nor medically reasonable.

381.    As noted above, the HCPCS system has the following four bariatric bed codes: E0301 (weight capacity for 350-600 pounds, no mattress), E0302 (weight capacity for over 600 pounds, no mattress), E0303 (weight capacity for 350-600 pounds, with mattress), E0304 (weight capacity for over 600 pounds, with mattress).

382.    Upon information and belief, the dollar amount of federal reimbursements under these HCPCS codes typically start lowest for the E0301 code and generally increase in value as the bariatric HCPCS code increase.  Thus, upon information and belief, code E0304 always results in the most expensive reimbursement under federal government health care programs.

383.    One primary focus of Hill-Rom's intentional and knowing upcode and miscode of bariatric HCPCS codes involves Hill-Rom's contract with United Healthcare ("UHC") insurance company. UHC participated with Medicare, Medicaid and Tricare programs, and many of its customers are federal health care program beneficiaries. Since at least 2010, UHC was one of Hill-Rom's biggest insurance customers and payors.  Hill-Rom and UHC executed a contract in which Hill-Rom provided DME products and services to UHC and its federal health care program beneficiaries. The DME Hill-Rom provided to UHC and its federal health care program beneficiaries included bariatric beds.

384.    Beginning in 2010, Hill-Rom began upcoding all bariatric beds it provided to UHC and its federal health care program beneficiaries.  On October 5, 2010, Hill-Rom manager Kate Malcolm issued instructions to Relator and others that "all bariatric products should have already been changed to E0304."  **Exhibit 17**.  Hill-Rom manager Malcolm further instructed in the subject email that "if you have one that has not, please notify Lisa May or myself."  Id.  As a result of Malcolm's instructions, all of the bariatric beds provided by Hill-Rom to UHC and its federal health care program beneficiaries were upcoded to E0304 regardless of whether there was any supporting medical necessity and contrary to the HCPCS code requirements.

385.    Upon information and belief, this fraudulent Hill-Rom companywide policy of upcoding all of its bariatric beds provided under the UHC contract to the E0304 HCPCS code pursuant to the Bariatric Upcode Scheme was perpetrated upon UHC and its federal health care program beneficiaries from about 2010 until at least 2013.

386.    Upon information and belief, Hill-Rom's fraudulent Bariatric Upcode Scheme involving UHC applied to both its DME rentals and sales under its UHC contract.  While Relator does not have any specific examples of Hill-Rom's federal claims under the UHC contract pursuant to the Bariatric Upcode Scheme, she has personal knowledge that this policy resulted in numerous such knowingly false claims.

387.    Furthermore, Hill-Rom knowingly upcoded and miscoded its bariatric beds outside of the UHC contract context.  Upon information and belief, Hill-Rom routinely upcoded and miscoded its bariatric beds, and made claims to the federal government health care programs, when there was no underlying medical necessity for a bariatric beds for patients.

388.    A few examples of false claims to the federal government of such upcoding, miscoding and lack of medical necessity pursuant to the Bariatric Upcode Scheme are as follows:

389.    A claim for Patient AL, dated February 12, 2015, to the California Medicaid program, for $10,250.  This claim was for a bariatric bed, HCPCS code E0303, and there was no documentation in the file that the said bariatric bed was medically necessary.

390.    A claim for Patient AL, dated December 26, 2014, to the California Medicaid program, for $10,250.  This claim was for a bariatric bed, HCPCS code E0303, and there was no documentation in the file that the said bariatric bed was medically necessary.

391.    A claim for Patient LM, dated August 19, 2010, to the Tennessee Medicaid program, for $1,395 for a monthly rental.  This claim was for a bariatric bed for one month, HCPCS code E0303, and there was no documentation in the file that the said bariatric bed was medically necessary. Upon information and belief, Hill-Rom continued to file false monthly claims for this Patient.

392.    Relator is informed and believes that Hill-Rom's practice of presenting knowingly and materially false and fraudulent claims, or causing the presentation of the subject false claims, to the federal government for DME products and/or services pursuant to the Bariatric Upcode Scheme was a companywide and nationwide endeavor by Hill-Rom, and that further investigation by the federal government will reveal thousands of similar knowingly false and fraudulent claims.

393.    Upon information and belief, the federal government would not have paid Hill-Rom these Bariatric Upcode Scheme claims had the truth been known that the claims were false and fraudulent.

394.    Upon information and belief, Hill-Rom certified on the Claim Form 1500s for each of its respective Bariatric Upcode Scheme claims, both expressly and impliedly, that the claim contained the appropriate HCPCS codes for bariatric DME, when, in truth and fact, such certifications were false.

395.    Upon information and belief, Hill-Rom certified on Claim Form 1500s for Bariatric Upcode Scheme claims, both expressly and impliedly, that the claims were supported by medical necessity and were medically reasonable, when, in truth and fact, such certifications were false.

396.    Upon information and belief, Hill-Rom certified on the Claim Form 1500s for each of its respective ABN Scheme claims, both expressly and impliedly, that the claims were true, complete and accurate, even though they were not.

397.    Upon information and belief, Hill-Rom certified on the Claim Form 1500s for each of its respective Bariatric Upcode Scheme claims, both expressly and impliedly, that the claims complied with applicable statutes, regulations, rules and program requirements, when, in truth and fact, they did not.

398.    Hill-Rom knew that these Bariatric Upcode Scheme claims to the federal government for reimbursement were materially false and fraudulent, or had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or was deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly presented, and caused or conspired to be presented, said false and fraudulent claims in violation of the FCA.

**Vendor AKS Scheme**

399.    Hill-Rom knowingly, intentionally and willfully presented, or caused or conspired to be presented, for payment or approval, false or fraudulent claims to the federal government for Hill-Rom DME which were ordered by or recommended to third-party DME vendors as a result of Defendants' illegal remuneration to send DME vendors and their salesmen to induce referrals of federal health care beneficiaries in violation of the federal AKS statute, 42 U.S.C. § 1320a-7b(b), pursuant to its Vendor AKS Scheme.

400.    Upon information and belief, in its nationwide Vender AKS scheme to defraud the federal government in violation of the AKS and the FCA, the Defendants knowingly and fraudulently routinely presented, or caused or conspired to be presented, materially false claims to the federal government and its contractors for Hill-Rom DME products which were the result of illegal remuneration paid or offered to third-party vendors and/or their employees to induce the ordering and purchase of Hill-Rom DME products ultimately to be sold to federal health care beneficiaries.

401.    Upon information and belief, as a result of the illegal remuneration paid in violation of the AKS, such Vendor AKS Scheme claims were knowingly, willfully and materially false and fraudulent violations of the FCA.

402.    Upon information and belief, Hill-Rom offered and paid unlawful financial incentives to DME vendors and/or their employed to recommend, arrange for, or order Hill-Rom DME products.

403.    Upon information and belief, at least one purpose of the illegal remuneration offered or paid by Hill-Rom pursuant to the Vender AKS Scheme was to induce referrals of orders of patients covered by federal health care programs.  Upon information and belief, Hill-Rom received, in whole or in part, directly or indirectly, payments from federal health care programs as a result of the Vendor AKS Scheme referrals.

404.    For instance, on or about April 12, 2017, Hill-Rom offered a $100 discount off its regular DME prices to DME seller Med Mart.  In an email of the same date from Hill-Rom sales coordinator April Meyer to D-T-C employees Michael Boyce, Hubie Branstetter and Melanie Flodder, Meyer stated as follows:  "For Careassist beds or higher, Med Mart gets a $100 discount off their price for a promo we are running with their sales reps."

405.    See the Meyer email below:

From:               Liko At Home
Sent:               Tuesday, September 12, 2017 7:24 PM
To:                 Michael Boyce; Hubie Branstetter
Cc:                 Melanie Flodder
Subject:            FW: New Purchase Order from Med Mart
Attachments:        5605130.json; 5605130.xml

Hi everyone,

For Careassist beds or higher, Med Mart gets a $100 discount off their price for a promo we are running with their sales reps.

Please let me know if you have any questions.

April Meyer
Sales Coordinator | Hill-Rom Home Care

O: 888.545.6671 | D: 812.934.8162 | F: 812.934.1918
april.meyer@hill-rom.com | homecare.hill-rom.com

 Enhancing outcomes for patients and their caregivers:

From: do-not-reply@logicbroker.com [mailto:do-not-reply@logicbroker.com]
Sent: Tuesday, September 12, 2017 4:07 PM
To: Liko At Home <likoathome@hill-rom.com>
Subject: New Purchase Order from Med Mart

406.    Upon information and belief, Hill-Rom was offering these discounts and other remuneration as a financial incentive to Med Mart and its employees to recommend, arrange for, and order more DME products and services from Hill-Rom, including recommendations to, arrangements for, and orders from federal health care program beneficiaries.

407.    Upon information and belief, Hill-Rom had similar financial arrangements or promotions with other DME brokers/retailers and/or their employees to recommend, arrange and order DME products and services from Hill-Rom, including recommendation to, arrangements for, and orders from federal health care program beneficiaries.

408.    Upon information and belief, Hill-Rom had similar arrangements with one or more the following entities and/or their sales agents:  Adaptive Specialties; Astrix Medical Supplies; Blackburn's; Cypress Care, Inc.; Doc Supply of Tennessee, LLC; E-Med Stores; Gould's Discount

Medical; Healthbridge; Healthwise; Just In Time Medical Services, LLC; Mark Drug Medical Supply; MCNS, LLC; Medone; Numotion; National Seating and Mobility; Revolutions, Inc. d/b/a Spinlife; RGH Enterprises, Inc.; Rocky Mountain Medical Equipment, LLC; Therapy Supply House.

409.    Upon information and belief, Hill-Rom had an implicit or explicit arrangements with some of these entities to handle Hill-Rom's DME customers who were federal health care beneficiaries in order to avoid federal fee schedule payments, to avoid disclosure of Hill-Rom's costs to federal government programs, or because Hill-Rom was not licensed or enrolled in a particular area.

410.    So, upon information and belief, oftentimes when a federal health care beneficiary would contact Hill-Rom about buying or renting DME products, Hill-Rom would contact one of these vendors, Hill-Rom would forward the customer's name and information to the vendor, and oftentimes provide the vendor a discount or other remuneration for the DME, who then sold or rented the same DME to the federal health care patient.

411.    For instance, upon information and belief, Astrix Medical Supplies had such implicit or explicit arrangement with Hill-Rom with respect to patients with Medicaid health insurance coverage in the states of Virginia and North Carolina because Hill-Rom did not want to disclose its DME costs to these Medicaid programs.

412.    Upon information and belief, Astrix Medical Supplier acted as a straw purchaser for Hill-Rom's Medicaid customers in Virginia and North Carolina, so Hill-Rom could increase the prices it charged to Virginia's and North Carolina's Medicaid programs, and avoid disclosure of its costs to the programs.

413.    Upon information and belief, since June 20, 2013, Hill-Rom has been in a contractual relationship with Van G. Miller and Associates, Ltd. ("VGM") referenced as the VGM Group Participating Vendor Agreement.  See **Exhibit 18**.

414.    Upon information and belief, VGM sells or brokers Hill-Rom DME in the United States pursuant to this agreement, and VGM is an independent contractors.  Upon information and belief, the sales of Hill-Rom's DME products recommended by, arranged for, or ordered by VGM were paid in part by one or more federal health programs.

415.    Upon information and belief, since June 20, 2013, Hill-Rom paid VGM a commission on the said DME sales, which was disguised as a so-called "administrative fee."  The commission arrangement between Hill-Rom and VGM was straightforward:  "The administrative fee shall be 3% on all sales up to and including $1 million, and 2% on all sales over $1 million."  **Exhibit 18**, at ¶ 2.

416.    Upon information and belief, the illegal remuneration offered and paid by Hill-Rom to its vendors or their employees to induce or arrange referrals and orders of Hill-Rom DME products was paid on a per-referral or per-order basis.  Upon information and belief, the remuneration offered and paid by Hill-Rom to its vendors or their employees to induce or arrange referrals and orders of Hill-Rom DME products varied with the volume or value of the DME ordered by vendors from Hill-Rom.  These illegal kickbacks offered and paid by Hill-Rom caused the intended effect of generating more business for Hill-Rom which was paid, in large part, directly and/or indirectly, by federal government programs.

417.    Upon information and belief, these AKS violations by Hill-Rom, its vendors and/or their employees were knowing, intentional and willful.

418.    Upon information and belief, Hill-Rom, by and through its officers, employees, servants and agents, knew that it was materially misrepresenting in its Vendor AKS Scheme claims, both expressly and impliedly, that the claims were compliant with the AKS, when, in fact, they were not.

419.    Upon information and belief, Hill-Rom, by and through its officers, employees, management, servants and agents, knew that it was materially misrepresenting both expressly and impliedly, that its Vendor AKS Scheme claims were true, accurate and complete, when, in fact, they were not.

420.    Upon information and belief, Hill-Rom knew that it causing its vendors to materially misrepresent in their Vendor AKS Scheme claims, both expressly and impliedly, that these Vendor AKS claims were compliant with the AKS, when, in fact, they were not.

421.    Upon information and belief, Hill-Rom knew that it causing its vendors to materially misrepresent in their Vendor AKS Scheme claims, both expressly and impliedly, that these Vendor AKS Scheme claims were true, accurate and complete, when, in fact, they were not.

422.    Upon information and belief, Hill-Rom and/or its vendors in the Vendor AKS Scheme received payment from the federal health care programs for these fraudulently submitted Vendor AKS Scheme claims.

423.    Upon information and belief, the federal government would not have paid these Vendor AKS Scheme claims had it known that these claims were false and fraudulent.

424.    Upon information and belief, the federal government would not have paid these claims had it known the falsity of Hill-Rom's and/or its Vendor's express and/or implied representations that the claims complied with the AKS Statute.

425.    Upon information and belief, the federal government would not have paid these Vendor AKS Scheme claims had it known the falsity of Hill-Rom's and/or its vendors' express and/or implied representations that the claims were true, accurate and complete.

426.    Upon information and belief, Hill-Rom, by and through its officers, employees, servants and agents, as well as the subject vendors, knew that these Vendor AKS Scheme claims presented, or caused or conspired to be presented, to the federal government for reimbursement which resulted from remuneration inducements to Hill-Rom's vendors or employees were materially false and fraudulent, or Hill-Rom and the subject vendors had reckless disregard as to whether or not these claims to the federal government were materially false and fraudulent, or Hill-Rom and the subject vendors were deliberately indifferent as to whether or not these claims to the federal government were materially false and fraudulent, yet nevertheless knowingly and willfully presented, and knowingly and willfully caused and conspired to be presented, said false and fraudulent claims in violation of the AKS and the FCA.

**The CIA (Corporate Integrity Agreement) Scheme**

427.    Because Hill-Rom was involved in prior false billing schemes, Defendant Hill-Rom's CIA with the OIG was executed effective October 1, 2011 and was in force for five (5) years thereafter.

428.    Each of the foregoing false and fraudulent claims pursuant to the schemes cited herein above, which occurred while the CIA was in force, were individually and collectively "substantial overpayments" to Hill-Rom subject to the CIA's provisions and created an obligation of Hill-Rom to pay the money back to the United States.

429.    Each of the foregoing false and fraudulent claims pursuant to the schemes cited herein, which occurred while the CIA was in force, were individually and collectively "a matter that a

reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized."

430.    Each of the foregoing false and fraudulent claims pursuant to the schemes cited herein, which occurred while the CIA was in force, were individually and collectively Reportable Events under the CIA.

431.    Hill-Rom knew of its obligations to pay the money back to the federal government as a result of these false claims, but, pursuant to its CIA Scheme, knowingly decided to not do so.

432.    Pursuant to the CIA, Hill-Rom was required to notify the OIG of Reportable Events but intentionally and knowingly failed to do so with respect to the schemes enumerated herein.

433.    Pursuant to the CIA, upon information and belief, Hill-Rom filed with the OIG annual reports of compliance, claims review reports, implementation reports, and all of these reports and the related certifications therein were false and fraudulent by concealing all of the false claims which were occurring pursuant to the foregoing schemes enumerated herein.

434.    Pursuant to its CIA Scheme, Defendant Hill-Rom knowingly concealed its obligations to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased its obligations to pay or transmit money or property to the United States Government, in knowing and material violation of both the CIA and 31 U.S.C. § 3729(a)(1)(G), or Hill-Rom had reckless disregard as to whether or not it concealed its obligations to pay or transmit money or property to the United States government or improperly avoided or decreased its obligations to pay or transmit money or property to the United States Government, or was deliberately indifferent as to whether or not it concealed its obligations to pay or transmit money or property to the United States government or improperly avoided or decreased its obligations to

pay or transmit money or property to the United States Government, and knowingly conspired to do so, in violation of both the CIA and the FCA.

## RELATOR'S WARNINGS AND HILL-ROM'S RETALIATION

435.    The Relator warned Hill-Rom and its employees about the foregoing fraudulent activities and false claims.  Relator told the Defendants that the above referenced violations of the AKS Statute, Medicare laws, regulations and rules, could expose the Defendants to administrative sanctions, civil liability and criminal liability.  The Defendants' typical responses were to either ignore the Relator's warnings, remove the area of concern from the Relator's work responsibility, or, sometimes, the Defendants would change their fraudulent business practices.

436.    Relator discussed with, and warned, employees of Hill-Rom about one or more of the foregoing fraudulent activities and schemes, including, but not limited to, Dan Davidson, Greg van Sickle, Sara Blessing, Tom Karbowski, Joe Price, Nicole Jenkins, Brian Roth, Amy Meyers, Shannon Dearborn, Michael Boyce, Kristen Gregory, Catherine Johnson, Rhoda Hiott, Marilyn Wyatt, Barry Grosse, and Jeanne Bohen.

437.    Relator specifically advised and warned Hill-Rom management that it was illegal, improper and fraudulent to upcode DME to E1399, to use improper or inapplicable HCPCS codes, to bill for DME when there was a lack of medical necessity, to bill the federal government from Hill-Rom locations that were not properly licensed or enrolled, to bill the federal government when the NPI numbers were wrong, to bill the federal government for reconditioned Clinitron and TotalCare beds as new when they were not, to issue ABNs if they were not true, to waive co-pays and deductibles to induce referrals, and to upcode DME to E0304.

438.    Hill-Rom Defendants had knowledge and notice of Relator's whistleblowing warnings, complaints, reports, memorandums, investigations, attempts to stop continued violations and

fraudulent business practices and recommendations to get in compliance (sometimes referenced as "Protected Activities"), regarding one or more of the Defendants' fraudulent acts and omissions in violation of the False Claims Act set forth above and below, and Defendants had knowledge and notice that all of the Relator's Protected Activities were in furtherance of, or potentially in furtherance of, a qui tam action under the False Claims Act.

439.    Relator was harassed and discriminated against as a result of her Protected Activities by her Hill-Rom managers and supervisors, including, but not limited to, Carol Prickle, Brian Roth, and Dan Davidson.

440.    As a result of Relator's repeated warnings to Hill-Rom and its employees regarding their foregoing violations of the AKS Statute, Medicare laws, regulations and rules, and the False Claims Act, and their potential administrative, civil, and criminal liability, and Relator's attempts to stop the same, and her refusal to ignore, consent to, participate in, approve or commit unlawful or illegal acts as requested by the Hill-Rom Defendants, the Relator was harassed and discriminated against by Hill-Rom and its employees with respect to the terms and conditions of her employment, and was eventually constructively discharged by Hill-Rom from her position of employment with Hill-Rom in violation of 31 U.S.C. § 3730(h) and South Carolina public policy.

## CONCLUSION

441.    Defendants knew that they were not entitled to receive payments from the federal health care benefit programs for the foregoing materially false and fraudulent claims, yet nevertheless knowingly accepted these federal payments, and, upon information and belief, except as noted above, continue to knowingly accept such federal payments for such false and fraudulent claims. Defendants knowingly made materially false records and false statements in support of such false and fraudulent claims to the federal health care benefit programs, and, upon information and belief,

except as noted above, continue to make such false records and false statements in support of such false and fraudulent claims to the federal health care benefit programs. Defendants knowingly made false records and false statements in support of such false and fraudulent claims to the federal health care benefit programs, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and, upon information and belief, except as noted above, continue to knowingly conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government.

442.    The Defendants' foregoing materially false records, false statements and false claims include, but are not limited to, Medicare enrollment applications and certifications, Medicaid enrollment applications and certifications, Tricare enrollment applications and certifications, federal health care benefit program provider or supplier agreements and certifications, the paper and/or electronic claims for payment (i.e., CMS Form 1500 for DME or DME services), and the express and implied certifications therein, Electronic Data Interchanges ("EDIs"), patient charts, Electronic Medical Records ("EMRs"), Electronic Health Records ("EHRs"), physicians orders, plans of care, physician referral orders, physician certifications, ABNs, CMNs, all CIA Reports, invoices, fax transmittals, and emails. The federal government relied upon the express and implied representations and certifications contained in these documents as being accurate, true, and complete, and in compliance with all federal laws, regulations and rules, including the provisions of the AKS statute and FCA.

443.    Upon information and belief, the Defendants made the foregoing materially false and fraudulent claims to the federal health care benefit programs on an almost daily basis through the

governments' paper and/or electronic claims payment system. Upon information and belief, the federal health care benefit program claim forms used to submit the foregoing knowingly false and fraudulent claims were CMS Form 1500s, and the comparable electronic claim form.

444.    Upon information and belief, the federal government did not know of the false nature of the foregoing fraudulent claims, and, had it known of the falsity of these claims, would not have made payments to the Defendants for these false and fraudulent claims.

445.    The Defendants conspired with each other to defraud the federal government in pursuing the fraudulent conduct set forth above, and aided and abetted each other in furtherance of the conspiracy.

446.    As a result of the foregoing, Defendants knowingly violated the federal False Claims Act, including but not limited to, 31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G).

## COUNT 1
## SECTION 3729(a)(1)(A) CLAIM

447.    Relator/Plaintiff incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

448.    Defendants knowingly presented, or caused to be presented, and upon information and belief continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – i.e., the foregoing false and fraudulent claims to Medicare, Medicaid, Tricare and other federal programs for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

449.    Said false and fraudulent claims were presented with the said Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

450.    The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the truth of the falsity of the said Medicare, Medicaid, Tricare and other federal program claims by these Defendants.

451.    As a direct and proximate result of the knowingly false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty for each false claim as provided by law.

## COUNT 2
## SECTION 3729(a)(1)(B) CLAIM

452.    Relator/Plaintiff incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

453.    The Defendants knowingly made, used or caused to be made or used, and upon information and belief continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

454.    These Defendants' knowingly false records or false statements were material, and upon information and belief continue to be material, to the false and fraudulent claims for payments they made and continue to make to the United States for Medicare, Medicaid, Tricare and other federal program reimbursements and benefits.

455.    The Defendants' materially false records or false statements are set forth above and include, but are not limited to, the foregoing Medicare enrollment applications and certifications, Medicaid enrollment applications and certifications, Tricare enrollment applications and certifications, federal health care benefit program provider or supplier agreements and

certifications, EDIs, patient charts, EMRs, EHRs, physicians orders, plans of care, physician referral orders, physician certifications, CMNs, ABNs, all CIA Reports, invoices, fax transmittals, emails, the paper and/or electronic claims for payment (i.e., CMS Form 1500 for DME or DME services), and the express and implied certifications therein.

456.    These said false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with these Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

457.    As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims knowingly made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty for each false claim as provided by law.

## COUNT 3
## SECTION 3729(a)(1)(G) CLAIM

458.    Relator/Plaintiff incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

459.    Defendants knowingly made, used or caused to be made or used false records or false statements, and upon information and belief continues to knowingly make, use or cause to be made and used, false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and upon information and belief continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

460.    These said false records or statements were made and used, or caused to be made and used, and upon information and belief continue to be made and used, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

461.    Defendants knowingly concealed their obligations to pay or transmit money or property to the United States Government, and, upon information and belief, continue to knowingly conceal such obligations to the United States Government, or concealed such obligations with reckless disregard or deliberate ignorance of whether or not such obligations were due and disclosable to the United States Government.

462.    Defendants knowingly and improperly avoided or decreased their obligations to pay or transmit money or property to the United States Government, and, upon information and belief, continue to knowingly and improperly avoid or decrease such obligations to the United States Government, or avoided or decreased such obligations with reckless disregard or deliberate ignorance of whether or not such obligations were due and disclosable to the United States Government.

463.    As a direct and proximate result of these knowingly made and used false records or false statements by the Defendants, their knowing concealment of their obligations to pay or transmit money or property to the United States Government, and their knowing avoidance or decrease of their obligations to pay or transmit money or property to the United States Government, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each false claim as provided by law.

**COUNT 4**
**SECTION 3729(a)(1)(C) CLAIM**

464.    Relator/Plaintiff incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

465.   In violation of 31 U.S.C. § 3729(a)(1)(C), the Defendants knowingly combined, agreed and conspired to violate sections of the FCA, including, but not limited to, 31 U.S.C. § 3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B) and 31 U.S.C. § 3729(a)(1)(G) as set forth above.

466.   In a conspiracy, agreement and combination, and in furtherance thereof, the Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – i.e., the foregoing false and fraudulent claims to Medicare, Medicaid and Tricare and other federal programs for payment or approval -- in violation of 31 U.S.C. § 3729(a)(1)(A), and, upon information and belief, continue to combine and conspire to violate the foregoing sections of the FCA.

467.   In a conspiracy, agreement and combination, and in furtherance thereof, the Defendants knowingly made, used or caused to be made or used, and upon information and belief continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

468.   In a conspiracy, agreement and combination, and in furtherance thereof, the Defendants knowingly made, used or caused to be made or used false records or false statements, and upon information and belief continue to knowingly make, use or cause to be made false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and upon information and belief continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

469.    Each of the overt acts and claims set forth above were perpetrated in furtherance of the conspiracy to violate the FCA by the Defendants.

470.    During the conspiracy, agreement and combination, and in furtherance thereof, the conspirators acted knowingly to have the foregoing false and fraudulent claims, statements, and records to be made, used and/or presented, or acted with reckless disregard or deliberate ignorance of whether or not the claims, statements and/or records were false and fraudulent, and, upon information and belief, continue to do so.

471.    As a direct and proximate result of the foregoing combination, agreement and conspiracy by, between and among all of the Defendants, who each acted in furtherance of the conspiracy, and aided and abetted the other defendants in furtherance of the conspiracy, agreement and combination, and knowingly committed the aforesaid overt and covert acts in furtherance of the conspiracy with each knowingly false and fraudulent claim, false statement and false record submitted to the federal government, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty for each false claim as provided by law.

### COUNT 5
### SECTION 3730(h) CLAIM

472.    Plaintiff/Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

473.    From on or about 2009 through on or about July, 2018, Relator was an employee, contractor and/or agent of the Defendants.

474.    During the course of her employment, contract and/or agency with Hill-Rom, Relator obtained personal knowledge of the foregoing fraudulent conduct of all of the Defendants.

475.    Relator reported one or more of the foregoing fraudulent activities to Hill-Rom, and expressed concern that one or more of the said fraudulent activities would subject the Defendants to suit and potential civil damages/penalties and/or criminal penalties for Medicare, Medicaid and Tricare fraud pursuant to the FCA.

476.    As a direct and proximate result of Relator's Protected Activities and her lawful whistleblower acts to warn of and/or stop one or more of the Defendants' foregoing FCA violations, including but not limited to the investigation of, and complaints to the Defendants of, the foregoing fraudulent conduct and false claims, Hill-Rom, and its employees, wrongfully harassed, demoted, created a hostile work environment, and discriminated against the Relator with respect to the terms and conditions of her employment.

477.    As a direct and proximate result of Relator's Protected Activities and aforesaid lawful acts to warn of and/or stop one or more of the Defendants' foregoing FCA violations, including but not limited to the investigation of, and complaints to the Defendants of, the foregoing fraudulent conduct and false claims, and the Protected Activities, the Relator was harassed, demoted, retaliated against, subjected to a hostile work environment, subjected to retaliatory acts which adversely affected the terms and conditions of her employment, and, in or about July, 2018, Hill-Rom wrongfully and constructively terminated the Relator's employment in retaliation, harassment and discrimination against the Relator for her Protected Activities, including whistleblower reports of, and complaints about, the foregoing fraudulent conduct and false claims, said retaliatory discharge from employment being in violation of 31 U.S.C. § 3730(h).

478.    As a direct and proximate result of the Defendants' foregoing wrongful harassment, discrimination, demotion, and constructive termination of Relator's employment in retaliation for the aforesaid whistleblowing Protected Activities with respect to the foregoing fraudulent conduct

of the Defendants, Relator has been injured, and is entitled to all relief necessary to make her whole, including, but not limited to, two (2) times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of Hill-Rom's constructive retaliatory discharge, including litigation costs and reasonable attorneys' fees.

## COUNT 6
## Wrongful Discharge In Violation of Public Policy

479.    Plaintiff/Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

480.    That the unjust, unlawful, wrongful constructive discharge and constructive termination of Plaintiff's employment with Hill-Rom in or about July, 2018, was the response of Hill-Rom, and its employees, agents and servants, to Plaintiff's refusal to commit, participate in, approve, ignore or consent to illegal or unlawful acts at the request of, promotion or encouragement of Hill-Rom and its employees, agents and servants, and said unlawful constructive discharge and constructive termination was in violation of the public policy of the State of South Carolina and the United States.

481.    Hill-Rom knew that Plaintiff refused Defendants' requests, promotion of, and/or encouragement to commit, participate in, approve, ignore or consent to illegal or unlawful acts which violated South Carolina criminal laws, including, but not limited to, S.C. Code §§ 47-7-60 and -70, 38-55-540, 16-17-410, and 38-55-170 and -540.

482.    Hill-Rom knew that Plaintiff refused Defendants' requests, promotion of, and/or encouragement to commit, participate in, approve, ignore or consent to illegal or unlawful acts which violated federal criminal laws, including but not limited to, 42 U.S.C. § 1320a-7b and 18 U.S.C. §§ 286, 287, 1001, 1035, 1347, 1349, which violated federal civil laws other than the FCA, including but not limited to, 42 U.S.C. §§ 1320a-7 and 1320a-7a, which violated the terms and

complaint 2019-10-30

conditions of one or more VA contracts and related Federal Acquisition Regulations and rules, and which violated the terms and conditions of the CIA.

483.     The aforesaid conduct of Hill-Rom, its employees, agents and servants, violated South Carolina public policies and United States public policies against retaliatory, wrongful constructive discharge or termination of employment and was, in fact, retaliatory and wrongful in nature.

484.     The aforesaid constructive discharge or constructive termination of Plaintiff's employment by Hill-Rom, and its employees, agents and servants, constitutes a violation of a clear mandate of public policy of the State of South Carolina to protect employees from wrongful discharge when said employees refuse to commit, participate in, approve, ignore or consent to illegal activities as requested, promoted or encouraged by the employer.

485.     The conduct of Hill-Rom, and its employees, agents and servants, was gross, reckless, willful, wanton and intentional.

486.     That as a direct and proximate result of the aforesaid conduct of Hill-Rom, by and through its employees, agents and servants, in wrongfully constructively discharging or terminating Plaintiff from her employment with Hill-Rom, in violation of the public policy of South Carolina and the United States, Plaintiff has been damaged, and is entitled to recover actual, compensatory, consequential, special and punitive damages, in such amount as a jury may award.

## **PRAYER FOR RELIEF**

487.     WHEREFORE, Relator/Plaintiff respectfully requests and demands that this Court enter judgment against Defendants, jointly and severally, for Counts 1 through 4, and enter judgment against the Defendant Hill-Rom for Counts  5 and 6, and that the Relator/Plaintiff and the United States be granted the demanded relief set forth below, including but not limited to:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and frauds alleged within this Complaint, as provided under the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

(b)     That civil penalties be imposed for each and every false claim that Defendants presented or caused to be presented to the United States and/or its agencies;

(c)     That pre-judgment and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator/Plaintiff necessarily incurred in bringing and pressing this case;

(d)     That the Relator/Plaintiff be awarded the maximum amount allowed pursuant to the False Claims Act;

(e)     For Counts 5 and 6, that the Relator/Plaintiff be granted all relief necessary to make her whole, including but not limited to:

    i.      Judgment in favor of the Relator/Plaintiff and against Defendant Hill-Rom for these causes of actions in an amount which is fair, just and reasonable, and for actual, compensatory, consequential, special, and punitive damages;

    ii.     Prejudgment interest, costs and attorneys' fees as may be allowed by law;

    iii.    Judgment in favor of the Relator/Plaintiff and against Defendant Hill-Rom with two times back pay and associated benefits Relator/Plaintiff would have earned, interest on back pay, reinstatement with appropriate seniority status, and all lost or diminished benefits to be determined by the trier of fact;

    iv.     Judgment in favor of the Relator/Plaintiff and against Defendant Hill-Rom for front pay and any other work benefits lost in an amount to be determined by the trier of fact;

    v.      Judgment in favor of the Relator/Plaintiff and against Defendant Hill-Rom in such an amount for punitive damages, pain and suffering, embarrassment, humiliation, shock and emotional distress in an amount to be determined by the trier of fact; and,

    vi.     Judgment in favor of the Relator/Plaintiff and against Defendant Hill-Rom, in such an amount of actual damages, compensatory damages, consequential damages, special damages, punitive damages, attorneys' fees, costs of this action and any other relief this Honorable Court deems allowable under law.

complaint 2019-10-30

(f)   That this Court award such other and further relief as it deems just, fair and proper under the circumstances.

**A JURY TRIAL IS DEMANDED.**

Respectfully submitted,

*/s/ Joseph P. Griffith, Jr.*
Joseph P. Griffith, Jr., Esquire
946 Johnnie Dodds Boulevard
Mt. Pleasant, South Carolina  29401
(843) 225-5563 (tel)
(843) 723-6686 (fax)
joegriffithjr@hotmail.com
joe@joegriffith.com
www.joegriffith.com

Attorney for the Plaintiffs/Relator

Charleston, S.C.
October 30, 2019

**<u>Exhibits to the Complaint:</u>**

1   10/1/2011 Corporate Integrity Agreement
2   5/15/2012 Hill-Rom Work Instruction re Clinitron Sales from Rental Fleet
3   6/23/2015 Redacted CMS Claim for Clinitron Bed for Patient WA
4   5/19/2015 Davidson Email re Clinitron Sales to Date
5   CGS Repair, Labor, Billing and Payment Policy
6   Washington State Dept. of Social and Health Services, Monthly DME Webinar and Q&A
7   4/15/2012 Hill-Rom Work Instructions re Billing for Repairs
8   Relator's 7/21/2014 notes
9   Relator's 7/22/2014 notes
10  2014 Hill-Rom repair spreadsheet
11  3/19/2015 Claim Form for Patient MD re Travel Expenses
12  HCPCS Level II Manual and condensed narratives
13  P500 Therapy Surface Mattress Brochure
14  FY2013 Hill-Rom Products Listing
15  Spreadsheet of Enrollment/Licensing Scheme Claims and Frauds
16  1/14/2012 Redacted CMS Claim for TotalCare Bed for Patient JM (service date)
17  10/5/2010 Email from Malcolm re UHC upcodes to E0304
18  6/20/2013 Hill-Rom Commission agreement with VGM

complaint 2019-10-30